IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DONQUENICK YVONNE JOPPY

     Plaintiff,

v.

HCA-HEALTHONE LLC, d/b/a THE MEDICAL CENTER OF AURORA, BONNIE ANDREWS
and KATIE WEIHE, INDIVIDUALLY

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

     Plaintiff, DonQuenick Yvonne Joppy ("Ms. Joppy" or "Plaintiff"), through her attorney, Jennifer Robinson of Robinson & Associates Law Office, LLC, hereby files her Complaint against Defendants HCA-Healthone d/b/a/ The Medical Center of Aurora ("TMCA"), Bonnie Andrews (Andrews") and Katie Weihe ("Weihe"). In support thereof Plaintiff states as follows:

### NATURE OF THE ACTION

     1.     During her employment with TMCA Ms. Joppy, a Black nurse, was subjected to verbal and nonverbal slights or microaggressions designed to marginalize, segregate and undermine her based on stereotypical and harmful views of Black professionals.

     2.     TMCA unlawfully denied Ms. Joppy training and transfer opportunities, refused to investigate her complaints of race discrimination, placed her on an unwarranted Performance Improvement Plan ("PIP"), isolated her from colleagues, then ultimately terminated her employment because of her race and because she engaged in protected activity.

     3.     In a final blow to Ms. Joppy, in an effort to have her professional nursing license

revoked and end her career, TMCA, Andrews and Weihe, in a "take no prisoners" approach, maliciously caused felony manslaughter charges to be brought against Ms. Joppy for the death of a patient known to have died from natural causes.

4.     On September 21, 2021, The State of Colorado, Attorney General moved to dismiss all charges against Ms. Joppy "in the interest of justice." The Order was granted by the District Court, Arapahoe County, Colorado on September 22, 2021.

5.     Ms. Joppy was harmed by TMCA's malicious conduct, racially hostile work environment and discriminatory and retaliatory practices. Ms. Joppy brings this action to hold TMCA, Andrews and Weihe accountable.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 and §1343 in that this action arises under federal law, specifically 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991. This Court has supplemental jurisdiction over Ms. Joppy's state-law claim under 28 U.S.C. § 1367 because the claim arises out of the same nucleus of operative facts.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), as the unlawful employment practices alleged herein were committed within this judicial district.

8.     There are no jurisdictional, administrative or other legal prerequisites to filing this action.

## PARTIES

9.     Ms. Joppy, a Black woman, is a registered nurse and former employee of TMCA. She is a citizen of the United States and a resident of the State of Colorado

10.     TMCA is a Colorado Corporation under the corporate umbrella of HCA-Health One LLC, with a principal address at 4900 S. Monaco St., Suite 380, Denver, CO. 80237.

11.     HCA-Health One LLC is one of the nation's leading providers of healthcare

services with 185 hospitals and approximately 2,000 ambulatory sites of care, including surgery centers, freestanding emergency rooms, urgent care centers and physician clinics in 20 states and the United Kingdom. HCA-Health One has more than 275,000 employees.

12.     Andrews was the Director of Patient Safety and Risk Management at TMCA and upon information and belief is a resident of the State of Colorado.

13.     Weihe is the Vice President of Human Resources at TMCA and upon information and belief is a resident of the State of Colorado.

## FACTUAL ALLEGATIONS

## MS. JOPPY'S WORK HISTORY AND PERFORMANCE AT TMCA

14.     TMCA hired Ms. Joppy on June 5, 2017, to work as a Registered Nurse in its Intensive Care Unit ("ICU"). Ms. Joppy is licensed by the Colorado Board of Nursing.

15.     TMCA terminated Ms. Joppy two years later on June 4, 2019.

16.     Ms. Joppy was qualified for her position.

17.     Throughout her employment, Ms. Joppy performed her duties in a satisfactory manner and received many accolades, awards and praise for her dedicated service and commitment to her patients.

18.     For example, in October, 2017, Ms. Joppy received an Excellence Award from the American Heart Association for her Heroic Life Saving Actions in performing CPR and saving a patient's life.

19.     In addition, Ms. Joppy is a three-time nominee of the prestigious Daisy Award.

20.     The Daisy Award is an international program that rewards and celebrates the extraordinary skill and compassionate care given by nurses. It was created to establish an award program that would recognize extraordinary nursing care.

21.     Ms. Joppy also received many excellent unsolicited reviews by several patients for being an extraordinary nurse while at TMCA.

22.     For example, one patient sent a written letter to TMCA after his stay in ICU describing Ms. Joppy as "absolutely amazing."

23.     These comments are the typical comments that Ms. Joppy received regarding her patient care while at TMCA.

24.     Ms. Joppy was also featured in a Colorado news story for her actions in going door-to-door to teach CPR awareness in underserved communities.

25.     During her two-year tenure at TMCA, Ms. Joppy received only one performance evaluation from her supervisor.

26.     For the performance review period beginning July 1, 2017 through June 30, 2018 Ms. Joppy received a favorable performance rating in the areas of integrity, compassion, accountability, respect and excellence.  Ms. Joppy's overall rating was "Meets Expectations."

27.     Her supervisor at the time, Paul Page ("Page"), commented, "[t]he consummate encourager. You are encouraging patients, families and co-workers.  Your integrity is noticed and your compassion is evident.  I look forward to seeing you grow here.  Thank you DQ."

## MS. JOPPY'S COMPLAINTS ABOUT DISCRIMINATION

28.     In spite of the positive performance review, patient care comments and other awards and accolades, Ms. Joppy's treatment by the overwhelmingly non-Black management in the ICU was racially biased and on many occasions the Charge Nurses would publicly and openly yell at Ms. Joppy undermining her in a humiliating and demeaning manner.  None of the non-Black nurses were treated in this manner.

29.     Charge nurses are responsible for supervising the staff nurses, making work assignments, shift scheduling, pod assignments, communicating with management and the overall

functioning of the ICU.

30.     Ms. Joppy was subjected to numerous microaggressions and acts of harassment on a daily basis at the hands of the Charge Nurses.  This included publicly screaming at Ms. Joppy, criticizing her for things that her non-Black co-workers were not criticized for and isolating her in an effort to force her out.

31.     Charge Nurse Lindsay Jordan ("Jordan") was particularly abusive towards Ms. Joppy and would constantly criticize Ms. Joppy's work, scream at her when Ms. Joppy attempted to ask questions or clarify issues and treat Ms. Joppy in a demeaning manner.

32.     In addition, patients entering the ICU were assigned to different pods to receive care.  Because these patients were in need of critical care, the nurse/patient ratio was intended to reflect the needs of the patient.  While some pods had ratios of one nurse to every two patients, Ms. Joppy was frequently left alone with no backup in pods with up to three critically ill patients.

33.     In March 2019 Ms. Joppy complained to her supervisor, Page, about her treatment by the Charge Nurses and that she did not feel safe with these assignments and complained that she was being treated differently than her non-Black co-workers and given assignments that she could not be successful at.

34.     Page indicated that he would take care of the situation but nothing was ever done.

35.     Other nurses worked as a team leaving Ms. Joppy alone, isolated and occupationally segregated.

36.     Ms. Joppy was embarrassed and humiliated and each incident contributed to the racially biased and hostile work environment she experienced.

37.     Ms. Joppy continued to experience isolation from her co-workers and management team.  She was frequently on the outside looking in.

38.     In addition, TMCA relies on negative stereotypes about Black employees' abilities

in making employment decisions.

39.    For example, in or around January, 2019, a new Charge Nurse, Michael Oleszczuk ("Oleszczuk"), began working in the ICU.

40.    On or about January 19, 2019, Oleszczuk sent an email to the ICU nurses about their interest in additional training for patient with heart problems.

41.    When Ms. Joppy expressed an interest in the training Olsezczuk denied the training for Ms. Joppy, questioning Ms. Joppy's critical thinking skills, telling her that heart patients require a "much deeper critical thinking and much better organizational skills."

42.    Olseszczuk's negative comments about Ms. Joppy's critical thinking and organizational skills represents the type of biased and stereotypical views about the abilities and potential of Black professionals like Ms. Joppy which has the effect of denying them advancement opportunities because of their race.

43.    Non-Black employees did not receive such criticisms.

44.    Oleszczuk continued to treat Ms. Joppy in a demeaning and demoralizing way expressing disdain for her based on racially stereotypical views of the abilities of Black professionals.

45.    On or around late February or early March 2019 Oleszczuk told Ms. Joppy that since she was good at cleaning she should "clean his house and clip his dog's toe nails."

46.    Ms. Joppy also complained to Page about Oleszczuk but nothing was done.

47.    On another occasion, a white patient's family accused Ms. Joppy of going into the patient's purse, stealing a credit card and buying a stethoscope. Rather than conduct an investigation and support Ms. Joppy, Human Resources made the decision to restrict her to working only one section of the ICU; she was not allowed to go into the locker room or main break room with other employees.  Then they thanked her for not making a "big fuss" over it.

## MS. JOPPY ATTEMPTS TO TRANSFER OUT OF THE ICU.

48.     In order to escape the abusive and discriminatory treatment she was being subjected to in the ICU, on or around February or March of 2019 Ms. Joppy applied for a transfer out of the ICU to the RN Critical Care Float Pool.

49.     The position was a Premium Pay position and would have given Ms. Joppy a pay increase.

50.     Employees under a Performance Improvement Plan ("PIP") are ineligible for transfer positions.

51.     The RN Critical Care Float Pool management reviewed Ms. Joppy's application and work history and selected her for an interview for the position on March 20, 2019, at 11:00 a.m.

52.     Ms. Joppy met all of the requirements to qualify for the position and she was not on a PIP.

53.     On the morning of the interview, Ms. Joppy was informed that the interview was cancelled because she was on a PIP in the ICU.

54.     Ms. Joppy was shocked.  Not only was she not on a PIP but her supervisor, Page, had not raised any concerns with her about her performance that warranted placing her on a PIP.

55.     Ms. Joppy immediately contacted Page about the PIP.  Page told Ms. Joppy that he was unaware of the PIP and that he would try to find out the details from higher management.

56.     TMCA's normal practice is for PIP decisions to be made by the employee's immediate supervisor.

57.     Under TMCA's practices Page, as Ms. Joppy's immediate supervisor, should have been aware of and involved in the PIP before the PIP was communicated to Ms. Joppy.

58.     In February and early March 2019 Ms. Joppy had previously complained to Page about the discriminatory treatment she was being subjected by the charge nurses on the floor

including Oleszczuk and Lindsay.

59. The PIP was retaliatory for Ms. Joppy's previous complaints about the charge nurses, including Oleszczuk and Lindsay.

60. On March 20, 2019 Ms. Joppy complained to Page again, stating, "Sir you said you were going to straighten it all out but you have not a clue how cruel your team is."

61. In March, 2019, Ms. Joppy also filed a complaint with Corporate Headquarters that she was being discriminated against because of race. Ms. Joppy further complained that she was being isolated and made to work in pods by herself with triple the patient care and she felt unsafe.

62. Ms. Joppy never received a response from Page, Corporate Headquarters or anyone else regarding her complaints.

## THE PERFORMANCE IMPROVEMENT PLAN

63. On March 25, 2019 Page and Interim Director, Breanne Burley ("Burley"), met with Ms. Joppy and presented her with a 60-day PIP.

64. The PIP was retaliatory and largely based upon unsubstantiated accusations against Ms. Joppy from the charge nurses that Ms. Joppy had previously complained about.

65. Among other things, the PIP demanded that Ms. Joppy "use proper body language and tone" and "remain respectful towards the charge nurses and any other employee within the hospital."

66. The PIP also demanded unattainable objectives for Ms. Joppy such as "no further patient or family complaints."

67. The PIP further falsely reprimanded Ms. Joppy (based on unsubstantiated complaints from the charge nurses) for "listening to music and dancing on the night of March 18th."

68. The PIP was the result of racially biased, stereotypical and harmful views of Black professionals and is an example of the type of microaggressions and acts of harassment Ms. Joppy

faced on a daily basis.

69.  The PIP also indicated that TMCA management and Ms. Joppy would "reconvene weekly to review your progress toward these objectives."

70.  The PIP was a sham.  Even though it required weekly meetings with Ms. Joppy to review her progress, no such meetings ever occurred at any point during the 60-day PIP.

71.  After the March, 2019, PIP, Page no longer supervised Ms. Joppy and Kathryn Schoolcraft ("Schoolcraft") began supervising Ms. Joppy.

72.  In or around April or early May 2019, Ms. Joppy also complained to Schoolcraft about the discriminatory and abusive treatment she was being subjected to in the ICU.

**PATIENT S.B.'S DEATH WHILE UNDER TMCA'S CARE**

73.  In the very early morning hours of May 24, 2019, a 94-year-old critically ill patient, "S.B.", arrived at TMCA emergency room with septic shock with multiorgan failure evidence, multiple co-morbidities and was admitted to TMCA by Dr. Ahmad Alsaleem.  S.B. was unconscious and unresponsive.

74.  S.B.'s admission's diagnoses showed:

- Pneumonitis due to inhalation of food and vomit [meaning he had previously aspirated food and his own vomit into is lungs].

- Encounter for palliative care,

- Pressure ulcer of left hip, stage 3 pressure ulcer of right hip, severe, open, yellow and sloughing skin,

- Stage 3 sepsis, unspecified organism metabolic encephalopathy,

- Acute respiratory failure unsp w/ hypoxia or hypercapnia,

- Severe Sepsis with septic shock,

- Acute infarction of large intestine, extent unspecified acidosis,

- Acute kidney failure, unspecified,

- vascular disorder of intestine, unspecified

- non-PRS chronic ulcer of right heel and midfoot,

- UNSP severe hyperkalemia

- Hypokalemia

- Alcohol abuse, uncomplicated

- chronic obstructive pulmonary disease

- unspecified fecal impaction

- other specified disease of intestine

- Bradycardia, unspecified

- Age-related physical disability,

- contusion of other part of head, initial encounter exposure to other specified factors initial encounter,

- fall from bed, initial encounter, activity, other specified other places as the place of occurrence of the external cause other external cause status,

- Prsnl history of TIA and cereb infrc w/p resid deficits

- Personal history of nicotine dependence,

- Patient was kept in ER due to no ICU bed available

- Other patient in ICU was transitioned to make room for S.B. who was transferred to ICU in a **<u>non-survivable</u>** multi-Organ failure.

75.     S.B. was a Do Not Resuscitate ("DNR") but S.B.'s family initially agreed to intubation and medications and the patient was placed on mechanical ventilation while in the ER.

76.     Dr. Alsaleem advised S.B.'s family that this was a non-survival event and patient's family decided not to continue with intervention and a decision was made to move the patient to ICU for palliative care.

77.     In the early morning hours of May 24, 2019, Ms. Joppy, who was working her overnight shift in the ICU as a critical care nurse, was directed to make room in the ICU for a critically ill patient, S.B., who was dying in the Emergency Room.

78.     S.B. had never been under Ms. Joppy's care and Ms. Joppy had never met S.B. prior to his transfer to ICU.

79.     At the time, TMCA was under staffed with an overflowing critically ill patient population and Ms. Joppy was caring for several critically ill patients in the ICU alone.

80.     As directed, at or around 5:06 a.m., Ms. Joppy went down to the ER to transition S.B. to ICU for palliative care.  S.B. was unconscious and unresponsive.

81.     Ms. Joppy's shift ended at 7:00 a.m.  From the time of the transfer through the end of her shift, Ms. Joppy provided compassionate and extraordinary care to S.B. which was appropriate and well within the standard of care expected of an ICU critical care nurse caring for a critically ill and terminal patient like S.B.

82.     At 7:00 a.m. there was a shift change when Ms. Joppy's shift ended and nurse Karen Welter's ("Welter") shift began.

83.     Jordan was the Charge Nurse on the day shift and her shift also began at 7:00 a.m.

84.     As was common practice at TMCA, when Ms. Joppy's shift ended she did not clock out immediately but stayed to assist Welter in the understaffed ICU in caring for several critically ill patients.

85.     Welter confirmed that it was common practice for a nightshift nurse to stay over and help and that it "does occur quite a bit."

86. While in the ICU S.B. was under the care of Dr. Joseph Forrester ("Forrester").

87. At 7:15 a.m. Welter notified Forrester that S.B.'s family wanted to withdraw all care and reiterated S.B.'s DNR status.

88. Ms. Joppy also contacted Forrester and Jordan to advise them of the wishes of S.B.'s family.

89. Jordan told Ms. Joppy that she (Ms. Joppy) should handle it.

90. At 7:55 a.m. Forrester met with Welter and S.B.'s family and confirmed the family's wishes to withdraw all care and no further palliative or hospice care. The family also informed Forrester that funeral arrangements had already been made.

91. At or around 8:00 a.m. Forrester gave verbal orders to Welter for "versed and morphine" and to assume "end of life" measures and to "stop all pressors."

92. It was Welter's responsibility to document Forrester's verbal orders into written format in S.B.'s chart.

93. Welter documented Forrester's verbal orders into written format in S.B.'s chart at 8:00 a.m.

94. Welter did not contact or notify a respiratory therapist after receiving Forrester's Order.

95. Instead, Welter communicated and delegated Forrester's orders to Ms. Joppy.

96. Ms. Joppy then contacted TMCA respiratory therapist, Darryl Shafer ("Shafer"), by phone, to implement Forrester's order to assume end of life measures and to withdraw S.B. from the ventilator.

97. In Shafer's experience "you don't leave people on vent when doing end of life care."

98. Shafer advised Ms. Joppy that he was busy and would give Ms. Joppy instructions

12

over the phone on how to turn the ventilator off and would come to S.B.'s room when he could.

99.     Nothing in TMCA's policy prohibited Shafer from delegating and instructing Ms. Joppy on the procedures to turn off the ventilator.

100.    Nothing in TMCA's policy prohibited Ms. Joppy from complying with Shafer's instructions.

101.    As Shafer provided Ms. Joppy with instructions on how to turn the ventilator off, Ms. Joppy followed Shafer's instructions and turned off S.B.'s ventilator.

102.    Shortly thereafter, Shafer arrived at S.B.'s room, had a brief conversation with Ms. Joppy then, proceeded to disconnect S.B. from the ventilator.

103.    When Safter arrived at S.B.'s room, S.B. still had a heartbeat.

104.    S.B. had been intubated while in the E.R.

105.    Respiratory therapist have responsibility for removing intubation.

106.    Rather than remove the tube from S.B., Shafer indicated that the practice was to leave the tube in.

107.    Shafer failed to remove the tube from S.B. and left S.B.'s room.

108.    Ms. Joppy remained in S.B.'s room to assist and comfort the family during the end of life transition.

109.    At 8:28 a.m. Welter cuffed the ET tube and S.B.'s airway was discontinued.

110.    Forrester pronounced S.B.'s death at 8:28 a.m. on the morning of May 24, 2019.

111.    Thereafter, Welter signed the pronouncement of death indicating that patient was "without apical pulse rate, blood pressure, respiration and reflexes."

112.    Forrester signed S.B.'s Certificate of Death indicating that S.B. died of natural causes.

113.    The cause of death is listed on the Certificate of Death as "Septic shock due to

pneumonia and bowel infarction; acute renal failure."

114.    Coroner, Kelly, Lear confirmed S.B.s death from natural causes.

115.    When S.B.'s family member was later asked about the care Ms. Joppy provided during the end of life transition the family member stated, "Oh, I see, the lady was black, she was very, very helpful, and none of the other nurses, and I'm battling cancer okay. I was getting weak, I told them I needed something to eat to please bring me something, and she brought me a sandwich and coffee I think it was and it helped me. The main person I was talking with was this one lady and she was black, very nice. The other ladies were coming in on his vitals and that's basically it, I can recall."

### THE BIASED INVESTIGATION AND MS. JOPPY'S TERMINATION

116.    Jordan, who was present at work during S.B.'s end of care on May 24, 2019, indicated that she did not "foresee this is an issue she needed to be present for" because it was "not something CNC usually does."

117.    After Ms. Joppy left work on May 24, 2019, Jordan voiced concerns about the way Welter handled the process and told Welter that she should have been titrating drips and Welter confessed that she did not know the difference between end of life care and hospice.

118.    Welter also falsely told Jordan that she (Welter) did not know that Ms. Joppy had turned off the ventilator and that Forrester had not ordered end of life measures.

119.    Welter's notes indicate that Forrester had given end of life measures for S.B.

120.    Jordan asked Welter why the respiratory therapist wasn't there or communicated with regarding the process to turn off the ventilator.

121.    Jordan told Welter that she should have been focused on the patient and this "shouldn't have been a complicated process."

122.    Welter then told Jordan that Ms. Joppy was in the room helping Welter with S.B.

14

123.    Jordan was one of the nurses who previously showed open animosity and hatred towards Ms. Joppy and had previously treated her more harshly than nurses outside Ms. Joppy's protected class.

124.    Ms. Joppy had previously reported to Page in February and March 2019 that she felt harassed and bullied by Jordan and to Schoolcraft in or around April or May, 2019.

125.    That same morning Jordan reported to Schoolcraft that Ms. Joppy (and only Ms. Joppy) had acted inappropriately with regard to S.B.'s end of life care.

126.    Based on Jordan's allegations against Ms. Joppy TMCA began an investigation into Ms. Joppy's actions.

127.    On May 28, 2019, Schoolcraft and Burley spoke with Ms. Joppy about the situation with S.B. and about the confusion on whether there were end of life orders for S.B.

128.    S.B.'s chart contained detailed entries by Forrester, Welter and Ms. Joppy showing that end of life orders had been placed by Forrester and initially written in the chart by Welter.

129.    Ms. Joppy told Schoolcraft about her concerns about her treatment by the charge nurses, including Jordan, and Schoolcraft told Ms. Joppy that there were some "cultural issues" within the department.

130.    The use of the term "cultural issues" is a safe and less inflammatory term for "racial issues."

131.    Later that afternoon Burley called Ms. Joppy and told her that she was suspended until further notice, pending the investigation.

132.    No other employees outside Ms. Joppy's protected class were suspended as a result of the end of life care S.B. received.

133.    On May 31, 2019, Ms. Joppy was interviewed by Schoolcraft and April Ulrich ("Ulrich") who worked in the human resources department.

134. TMCA's management and Jordan's actions clearly indicate that they viewed Ms. Joppy's conduct through the lens of harmful racial stereotypes while employees outside her protected class, including Welter, Shafer and Jordan, were given a free pass for their conduct.

135. Based on the biased and ineffective investigation, TMCA terminated Ms. Joppy's employment on June 4, 2019.

136. No other employees outside Ms. Joppy's protected class were terminated as a result of the end of life care S.B. received.

137. The reasons TMCA articulated for the termination are false.

138. TMCA claimed that it was "standard practice for nurses to ensure orders are being followed as received and entered" and "no order was placed into the chart until after the patient had deceased."

139. S.B.'s chart clearly indicates that Welter entered orders in S.B.'s chart for end of life care prior to S.B.'s death.

140. TMCA also claimed that Ms. Joppy did not wait for the respiratory therapist to arrive to assist with ventilator discontinuation.

141. The respiratory therapist, Shafer, assisted Ms. Joppy with turning off the ventilator.

142. Shaffer disconnected S.B. from the ventilator.

143. Shafer made the decision to leave the tube in S.B.

144. The termination documentation also stated as grounds that Ms. Joppy was "staying after her assigned shift continuing to provide care to the patient unnecessarily."

145. On the morning of May 24, 2019 TMCA was understaffed and when the shift change occurred in the ICU, Welter was assisting other critical care patients and it was necessary for Ms. Joppy to remain to assist Welter with end of life care for S.B.

146. It was the customary and common practice at TMCA for nurses to stay past their

assigned shift to assist with shift transition and patient care.

147.　Nurses staying past their assigned shift to assist with patient care is not grounds for discipline or termination at TMCA.

148.　After Ms. Joppy was terminated her position was not eliminated.

149.　Ms. Joppy was qualified for the position she occupied.

150.　TMCA unlawfully marginalized, undermined and ultimately terminated Ms. Joppy because of her race and her protected activity.

151.　TMCA's stated reasons for the termination were pretextual.

## THE GROUNDLESS CRIMINAL CHARGES AGAINST MS. JOPPY

152.　On May 31, 2019, Andrews reported Ms. Joppy to the Office of the Attorney General, State of Colorado ("AG's Office"), alleging criminal neglect by Ms. Joppy for her actions regarding S.B.

153.　TMCA also reported Ms. Joppy to the Colorado Nursing Board.

154.　At the time Andrews made the report TMCA had not completed its internal investigation regarding S.B.'s end of life care.

155.　Andrews also falsely reported to the AG's office that Ms. Joppy was involved in a Medicaid Fraud investigation.

156.　On September 18, 2019, AG Investigator, Steve Flageolle ("Flageolle") received and email from Weihe detailing the internal investigation TMCA conducted against Ms. Joppy related to S.B. and including additional documents on the in-house investigation.

157.　Flogeolle conducted several interviews regarding the circumstances surrounding S.B.'s death.

158.　Flageolle, Andrews and Weihe also had access to the Certificate of Death of patient S.B. which indicated the S.B. died from natural causes.

159.     On November 13, 2020, Ms. Joppy was served with a summons and complaint charging her with Manslaughter, Negligent Death of an At-Risk Person and Neglect of an At-Risk Person.

160.     On January 14, 2021, Flageolle received an email from Weihe.

161.     Weihe attached to the email a post from Ms. Joppy's facebook page and a photo of Ms. Joppy holding up a handwritten sign while walking outside TMCA but not on TMCA property.

162.     The handwritten sign Ms. Joppy was holding said "black nurses lives matter."

163.     Weihe's email to the AG's office further stated:

> Long time, no speak.  My name is Katie Weihe and I'm the HRVP for the Medical Center of Aurora.  We were partnering on a case regarding Donquenick (DQ) Joppy.  I want you to know that she's been seen twice in the past two weeks walking along our hospital sidewalk.  She's been holding a sign that says "black nurses lives matter".  She's on public domain and has not walked on our property, but she is close.  She is also posting things on social media (please see attached).  I thought it was important to alert you to this activity.  If you feel I should report this to others please let me know.  Thanks, Katie.

164.     On February 17, 2021, Flageolle, along with Senior Assistant Attorney General Daniel Edwards and Victim/Witness Specialist R. Villalobos conducted a follow up phone interview with S.B's family member who was present when S.B. died on May 24, 2019.

165.     Edwards told the family member that Ms. Joppy had been charged with negligence resulting in death, which is a felony and caretaker neglect on an at-risk person.

166.     Edwards also falsely told the family member that Ms. Joppy's license had been suspended by the nursing board and Ms. Joppy reported to the hospital that "they just let him die."

167.     On or about September 2, 2021, TMCA was served with a subpoena duces tecum by Ms. Joppy requesting the production of various documents related to S.B. and the criminal complaint against her.

168.     TMCA was commanded to appear in the District Court of Arapahoe County Justice

Center on September 13, 2021, and produce the requested documents.

169.    TMCA failed to appear pursuant to the subpoena and was in Contempt of Court.

170.    On September 14, 2021, Joppy filed a Contempt Citation and Order to Show Cause due to TMCA'S violation of a validly served subpoena.  A hearing was set for October 20, 2021.

171.    On September 21, 2021, the State of Colorado, by and through the Attorney General, moved to dismiss all charges against Ms. Joppy "in the interest of justice."

172.    On September 22, 2021, the Court granted the motion and entered an Order dismissing all charges against Ms. Joppy.

173.    TMCA, Andrews and Weihe knowingly and willfully contributed to the bringing of a cause of action against Ms. Joppy that they knew to be meritless and without factual foundation.

174.    As a result of TMCA's Andrews' and Weihe's unlawful conduct, Ms. Joppy has lost wages, promotional opportunities and other benefits and suffered irreparable harm to her reputation, career, emotional distress and other nonpecuniary losses.  TMCA's Andrews' and Weihe's actions have caused and continue to cause Ms. Joppy substantial losses in earnings and other employment benefits, in an amount to be determined by a jury.

**<u>FIRST CLAIM FOR RELIEF</u>**
**(42 USC § 1981:  Race Discrimination against TMCA)**

175.    Ms. Joppy hereby incorporates by reference Paragraphs 1 through 174 above as if fully alleged herein

176.    Defendant TMCA knowingly and willfully engaged in illegal employment practices and policies that discriminated against Ms. Joppy because of her race. Such illegal employment practices and polices included, but were not limited to, infringing upon Ms. Joppy's enjoyment of all benefits, privileges, terms and conditions of her contractual relationship with Defendant TMCA because of her race including but not limited to, (1) discharging her from her employment, (2)

placing her on a PIP, (3) denying her request for a transfer, (4) reporting her to the Attorney General's Order for criminal charges; and (5) reporting her to the Colorado Nursing Board. Such actions violate 42 U.S.C. § 1981.

177. Defendant TMCA's actions towards Ms. Joppy were intentional and exercised with malice and reckless indifference to Ms. Joppy's federally-protected rights.

178. As a proximate result of Defendant TMCA's actions, Ms. Joppy has suffered and continues to suffer a loss of wages and benefits, a loss of job, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential and punitive damages.

<u>SECOND CLAIM FOR RELIEF</u>
**(42 USC § 1981: Retaliation against TMCA)**

179. Ms. Joppy hereby incorporates Paragraph 1 through 178 of this Complaint as though fully alleged herein.

180. Defendant TMCA knowingly and willfully engaged in illegal employment practices and policies that have retaliated against Ms. Joppy because of her opposition to unlawful employment practices.

181. Such illegal employment practices and polices included, but were not limited to, (1) discharging her from her employment, (2) placing her on a PIP, (3) denying her request for a transfer; (4) reporting her to the Attorney General's Order for criminal charges; and (5) reporting her to the Colorado Nursing Board.

182. These adverse employment actions would dissuade a reasonable employee from complaining about discriminatory conduct.

183. The illegal retaliation to which Ms. Joppy was subjected infringed upon her ability to make, perform, modify and/or terminate her employment relationship or contract with Defendant TMCA and infringed upon her enjoyment of all benefits, terms and conditions of their employment

relationship. Such actions violated 42 U.S.C. § 1981.

184.    Defendant TMCA's actions towards Ms. Joppy were exercised with malice and reckless indifference to Ms. Joppy's federally-protected rights.

185.    As a proximate result of Defendant TMCA's action, Ms. Joppy has suffered and continues to suffer a loss of wages and benefits, a loss of job, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential and punitive damages.

**THIRD CLAIM FOR RELIEF**
**(Malicious Prosecution:  against TMCA, Andrews and Weihe)**

186.    Ms. Joppy hereby incorporates Paragraph 1 through 185 of this Complaint as though fully alleged herein.

187.    Defendants TMCA, Andrews and Weihe willfully and knowingly contributed to the bringing of a cause of action against Ms. Joppy for Manslaughter, Negligent Death of At-Risk Person and Neglect of an At-Risk Person.

188.    This action ended in Ms. Joppy's favor.

189.    There was no probable cause for bringing the action against Ms. Joppy.

190.    TMCA, Andrews and Weihe acted with malice causing damages to Ms. Joppy.

191.    As a proximate result of Defendants actions, Ms. Joppy has suffered and continues to suffer a loss of wages and benefits, a loss of job, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential and punitive damages.

WHEREFORE, Ms. Joppy respectfully requests the Court enter an order awarding judgment against Defendants and grant her:

1.    Economic damages, including but not limited to back pay and benefits.

2.    Reinstatement, or in the alternative, front pay and benefits,

3.    Compensatory damages, including but not limited to, those for emotional distress,

inconvenience, mental anguish, and loss of enjoyment of life in an amount to be proven at trial;

4.    Pre-and post-judgment interest at the highest lawful rate;

5.    Attorney's fees, expert fees and costs as allowed by law;

6.    Tax Off-Set;

7.    Punitive damages as allowed by law;

8.    Injunctive and declaratory relief or other appropriate equitable relief.

9.    Any further relief this Court deems just and reasonable.

### JURY TRIAL DEMAND

Ms. Joppy hereby requests a jury trial on all questions of fact raised by this

Complaint.

Dated this 22nd day of April 2022.


ROBINSON & ASSOCIATES LAW OFFICE, LLC
 s/Jennifer Robinson
Jennifer Robinson
Robinson & Associates Law Office, LLC
7900 E. Union Avenue, Suite 1100
Denver, CO 80237
(303) 872-3063
Email: jrobinson@raemployment.com

ATTORNEY FOR PLAINTIFF

Copy Sent to Plaintiff: