IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-CV-00986-CNS-STV

DONQUENICK YVONNE JOPPY,

      Plaintiff,

v.

HCA-HEALTHONE, LLC d/b/a THE MEDICAL CENTER OF AURORA,

      Defendant.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANT'S POST-TRIAL MOTION [ECF 402].**

_____

## I.    INTRODUCTION.

After a seven-day trial a unanimous jury returned a verdict in Plaintiff's favor on her race discrimination and retaliation claims awarding $5 million in compensatory damages and $15 million in punitive damages, reflecting the severe harm Plaintiff suffered and the reckless indifference with which Defendant treated her. The record amply supports the jury's finding that Plaintiff's termination would not have occurred but for her race and protected activity.  Defendant now wants to undo that verdict seeking a new trial or remittitur by questioning the fairness of the trial and the jury's verdict as excessive. However, the Court itself recognized the fairness of these proceedings and the care and thoughtfulness in which the jury made its decision. Before bringing the jury in on the final day of trial, the Court observed:

> [T]his was an excellent trial. What we know is the jury hasn't reached a rushed decision, so they've given it plenty of thought and thought overnight, thought over the weekend. So I am confident they have done their job.

(ECF No. 392,1352:3-12). This contemporaneous statement underscores that the jury's verdict was the product of careful, conscientious deliberations following a fair trial. That verdict is entitled to the highest deference.

## II.    RULE 50 ARGUMENTS.

A.    Rule 50 Legal Standard.

Judgment as a matter of law is cautiously and sparingly granted and "granted only when courts are certain that the evidence 'conclusively favors one party such that reasonable [people] could not arrive at a contrary verdict."  C*apture Eleven Grp. v. Otter Prods., LLC*, 777 F.Supp. 3d 1239, 1243 (D. Colo. 2025).(Sweeney, J.). Fed.R.Civ.P.

50(a)(2) requires a party to make a motion at any time before the case is submitted to the jury and to "specify the judgment sought and the law and facts that entitle [it] to the judgment." This requirement "protect[s] the Seventh Amendment right to trial by jury." *Marshall v. Columbia Lee Reg'l Hosp.*, 474 F.3d 733, 39 (10th Cir. 2007). When ruling on a renewed motion under Rule 50(b), the Court must first "assure itself the subject of Plaintiff's post-verdict Rule 50(b) motion is the same as its pre-verdict Rule 50(a) motion." C*apture Eleven Grp.* at 1244. In reviewing a Rule 50 motion, courts draw all reasonable inferences in favor of the nonmoving party and do not make credibility determinations, weigh the evidence, or challenge the factual conclusion of the jury. *Capture Eleven Grp*. at 1243.

B.    Substantial Evidence Supports the Jury's Verdict on Race Discrimination.[1]

Defendant moved at trial for judgment as a matter of law on Plaintiff's race discrimination claim, arguing that there was no evidence that Burley was a "mean girl," had any racial motive or prejudice and "[t]here is no pretext evidence.  There is no comparator evidence."  (ECF 390, 1236:6-21). The Court denied the motion explaining that while Burley was not one of the mean girls and there's no evidence of any outwardly prejudicial motive, there is pretext in this case from which a jury could infer that the decision was motivated by discrimination. (ECF 390, 1241:15-1242:5).  When viewed in the light most favorable to Plaintiff, the trial record provided multiple, independent bases from which the jury could find pretext and, in turn, infer race discrimination.

---

[1] Because of page limitations, the evidence summarized here is not exhaustive. Additional testimony and exhibits in the trial record further support the jury's verdict.

For example, Burley admitted she terminated Plaintiff "in part" for violating a ventilator policy written for respiratory therapists (ECF 388, 798:7–19), not for ICU nurses. She conceded the policy does not speak to what ICU nurses should or should not do (ECF 388, 807:8–808:2) and does not prohibit a nurse from receiving support from a respiratory therapist. (ECF 388, 808:3–7). She further admitted she did not rely on any nursing or ICU-specific policy in terminating Ms. Joppy.  (ECF 388, 808:8–10). A jury could infer from this evidence that violating the ventilator policy wasn't the real reason for the termination because it did not apply to Ms. Joppy's conduct and Burley could not identify any ICU policies that she violated.

The termination paperwork also falsely stated that Plaintiff acted "without an order present" (ECF 388, 821:3–17), when in fact Dr. Forrester had ordered Mr. Brown's end of life care. (ECF 388, 824:18–21). Burley's failure to accurately acknowledge Dr. Forrester's order could have led the jury to conclude that Burley was attempting to exaggerate and falsify what happened to support the harshest sanction of termination, making it appear that Ms. Joppy was acting on her own and independently made the decision to remove ventilator support from a dying patient.  Burley later advanced a new theory that a nurse must personally hear the physician's order before following it. (ECF 388, 824:1–7). Burley admitted she had never previously disciplined anyone for following a verbal order (ECF 388, 826:22–827:1).

Burley also conceded the language in the termination letter was "not 100 percent clinically accurate" (ECF 389, 858:22–859:4), a misstatement that exaggerated Plaintiff's conduct and the impact on the patient. A jury could reasonably view these inconsistencies

and inaccuracies as evidence of pretext. "Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Stroup v. United Airlines, Inc.*,26 F.4th 1147, 1159 (10th Cir 2022).

Other irregularities were also present. Burley never interviewed Plaintiff before terminating her. (ECF 388, 823:3–8). She failed to ensure PIP follow-up meetings occurred, admitting she "should have kept [her] eye on it." (ECF 389, 860:6–18). Plaintiff complained directly to Burley about mistreatment and culture in the department (ECF 389, 861:22–862:12). Burley admitted such complaints should be investigated (ECF 389, 862:9–12), but there was no formal investigation. (ECF 389, 862:23–863:1). Additionally, Dr. Forrester was not contacted or interviewed about the incident. (ECF 387, 335:3-8). Further, Burley found that Welter, who is white, failed to timely enter the physician's orders. (ECF 388, 812:3–5). Yet Welter received only "conversations," not discipline. (ECF 388, 812:3–15). At the same time, Burley listed the missing orders as a reason for Plaintiff's termination (ECF 388, 817:6–14) and blamed Plaintiff for Welter's inability to care for her patients. (ECF 388, 817:22–819:14). Burley admitted that only Plaintiff was investigated. (ECF 388, 811:12–21). Shafer, who gave the ventilator instructions, was not investigated nor terminated, yet Joppy who followed them. was investigated and terminated. The jury could reasonably find that Defendant's decision singling out Plaintiff for investigation is evidence of pretext. An employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the Defendant's explanation unworthy of credence and permits an inference of discrimination. *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 829 (5th Cir 2022).

Burley also, concurrently with the termination, submitted input on an Occurrence Report to the Colorado Department of Health and Environment that inaccurately suggested Plaintiff deprived a patient of air (ECF 389, 867:4–13; 869:1–15), omitted that Plaintiff was acting under a physician's order (ECF 389, 867:18–21), and falsely stated there were no witnesses (ECF 389, 868:9–15).  The report also included a section that stated that Ms. Joppy had been terminated. (ECF 389, 870:14-871:1). However, the email attaching the report was dated June 3 and Ms. Joppy wasn't terminated until June 4, 2019. (ECF 389, 872:7-10; 388, 618:16-17). This discrepancy strongly supports an inference of pretext: the termination decision had been made and reported before any final review or meeting with Ms. Joppy, demonstrating that Defendant's stated reasons were merely a post hoc justification for a decision that was already finalized. Taken together, these misrepresentations reinforce the jury's finding of pretext.

Burley was also involved in Plaintiff's Performance Improvement Plan, but admitted she failed to monitor required meetings. (ECF 389, 860:6–18). She knew Plaintiff sought to transfer and was raising concerns about her treatment, yet did not support the transfer or involve Human Resources in investigating complaints. (ECF 389, 861:22–863:1). This conduct gave the jury further basis to doubt Burley's neutrality.  The termination rested solely on her unfettered discretion, untethered to objective standards.

Finally, Defendant admitted it was trained to recognize signs and red flags of discrimination and retaliation. (ECF 386, 208:10-214:11). It further acknowledged that several such indicators were present with respect to Plaintiff. The jury was entitled to consider those cumulative warning signs as circumstantial evidence and to infer

discrimination and retaliation when the number and pattern of red flags made that conclusion more probable than not.

Defendant's counter arguments do not justify judgment as a matter of law. Neither direct evidence nor comparator evidence are required to prove race discrimination. Moreover, the jury instruction did not even identify comparator evidence as an indicator of pretext. Defendant's argument that Burley honestly believed her reasons fares no better. The jury was not required to accept Burley's self-serving statement. As this Court recognized in *Capture Eleven Grp.*, "[a]fter considering this testimony and the trial record in its totality the Court is unpersuaded that the evidence 'points but one way' [ ] and 'is susceptible to no reasonable inferences which may support'" the non-moving party's position. *Capture Eleven Grp.* at 1246. Here, the trial record amply supports the verdict.

C.     Rule 50(b) Relief on Retaliation was Waived and there is Evidence of Pretext.

In its Rule 50(a) motion Defendant's only mention of retaliation was a passing acknowledgment of Plaintiff's May 29 complaint, which Judge Sweeney correctly recognized was not a Rule 50(a) challenge to retaliation because there was "no fundamental argument" on the retaliation claim and Defendant's motion "focused on discrimination." (ECF 390, 1239:7-12). Thus, Defendant waived Rule 50(b) relief. Regardless, the same evidence of pretext that supports discrimination, as set forth above, equally supports retaliation because the same pretextual explanation concealed both discrimination and retaliation. Moreover, the Tenth Circuit has long recognized that very close temporal proximity is enough to establish retaliation. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("we have held that a one and one-half month

period between protected activity and adverse action may, by itself, establish causation"). The Court already ruled at summary judgment that the close proximity here was sufficient: "With respect to the retaliation claim separately, the timing can support an inference of pretext, because it was five days before she was terminated." (ECF 309, 91:12-14).

D.    Defendant Partially Waived Rule 50(b) Relief on the Punitive Damages Claim, and in Any Event, it Fails on the Merits.

At the close of Plaintiff's case, Defendant's only reference to punitive damages in its Rule 50(a) motion was the assertion that Plaintiff had not shown the hospital "flagrantly disregarded the law." (ECF 390, 1237:14-1238:6). That single statement both misstated the legal standard and failed to preserve any of the detailed arguments Defendant now advances in its Rule 50(b) brief. Any challenge based on alleged absence of mental state evidence, application of *Kolstad*'s good-faith safe harbor, or purported adequacy of Defendant's investigation was therefore waived. See *Marshall* at 738–39. Even if considered, those arguments fail as explained below.

The jury was instructed that punitive damages could be awarded if the jury found:

> Defendant engaged in discrimination or retaliation with malice or with reckless indifference to the right of Plaintiff Joppy to be free from such intentional discrimination or retaliation. In order to find Defendant liable for punitive damages, you must find that Defendant discriminated or retaliated in the face of a perceived risk that its actions would violate federal law.

(ECF 377, 26). *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617 (1993) ("definition of "willful" -- that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. . . "); *Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 532 (10th Cir. 2000) ("jury was also entitled to infer from [Defendant's] pretextual explanations for its actions that it knew its conduct was unlawful.")

Here, Burley admitted she was trained annually on the hospital's nondiscrimination obligations. (ECF 389, 879:11-880: 8). Moreover, Defendant reinforced that Burley knew her actions could violate federal law "including policies and programs designed to prevent unlawful discrimination which were presented to all employees upon hire and annually, as well as through handbooks, policies, annual trainings and leadership trainings.") (ECF 402, 10). As manager, Burley was a decisionmaker charged with applying those rules.

As detailed in the preceding section, the jury heard extensive evidence that Defendant's stated reasons for Plaintiff's termination were false, contradictory, selectively enforced, and riddled with procedural irregularities. The same body of evidence that allowed the jury to find Defendant's reasons pretextual also permitted it to find that Defendant acted with reckless disregard of Plaintiff's federally protected rights. Where an employer's decision to terminate an employee rests on false, implausible, shifting, and selectively applied reasons—despite the decisionmaker's training and knowledge that federal law prohibits race discrimination and retaliation—that conduct reflects utter disregard for the employee's rights, is reckless and malicious, and fully supports the jury's punitive damages award. *Deters v. Equifax*, 202 F.3d 1262, 1271 (10th Cir. 2000).

Even more telling, the head of human resources, Katie Weihe ("Weihe"), admitted it would be "reckless" not to investigate a discrimination complaint and such complaints are a "10 out of 10" in importance (ECF 386, 213:22-214:14). Yet, the jury heard evidence that Plaintiff's complaint was not investigated. (ECF 389, 971: 16–20). The refusal to investigate followed within days by termination, supports a finding that Defendant recklessly disregarded Plaintiff's rights when it decided to terminate her.

The jury also heard evidence of malice beyond reckless indifference. More than a year after Plaintiff's termination, Weihe claimed that Plaintiff was "termed because she turned off a ventilator, not RT-- respiratory therapist -- her, and a patient basically drowned in front of his niece, a horrifying situation." (ECF 386, 258: 13-19). That account was false and contradicted by medical records and witness testimony that when the ventilator was turned off "there was no reaction. The patient never reacted to anything. He had no signs or symptoms of distress, no signs or symptoms of pain." (ECF 389, 963: 1-17). The jury could reasonably view such an inflammatory and false accusation as evidence of malice. Defendant did not simply disregard Plaintiff's rights, but affirmatively concealed its unlawful termination decision with fabricated justifications.

This is not a case of rogue employees acting contrary to policy. The very managers entrusted with enforcing compliance — Burley and Weihe — chose to terminate Plaintiff despite clear obligations under federal law.  (ECF 386, 247: 9-18). In addition, the jury could and did reject Defendant's argument that it acted in "good faith."  As shown above the jury had more than enough basis to conclude that Defendant acted with malice or reckless indifference.

## III.    RULE 59 - REMITTITUR ARGUMENTS.

A.    Remittitur - Legal Standard.

"Trial by jury is the bedrock right of our legal system."  *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013). The Seventh Amendment prohibits a judge from simply substituting her view of the evidence for the jury's. *Id.* at 1061. The jury's damages award is "inviolate" unless it is so excessive as to "shock the judicial

conscience" and raise an "irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Id.* at 1061–62. "A district court abuses its discretion in ordering a remittitur when the size of the verdict turns upon conflicting evidence and the credibility of witnesses." *Id.*

B.    The Jury's Verdict is Entitled to Deference.

"The amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it." *Prager* 731 F.3d at 1063.  In *Prager*, the jury awarded the plaintiff $2,000,000.00 in compensatory damages in a loss of consortium case.   The district court remitted the award by 75% to $500,000.00. The 10th Circuit reversed holding that "the district court overreached in this case, improperly re-weighing the evidence and intruding on the rightful province of the jury." *Id.* at 1061.

The deference owed to the jury's verdict was recently reaffirmed by Judge Crews in *Brooks v. Colo. DOC*, 2024 WL 1051947 (D. Colo. Mar. 11, 2024), where the court upheld $3.5 million in compensatory damages, rejecting arguments that the verdict was excessive, shocked the judicial conscious or was based only on the plaintiff's self-serving testimony.   Judge Crews ultimately held that generous awards for emotional and reputational harm are within the jury's wide discretion and upheld the verdict.  In *Ward* v. *Nat'l Credit Sys., Inc.*, 2025 WL 370373, (D. Colo. 2025) Judge Wang refused to remit another verdict going so far as to hold that even "one somewhat similar case is not sufficient to convince the Court that remittitur is appropriate here." *Ward* at *17.

*Burke v. Regalado*, 935 F.3d 960, 1034 (10th Cir. 2019) upheld denial of remittitur of a $10,000,000 compensatory damages award in a jail-neglect case. There the Tenth

Circuit recognized the deference owed to the jury's $10 million verdict explaining that "we afford wide discretion . . . to juries to fix the amount of noneconomic compensatory damages." *Id.* at 1036. "To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict." *Id.* at 1035. *Casias v. Raytheon Co.*, 2022 WL 2824256, *9-10 (10th Cir. July 20, 2022) affirmed a $1 million noneconomic damages award in a whistleblower case holding: a jury "must weigh a large amount of conflicting evidence, and '[i]nherent in its decision [is] a searching assessment of each witness's credibility.' [Citing *Prager*]. Thus, we give great deference to its determination of damages." See also, *Therrien v. Target Corp.*, 617, F.3d 1242, 1258 (10th Cir. 2010) (upholding denial of remittitur where "the jury award [was] supported by sufficient evidence"); *Spahr v. Ferber Resorts, LLC*, 419 Fed.App. 796, 807 (10th Cir. 2011) (unpublished) ("Given the evidence in this case, we cannot say the district court abused its discretion in refusing to grant a new trial or remittitur in this case"). The jury awarded another multi-million-dollar compensatory damage award in *Tygrett v. City & County of Denver a/k/a Denver Water*, No. 1:19-cv-00726 (D. Colo. 2021) where the plaintiff was represented by the undersigned. There the jury awarded $3 million in compensatory damages on a disability-discrimination claim. (Exhibit 1, Tygrett Verdict Form). These cases are a direct example of the deference which courts give to the jury's verdict. The jury's verdict in this case is entitled to that same deference.

C.    Remittitur of the $5,000,000 Compensatory Damages Verdict is Not Warranted.

Here, the jury heard powerful, detailed testimony from Ms. Joppy and corroborating witnesses. First, Ms. Joppy testified that nursing was never "just a job" to

her but a true calling — an extension of who she is as a person. (ECF 389, 920:6-8). Being stripped of that identity by termination left her feeling disoriented and broken. She described the experience as being "outside of my body" and she recalled the shock as "cold" and incomprehensible.  (ECF 389, 973:4-12). She told the jury that she was "shell shocked and terrified," unsure how she would support herself and her daughter. (ECF 389, 973:4-25). She described the experience as uniquely isolating and unfair — unlike anything she had ever lived through.   The consequences of the termination were immediate and severe. She lost the ability to provide housing for herself and her daughter and has not been able to live with her daughter for the past six years. She testified that she has spent years without stable housing, "couch surfing" with friends, and at one point living with a stranger in Massachusetts to avoid sleeping outside.  (ECF 389, 974:10-24).

The toll on her emotional health was equally devastating. She described how she no longer trusted anyone. She was hypervigilant, afraid of what might happen next, and deeply wounded by being singled out and falsely accused. She told the jury she had "not been the same" since.  The physical toll was plain as well. She lost 80 pounds. She does not sleep well. She wakes up crying at night, searching for the job and career that once anchored her life. She testified to having a startle reflex, jumping at noises, and described herself as a person who now "weeps a lot." (ECF 389, 974:7-24).

She also testified to the enduring and permanent nature of the harm. When asked whether this experience will stay with her, she responded, "Always. Yes, always." (ECF 389, 975:12-17). Summing up the magnitude of the injury, Ms. Joppy told the jury: "I never felt like this, never in my life. I've never hurt like this. This is a life-changing thing." (ECF

389, 982:22-24). The record also established that before her termination, Ms. Joppy had been diagnosed with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. She was under the care of a licensed therapist, prescribed medication that she had been on for years, and receiving ongoing treatment. (ECF 389, 1056:17–23). Although these conditions pre-dated her termination the jury was expressly instructed that it could not reduce or deny damages "because of any mental health conditions of Plaintiff Joppy that may have made her more susceptible to injury, disability, or impairment than an average or normal person." (ECF 377 at 23).

Here, the jury reasonably concluded that Defendant's unlawful termination profoundly impacted Ms. Joppy. She saw her therapist on the very day she was fired, a fact underscoring the immediacy and severity of the impact. (ECF 389, 973:4-12). The jury was entitled to credit her testimony that the termination left her disoriented, broken, and traumatized in ways far beyond her baseline functioning.

In addition to Plaintiff's own testimony, corroborating witness who knew Plaintiff prior to her termination testified about the devastating impact the termination had on Plaintiff.  Carla Banks first met Ms. Joppy at the hospital when Ms. Joppy was caring for Banks' daughter after an accident. (ECF 390, 1113: 6-22). Ms. Joppy's professionalism, compassion, and attentiveness stood out. Banks described her as "a saving grace" during one of the hardest times of her life—someone who was "full of joy and concern" despite the circumstances. (ECF 390, 1113: 19-22). That changed after Ms. Joppy was terminated. Banks testified that Ms. Joppy "was very devastated." (ECF 390, 1114: 11-15). In the months that followed, Banks noticed a marked decline. Whereas before Ms.

Joppy was focused and "on point with everything that she said," afterward she "just started to…unravel." (ECF 390, 1114: 19-1115:2). She lost her focus — conversations that were once deep and thoughtful became scattered. (ECF 390, 1114: 19-1115:2). She would start on one topic and end up far afield, "in Kansas somewhere," leaving her friends to try to follow along. (ECF 390, 1115:3-13). Banks repeatedly described Ms. Joppy as looking and sounding like she was "in a lot of pain." (ECF 390, 1115:24-25). It was painful to witness. After her termination, she was not the same person. The termination left her visibly changed—unfocused, hurting, socially altered, and harder for even close friends and family to engage with. (ECF 390, 1114:19-1116:9).

Linda Bryant described Ms. Joppy as proud of her work and she loved her profession. (ECF 390, 1120:1-9). Ms. Joppy's pride in nursing came through in conversation, as did her compassion. (ECF 390, 1120:1-18). She described her as a woman who derived confidence, self-esteem, and identity from nursing. (ECF 390, 1121:6-18). Bryant explained that the difference in Ms. Joppy before and after termination was stark. Before, she was confident, self-assured, and anchored in her role as a nurse. After, she was devastated. (ECF 390, 1121:1-18). The termination stripped her of her confidence and shook her sense of self. Bryant testified that Ms. Joppy "was a totally different person" after losing her job. (ECF 390, 1120:1-18). Her career and her child were her two pillars. When the hospital took away her career it devastated her because it also jeopardized her ability to care for her child. Plaintiff repeatedly told Bryant, "Mother Linda, I don't know why they would accuse me of doing something to harm someone. I would never." (ECF 390, 1121:20-1122:11). Bryant explained this was not a fleeting thought—

rather, it became something that played over and over in her head, eroding her confidence and self-esteem. (ECF 390, 1121:20-1122:11). She became unsure of herself in ways Bryant had never seen. She lost the confidence that "anyone would take her seriously anymore" as a nurse leading Bryant to see that Ms. Joppy would be unable to work. (ECF 390, 1121:20-1122:11;1124:18;1125:3). Bryant testified that she was crying, and Bryant described it as if "it ripped her heart out." (ECF 390,1122:18-1123:4). Her emotional state totally changed. Bryant said Ms. Joppy cried "many days" over both the stigma of the accusation and the loss of her career. (ECF 390,1122:18-1123:4). She emphasized that Ms. Joppy felt unheard—that people did not believe her insistence that the accusations were false—and it started to weigh on her and it compounded her pain. (ECF 390, 1122:4-11)

Melinda Wilkins, a member of the congregation at the church Plaintiff attended, described her initial impression of Ms. Joppy as "full of light" — bubbly, outgoing, with an amazing smile. (ECF 390, 1126:5-19). She was an outgoing people-person who engaged warmly with others. (ECF 390, 1126:5-19). Nursing, she said, was clearly something Ms. Joppy loved. (ECF 390, 1126:24-1127:1). That bright, confident person changed dramatically after her termination. Wilkins described Ms. Joppy as becoming "guarded" and "really hurt" after she was fired. (ECF 390, 1128:16-19). She cried frequently because she could no longer live in her apartment, having lost the income to pay rent. She cried when she was forced to move from one temporary place to another, including hotels and other people's homes. (ECF 390, 1129:16-23). Wilkins and her family personally helped her move from one storage facility to another after she could no longer afford the first,

and they saw her cry through those transitions. (ECF 390, 1129:16-23). She cried over her separation from her daughter, a painful consequence of losing the stability that her job once provided. (ECF 390, 1129:16-23). Wilkins further described how the termination reverberated in nearly every aspect of Ms. Joppy's life. (ECF 390, 1129:16-25). The change in her demeanor was stark — the once bubbly and confident nurse was profoundly changed as a result of the termination.   (ECF 390, 1126:15-1130:15).

This testimony, from Plaintiff and three independent corroborating witnesses, provided the jury with a vivid, detailed, and consistent picture of the devastation wrought by Defendant's unlawful actions. Courts have long recognized that civil rights violations inflict harms of a different order. They strike not only at a person's economic stability but also at dignity, reputation, and equal standing in the community. "An injury resulting from discrimination produces impairments and wounds to the rights and dignities of the individual." *Baker v Bd. Of Regents of State of Kan*., 991 F.2d 628, 631 (10th Cir. 1993) see also *U.S. v. Burke*, 504 U.S. 229, 238 (1992) (employment discrimination is "an invidious practice that causes grave harm to its victims"). Justice Kavanaugh's concurrence in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), underscores that compensable harm under federal discrimination law includes harm to not only money, but also "time, satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospects, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like." *Id.* at 365.

The jury's verdict powerfully underscores that point. A panel of eight citizens, none of whom were Black, unanimously found that Defendant intentionally discriminated and

retaliated against Plaintiff on the basis of race. That outcome cannot be dismissed as passion or prejudice. It reflects careful deliberation by a cross-section of the community that recognized, even without Plaintiff's lived experience, and saw the devastating impact of race discrimination on her dignity, reputation, self-worth and security.  Plaintiff's damages were unique to her.  Placing a dollar value on such injuries is not a scientific exercise but an act of community judgment. As *Webner v. Titan Distrib., Inc.*, 101 F. Supp. 2d 1215, 1226 (N.D. Iowa 2000) (aff'd in relevant part and remanded, 267 F.3d 828 (8th Cir. 2001), explains, "a jury of peers represents a cross section of the citizens . . . and a reflection of its diversity. This civil jury with their varied life experiences . . . embody a collective knowledge and wisdom about the effect of losing a job that is far superior to the vast majority of life tenured Article III trial judges (and I might add appellate judges) who presumably have less life experience, knowledge, or personal concern about losing one's job." That principle applies with particular force in the context of race discrimination, where evolving community standards are critical to assessing the true weight of the harm.  To second-guess this verdict would risk minimizing the very injuries Congress sought to remedy when it enacted § 1981.

D.    The 10th Circuit discourages comparisons to compensatory awards in other cases.

Defendant claims the "10th circuit recognizes comparison to other cases as an appropriate measure of excessiveness."  (ECF 402, at 5). But Defendant is wrong on the law and has misapplied the facts. The Tenth Circuit has expressly cautioned against the very approach Defendant advances. "Comparisons to awards from other cases" are disfavored because they "yield no insight into the evidence the jurors heard and saw or

how they used it during their deliberations." *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 670–71 (10th Cir. 2016). Exceptions to this general rule can be made only where facts of the comparable cases are "strikingly similar" or at least "similar enough to serve as a meaningful benchmark." *Id.* at 671, citing *Prager* at 1063.

None of the cases Defendant cites meets this demanding "strikingly similar" standard. First, both Wulf v. City of Wichita, 883 F.2d 842, 875 (10th Cir. 1989) and *Blangsted v. Snowmass Hospitality, Inc.*, 642 F. Supp. 2d 1250 (D. Colo. 2009) have been largely discredited. As Judge Wang explained in *Ward v. Nat'l Credit Sys., Inc.*, 2025 WL 370373, at*5 (D. Colo. Feb. 3, 2025), both are "too dissimilar to warrant any consideration in the remittitur analysis." *Id.* at 17. *Wulf* in particular was described as a "35-year-old § 1983 case that does not account for three decades' worth of shifts in our society's approach to mental health." *Ward, 2025 WL 370373 at *50.  Blangsted* was described as a "15-year-old 1983 employment case in which the court relied, in part, on the fact that the Title VII limitation for compensatory damages was $50,000 to $300,000 depending upon the size of the employer, as the court believed this statutory limit "supported a conclusion that the upper limit for emotional distress damages is significantly less than awarded by the jury in this case." *Ward,* 2025 WL 370373 at *50.  See also *Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1150 (D. Kan. 2017) ("The Tenth Circuit moved away from its approach in *Wulf* of comparing awards in other cases.")

Plaintiff's § 1981 claim carries no statutory cap, reflecting Congress's different legislative judgment that victims of intentional race discrimination are entitled to full, uncapped compensation for their injuries. Finally, Defendant strings together a handful of

cases in a footnote seeking remittitur based on those cases. (ECF 402 at 5, fn.2). Even a cursory review shows why they are only footnoted—none of them are "strikingly similar" to the facts of this case. Simply put, Defendant has not identified a strikingly similar case that would warrant comparison.

E.    Because Defendant chose to anchor damages at a billion dollars during closing arguments, the Jury's Award of Less Than One Percent is Not Excessive.

Courts have recognized that a party who declines to provide the jury with a reasonable alternative calculation of damages cannot later complain that the verdict was excessive. In *Coachman v. Seattle Auto Mgmt., Inc.*, 2019 WL 4695660, at *5 (W.D. Wash. Jan 13, 2019) the court rejected a defendant's remittitur request stating:

> Most telling, Defendants' arguments that the verdict was excessive all fail for the same reason: Defendants elected not to address damages in their closing argument. To the extent Defendants argued that the 'tools' Plaintiff provided the jury were speculative or did not properly consider the facts, Defendants should have made that argument to the jury. Defendants did nothing to provide the jury with a reasonable—or even possible— calculation of Plaintiff's damages. … If Defendants believed that the jury should award a smaller amount of damages, they should have told the jury.

The same is true here. To be sure, Defendant was not legally obligated to propose a specific dollar figure during its closing arguments. But instead of offering any reasonable alternative, Defendant told the jury there was "no need to consider damages" and then distorted Plaintiff's request by falsely stating that she sought "a billion dollars." (ECF 391, 1344:6–19). The jury's award of $5 million—is exactly one quarter of Plaintiff's $20 million request during closing, and less than one percent of Defendant's billion-dollar anchor.

As this Court noted in *Capture Eleven*, "[a]rguably, there is a tension between evidence supporting the jury's apportionment and disgorgement findings. It is not the

Court's job to resolve it by second-guessing the jury. The jury's award was within the range of evidence. . . . That contradictory evidence exists in the record is no reason to set its award aside." *Capture Eleven* 777 F.Supp.3d at 1250 (citation omitted).

F.     The Jury's $15 Million Punitive Damages Verdict is not Constitutionally Excessive.

In *Deters v. Equifax Credit Infor. Serv.*, 202 F.3d at 1273 the Tenth Circuit outlined the standard for determining the constitutionality of a punitive damages award:

> One must receive fair notice both that certain conduct will subject him to punishment, and the possible severity of the punishment that may be imposed. There are three "guideposts" involved in this fair notice calculus. First, and most important, is the reprehensibility of defendant's conduct. Second, is the ratio of the punitive damages awarded to the actual harm inflicted on the plaintiff. The third guidepost is a comparison of the punitive damages award with 'the civil or criminal penalties that could be imposed for comparable misconduct.' Additionally, in analyzing a punitive damages award for excessiveness, we must consider the goal of deterrence. The size and wealth of the defendant are relevant factors in this regard. (citations omitted)

1.   Reprehensibility.   In determining reprehensibility, courts examine whether: (1) the harm was physical as opposed to economic; (2) the defendant acted with indifference to health or safety; (3) the plaintiff was financially vulnerable; (4) the conduct was repeated rather than isolated; and (5) the harm resulted from intentional malice or reckless disregard. *Id*.   As detailed above, the jury heard extensive evidence that Defendant's discrimination and retaliation inflicted devastating emotional, reputational, and dignitary harms on Plaintiff**.** Defendant falsely stigmatized Plaintiff as someone who harmed a patient and recklessly disregarded both Plaintiff's professional standing and her regard for patient safety.   Plaintiff was also a newly single mother, financially vulnerable, and

Defendant's conduct resulted in years of housing instability, homelessness and a six-year separation from her daughter.

Most telling, Defendant's conduct was not an isolated incident. The record showed that the ICU was in a state of chaos.  Complaints were made by multiple nurses but the hospital chose not to investigate, letting a group of "mean girls" wreak havoc on nurses they targeted.  Although Ms. Burley was not one of the mean girls, she knew about their conduct and did nothing to stop it. Even Plaintiff's complaint of discrimination to corporate headquarters was ignored and the head of human resources admitted that failure to investigate discrimination complaints was "reckless." The hospital chose not to interview key witnesses like Dr. Forrester and Mr. Brown's niece, jumping to terminate Plaintiff without first having all the facts about Mr. Brown's end of life care.  The hospital knew that the policy it terminated Ms. Joppy for violating didn't apply to ICU nurses and that it falsely stated as grounds for the termination that Ms. Joppy was acting without an order. Most troubling is the hospital's admission that, when viewed through the Just Culture lens, if the ventilator was turned off and there was no harm to the patient, this was not a terminable offense. (ECF388, 779:10-18). When viewing the record as a whole, the jury could reasonably find that Defendant's conduct was reprehensible.

2.  Ratio of punitive damages to the actual harm inflicted on the plaintiff.

The jury's $15 million punitive damages award was a 3:1 ratio of the $5 million compensatory award.  That ratio is well within constitutional limits. "[S]ingle-digit multipliers are more likely to comport with due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). But when compensatory damages include

intangible harms like emotional distress and reputational stigma like Plaintiff experienced here, higher ratios are permissible. *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1069 (10th Cir. 2016).  On the evidence presented, the jury's careful calibration of a 3:1 ration shows considerable restraint.  The Court should thus defer to the jury's award, as it falls well within constitutional limits.

3.  Comparison of the punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct.

Defendant relies on verdicts from a handful of other cases to support reduction of the award.  That reliance is misplaced. The relevant benchmark is not verdict-to-verdict comparisons, but legislative judgments concerning appropriate sanctions for the conduct at issue—not a patchwork of unrelated jury awards.  *White v. Wycoff*, 2016 WL 9632873 at *5 (D. Colo. June 24, 2016). In *White*, the court rejected defendant's reliance on verdicts from other cases, explaining that this factor "does not invite a race to the law library to find verdicts upheld or overturned in cases involving similar claims. Instead, as *Gore* instructs, this factor is premised upon the notion that 'legislative judgments concerning appropriate sanctions for the conduct at issue' constitute an alternative 'indicium of excessiveness.'" *Id.* The Court further concluded, "[e]ven assuming that this factor requires consideration of comparable suits, this Court sees little value in dissecting individual cases having little factual relation to the instant matter. *Id.* See also *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1252 (10th Cir 2000) ("comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations").

In looking at the purpose behind § 1983 in affirming the award, the court noted that "the deterrence of future egregious conduct is a primary purpose of both § 1983 and of

punitive damages." *White,* at *5, citing *Smith v. Wade* 461 U.S. 30, 49 (1983). The same logic applies with equal force to § 1981, which was enacted to eradicate racial discrimination and deliberately left uncapped so that juries could impose meaningful punitive sanctions on violators. That legislative choice reflects Congress's judgment that discrimination implicating fundamental civil rights cannot be meaningfully deterred by nominal or limited sanctions. Defendant's attempt to compare dollar amounts across unrelated verdicts provides no basis for remittitur.

Even if comparable verdicts had any relevance, the most analogous decision underscores that large punitive awards are appropriate. In *Menninger v. PPD Development*, L.P.,145 F.4th 126, 139-141 (1st Cir. 2023), the jury awarded more than $24 million in a case under the Americans with Disabilities Act, including $10 million in punitive damages. The district court denied remittitur, and the First Circuit affirmed giving deference to the jury's verdict and refusing to substitute its judgment for that of the jury. As *Menninger* demonstrates, substantial punitive awards are not outliers but consistent with the remedial purposes of federal civil-rights statutes.

G.    The Punitive Damages Verdict Does Not Violate Common Law Standards.

Even apart from constitutional limits, a court may not disturb a punitive damages verdict unless it is "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Deyapp v. City of Farmington*, 2006 WL 8443773, at *5 (D.N.M. Aug. 14, 2006).* That demanding standard is not met here. As discussed in Section II.D above and incorporated herein, the evidence established that Defendant disregarded its own

policies, ignored Plaintiff's discrimination complaint, fabricated grounds for her termination, and falsely accused her of harming a patient. The verdict reflects the Court's own observation of the jury's diligence:

> "[T]his was an excellent trial. What we know is the jury hasn't reached a rushed decision, so they've given it plenty of thought and thought overnight, thought over the weekend. So I am confident they have done their job."

(ECF 392, 1352:3–12).   The jury's award of $15 million in punitive damages was a reasoned response to Defendant's reckless indifference and consistent with the Court's recognition of the jury's careful and conscientious evaluation of the evidence and not resulting from passion, prejudice, corruption, or other improper cause.

## IV. RULE 59 - OTHER GROUNDS ARGUMENTS.

A.    Legal Standard — New Trial.

Under Fed. R. Civ. P. 59(a)(1)(A). A new trial may be granted only if "the district court concludes the claimed error substantially and adversely affected the party's rights." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008).  A new trial is not warranted if the error was harmless. *Id.*

B.    The Court properly instructed the jury that "But-For" Plaintiff's race and protected activity the termination would not have occurred.

Jury Instruction No. 16 (discrimination) required Plaintiff to prove that "Defendant would not have terminated Plaintiff Joppy but for her race." Instruction No. 18 (retaliation) required proof that "Defendant would not have terminated Plaintiff Joppy but for her protected activity." (ECF 377, at 17, 19). These formulations mirror the Supreme Court's controlling decisions: *Comcast Corp. v. Nat'l Ass'n of African Am.–Owned Media*, 589 U.S. 327, 341 (2020) ("To prevail, a plaintiff must [ ] ultimately prove that, but for race, it

would not have suffered the loss of a legally protected right"), and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (retaliation must be proved according to traditional principles of but-for causation).

Both instructions 16 and 18 then included an additional statement that race or protected activity "must be a 'but-for' cause of the adverse employment action. Plaintiff Joppy's [race or protected activity] does not need to be the sole cause of Defendant's action, but Plaintiff Joppy must show that it played a part." (ECF 377, at 17, 19). The instructions explicitly required (twice in each charge), proof that the termination would not have occurred "but for" race or protected activity.

During the charging conference Defendant urged the Court to instruct the jury that "plaintiff Joppy must show that race was, indeed, the reason for the termination or that race was the determinative reason for the termination instead of played a part." (ECF 391, 1284:13-16). The Court overruled the objection, explaining that *Bostock* foreclosed Defendant's position. (ECF 391, 1284:17-21). However, Defendant now argues that "[t]he jury instructions stated that Section 1981's causation element is satisfied if Plaintiff proved that race or protected activity "played a part" in her termination. (ECF 402 at 16). That is not what the jury instructions stated. Instructions 16 and 18 both required the jury to find that Plaintiff "would not have been terminated but for" her race or protected activity. The "played a part" phrase was explanatory language, not the operative standard. And the verdict form required the jury to check a box confirming the but-for finding. Defendant's paraphrase omits that critical requirement and overstates the instruction's effect.

Defendant's challenge isolates the words "played a part" from the rest of the instructions. But jury instructions are not parsed phrase by phrase; they must be read as a whole. As the Tenth Circuit explained in *Healy v. Cox Commc'ns, Inc.*, 871 F.3d 1093, 1105 (10th Cir. 2017) "[w]e acknowledge that reading the last sentence in isolation could lead a jury to believe that plaintiffs met the foreclosure element just by showing that the defendant made a substantial amount of money on the [product at issue]. But, though unartfully drawn, the instruction must be read as a whole. And when doing so, we believe it evident that Plaintiffs' reading—elevating the last sentence above the rest of the instruction—is incorrect." The 10th Circuit went on to hold that, "[i]n fact, Plaintiffs' interpretation of Jury Instruction 19 would render the entire first paragraph of the jury instruction meaningless." *Id.* at 1106. So too here: Instructions 16 and 18 required the jury to find that Plaintiff "would not have been terminated but for" her race or protected activity, and the verdict form reinforced that standard.

Defendant's reliance on *Miller v. City of Ithaca, NY*, 758 Fed. App. 101, 104 (2d Cir. 2018) is misplaced. There, the jury was instructed under the now rejected "motivating factor" standard and a new trial was ordered to cure that error.  Here, by contrast, instructions 16 and 18 squarely track *Comcast* and *Nassar*.  Defendant's reading, isolating one line of the jury instruction, distorts the charge and ignores the settled rule that instructions must be read as a whole to determine whether they fairly and adequately stated the law.  Similarly, Plaintiff's closing argument also tracked the jury instructions precisely arguing that the "but for" standard applied.  (ECF 391, 1317:25-1318:14). But again, Defendant read in isolation the "played a part" phrase. Defendant did not object to

the closing argument and has waived it. See *Puckett v. United States*, 556 U.S. 129, 134

(U.S. 2009)("the contemporaneous-objection rule prevents a litigant from "'sandbagging'"

the court--remaining silent about his objection and belatedly raising the error only if the

case does not conclude in his favor.")

C.    The Court properly instructed the jury on hostile work environment and prior
      workplace treatment.

Defendant's challenge to the jury instructions on hostile work environment and

prior treatment grounds fails. (ECF 377 at 14, 20). The instructions correctly told the jury

that Plaintiff was not pursuing a hostile work environment claim, while also properly

permitting the jury to consider evidence of prior treatment for the limited purpose of

evaluating pretext. That distinction is consistent with settled law. *Noland v. McAdoo*, 39

F.3d 269, 271 (10th Cir 1994) (prior events not actionable may provide relevant

circumstantial evidence to explain later, actionable events). Taken as a whole, the

instructions accurately stated the law and allowed Defendant to argue its theories.

D.    The Court properly instructed the jury on compensatory damages.

Defendant's objection to the compensatory damages instruction is meritless. The

jury instruction correctly instructed the jury on compensatory damages (ECF 377 at 22)

and courts presume that jurors follow their instructions. *United States v. McBride*, 656

Fed. App. 416, 424 (10th Cir. 2016). Plaintiff did not seek economic damages, the

instructions did not authorize them, and the verdict form provided no mechanism to award

them. To the extent Defendant wanted to underscore that point, the Court agreed stating,

"[a]gain, I think this instruction allows the parties to certainly argue that.  Defendant can

highlight she's not seeking economic damages because there's no instruction and no

spot on the verdict form for it and can highlight what it is authorized to award." (ECF 391,

1290:24–1291:3). Defendant did not object further and waiver applies. *Puckett* at 134.

E.     The Court's Evidentiary Rulings on Pre-Termination Evidence Were Proper and
       Within Its Discretion.

The Court properly admitted pre-termination evidence such as the performance

improvement plan, the cancelled interview, and workplace culture because such

background evidence was relevant to explain later conduct and pretext. *Noland* 39 F.3d

at 271 (prior events not actionable may provide relevant circumstantial evidence to

explain later, actionable events). At the same time, the Court reasonably limited evidence

about Plaintiff's prior termination to avoid undue prejudice and confusion, while still

allowing Defendant to establish the fact and reason for that termination. These balanced

rulings are within the Court's discretion under Rule 403 and do not warrant a new trial.

Defendant also argues that Plaintiff should not have been allowed to introduce

certain "prejudicial" evidence, including Exhibits 14 and 18 and testimony referencing the

"mean girl culture." This argument fails at the threshold because Defendant did not

preserve it for review.   Exhibit 18 was admitted without objection and received by

stipulation. (ECF 386, 234:24-235:4). Similarly, Defendant never objected to testimony

referencing the "mean girl culture." As for Exhibit 14, Defendant objected only on hearsay

and foundation grounds. (ECF 386, 230:5-20). The Court overruled the objection and

admitted the exhibit. Defendant did not raise a Rule 403 objection. *Puckett*, 556 U.S. at

*134.* Finally, Defendant's failure to object constitutes waiver.

F.    Defendant Has Not Demonstrated Prejudice Warranting a New Trial Based on any
      alleged reference that the hospital caused the Criminal Prosecution.

Defendant's objection to references to the Attorney General's prosecution provides no basis for a new trial. Defendant points to six instances. (ECF 402, at 29). In at least one of the alleged violations Defendant did not object to the reference because it had nothing to do with causation. (ECF 386, 264:14-20). In another alleged violation that conversation was about taking a break during trial and had nothing to do with the Attorney General. (ECF 386: 265:14-23). To the extent that any statement made during trial implied that it did, the Court carefully managed this issue and required plaintiff to clarify to the jury that the attorney general made the decision to bring the charge. The Court also included an instruction that what the attorneys said during opening statements was not evidence and further instructed the jury that they should disregard the question at issue. (ECF 386, 256:21-23). Ultimately, the Court gave the jury a curative instruction, drafted by Defendant, stating that Defendant did not cause the prosecution. Instruction No. 8 stated: "This Court has already determined that the Hospital (including its employees and the report the Hospital made to the Colorado Department of Health and Environment) did not cause any actions taken by the Attorney General that you have heard." (ECF, 377 at 9; ECF, 386: 165:23–25). Courts presume that jurors follow such limiting instructions. See *Weeks v.* Angelone, 528 U.S. 225, 234 (2000). This instruction directly prevented the jury from attributing legal responsibility to Defendant for the prosecution.

These tailored rulings fell well within the Court's discretion and Defendant cannot transform a routine evidentiary dispute into reversible error. If Defendant truly believed that references to the criminal charge made a fair trial impossible, its remedy was to move

for a mistrial. It did not do so. Having accepted the Court's curative instructions and elected to proceed, Defendant cannot now claim the verdict was tainted by incurable prejudice.  A new trial may be granted only if "the district court concludes the claimed error substantially and adversely affected the party's rights." *Henning v. Union Pac. R.R. Co*., 530 F.3d 1206, 1217–18 (10th Cir. 2008).  Defendant has not met that high bar.

G.    Defendant Waived Objection to Net Worth and Denial of Bifurcation was Proper.

Defendant's challenge to the admission of net worth evidence fails for three independent reasons.  First, Defendant waived any objection. Plaintiff briefly referenced Defendant's financial condition in opening and closing, but Defendant made no contemporaneous objection. That alone is dispositive. *Puckett* 556 U.S. at 134. Second, Defendant affirmatively stipulated to the very net worth figure it now claims was prejudicial. (ECF 390, 1234, 1266). Third, there was no prejudice. "The wealth and size of the defendant are relevant considerations." *Deters,* 202 F.3d at 1273.  Finally, the Court acted well within its discretion in denying bifurcation. Rule 42(b) bifurcation is "the exception, not the rule" and appropriate only where issues are separable and prejudice unavoidable. *Easton v. City of Boulder*, 776 F.2d 1441, 1447 (10th Cir. 1985). Here, liability and damages overlapped significantly.

V.  CONCLUSION.

The jury heard the evidence, weighed the witnesses' credibility, and rendered a verdict fully supported by the record and the law. Defendant has not shown that any error occurred, much less one warranting disturbing that verdict. The Court should uphold the judgment and deny all post-trial relief.

Respectfully submitted this 8th day of October 2025.


ROBINSON & ASSOCIATES LAW OFFICE,
s/Jennifer Robinson
Jennifer Robinson
Robinson & Associates Law Office, LLC
7900 E. Union Avenue, Suite 1100
Denver, CO 80237
(303) 872-3063
Email: jrobinson@raemployment.com

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

The undersigned certifies that on October 8, 2025 a true and correct copy of the foregoing was electronically served via the Court's Electronic Filing system to all counsel of record.

/s Jennifer Robinson, Esq.