IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-00986-CNS-STV

DONQUENICK YVONNE JOPPY,

      Plaintiff,

v.

HCA-HEALTHONE LLC, d/b/a The Medical Center of Aurora,

      Defendant.

---

## ORDER

---

Before the Court are Defendant HCA-HealthOne LLC d/b/a The Medical Center of Aurora's (the Medical Center's) Opposed Renewed Motion for Judgment as a Matter of Law, Or in the Alternative, Motion for a New Trial, Remittitur, and Review of the Damages Award, ECF No. 402, and Plaintiff DonQuenick Yvonne Joppy's Motion for Reasonable Fees and Related Non-Taxable Expenses, ECF No. 411. The Court GRANTS IN PART and DENIES IN PART the Medical Center's motion. The Court GRANTS IN PART and DENIES IN PART Ms. Joppy's motion.

In doing so, this order proceeds in three parts. *First*, the Court sets forth this case's factual background, based on the seven-day trial record. *Second*, the Court discusses the Medical Center's motion. In doing so, the Court sets forth the applicable legal standards and then explains why under these standards the Medical Center has shown

1

only entitlement to a reduction in the jury's punitive damages award, not entitlement to a new trial as to the jury's liability findings on Ms. Joppy's 42 U.S.C. § 1981 discrimination and retaliation claims, or a reduction as to its compensatory damages award. *Third*, the Court discusses Ms. Joppy's fee motion. In doing so, the Court sets forth the applicable legal standard and then explains why it is proper to reduce the attorney fees and costs that counsel for Ms. Joppy seek. To preview the Court's later analysis of Ms. Joppy's motion, the hourly rates and hours worked for Ms. Joppy's counsel—upon which their motion is premised—demand reduction, as do the costs that Ms. Joppy seeks.

## I.    BACKGROUND[1]

### A. Plaintiff DonQuenick Yvonne Joppy's Professional Background, Qualifications, and Arrival at the Medical Center of Aurora

Plaintiff DonQuenick Yvonne Joppy received her associate's degree in nursing in 2013. *See* ECF No. 389 at 81. She does not hold a degree in respiratory therapy, nor did she receive an accreditation in respiratory therapy during nursing school. *See id.* at 145. At the time of trial, Ms. Joppy had not received a license to practice respiratory therapy from the Colorado Respiratory Therapy Board. *See id.* at 146. Prior to coming to work as a critical care nurse in the Medical Center's Intensive Care Unit (ICU), Ms. Joppy worked as an intensive care nurse in Texas at St. Joseph's Hospital for approximately two years. *See id.* at 144, 146.[2] She was terminated from this position. *See id.* at 144. Following this

---

[1] This background, admittedly lengthy, is drawn from the trial record, including from testimony and admitted exhibits. *See, e.g., Chapman v. Workman*, No. CIV–06–177–R, 2008 WL 2893725, at *1 (W.D. Okla. July 23, 2008).

[2] Ms. Joppy testified that while employed at St. Joseph's Hospital, she never performed an extubation on a patient. *See* ECF No. 389 at 146. An extubation requires removing a breathing tube that runs through the patient's mouth to their trachea. *See* ECF No. 387 at 87. The tube is itself connected to a ventilator

termination, Ms. Joppy applied for the critical care nurse position at the Medical Center. *See id.* at 146.

In May 2017, Ms. Joppy began working as a critical care nurse in the Medical Center's ICU. *See id.* at 82. In her role as an ICU nurse, Ms. Joppy was responsible for, among other things, "oversee[ing] and direct[ing] the care of the critically ill patient[s], including high acuity and critical trauma patient populations." ECF No. 407-6 at 1. The critical care nurse job description also specified that Ms. Joppy, as a critical care nurse, was responsible for "[s]erv[ing] as [a] primary nurse leading the collaboration of all disciplines for well-coordinated patient care." *Id.* Ms. Joppy testified that her job also involved working with "respiratory therapy" for ICU patients, as well as other physicians and medical care providers, including "neurologists, surgeons . . . phlebotomists, x-ray techs, even [individuals] in environmental services." ECF No. 389 at 83. While employed at the Medical Center, Ms. Joppy never received training as to how to extubate a patient, nor did her job responsibilities include performing patient extubations. *See* ECF No. 389 at 147.

### B.  Ms. Joppy's Work Performance at the Medical Center Prior to May 2019

From 2017 to 2018, Ms. Joppy was nominated for three Daisy Awards. *See* ECF No. 389 at 85; ECF No. 386 at 80. Katie Weihe, the Vice President of Human Resources

---

"delivering oxygen and breaths." *Id.* At trial, Karen Welter, a former Medical Center ICU nurse and Ms. Joppy's former co-worker, *see, e.g.,* ECF No. 387 at 81, testified that extubation is process of removing a breathing tube from a patient, *see id.* at 115. *See also id.* at 87 ("When we are extubating a patient, we will remove that tube."); *id.* at 115. She continued that "[i]t's not really uncomfortable coming out. It's mostly just going in." *Id.* at 88.

in 2019, *see id.* at 46, testified that patients nominate nurses for such awards when patients believe nurses have provided "really good care."[3]

On August 2, 2018, Ms. Joppy received a formal performance review. *See, e.g.,* ECF No. 407-5 at 6. The review was signed by Ms. Joppy and Paul Page, the ICU manager at that time, and Ms. Joppy's supervisor. *See* ECF No. 386 at 82. On a scale from 1–5, with 1 representing "Unsatisfactory/Below Target," and 5 representing "Exceptional," Mr. Page evaluated Ms. Joppy as having an "Overall Rating" of 3, or "Meets Expectations," regarding her job performance. ECF No. 407-5 at 6; *see also* ECF No. 386 at 82.  As for "Evaluator Comments," Mr. Page wrote of Ms. Joppy:

> **Evaluator Comments:** (*Justify any "Outstanding Performance" ratings.*)
> The consummate encourager.  You are encouraging patients, families and co-workers.  Your integrity is noticed and your compassion is evident.  I look forward to seeing you grow here.  Thank you DQ.

ECF No. 407-5 at 6.

Ms. Amanda Hayes, an interim supervisor of the ICU in May 2019, testified that she had a friendly relationship with Ms. Joppy and never had problems when working alongside her. *See* ECF No. 387 at 230.[4] According to Ms. Hayes, Ms. Joppy was a good, compassionate nurse who practiced with integrity, and respected her peers and supervisors. *See id.*

---

[3] Ms. Joppy did not ultimately win any of these awards for which she was nominated. *See, e.g.,* ECF No. 389 at 85.

[4] In May 2019, Ms. Hayes was an interim ICU supervisor, along with Nikki Schoolcraft. *See, e.g.,* ECF No. 390 at 54. Ms. Schoolcraft's ICU responsibilities and role in this case are discussed further below.

4

But by March 25, 2019, things had changed. To fully understand how and why, it is important to recount the events that occurred in early March 2019.

Discussions regarding Ms. Joppy and her work performance occurred weeks before March 25. On March 7, 2019, Lindsey Jordan, an ICU charge nurse at the time, *see* ECF No. 387 at 137, responsible, among other things, for nurse scheduling, corresponded with Mr. Page regarding Ms. Joppy's work performance, *see generally* ECF No. 408-11. In her March 7 email correspondence, Ms. Jordan stated: "Paul[,] This email is in reference to the multiple incidences of unprofessionalism and dangerous behaviors towards coworkers and patients on behalf of the employee DQ Joppy." *Id.* at 1.[5] In this email, sent March 7, 2019, Ms. Jordan described events that occurred on the following dates: "March 5, 2019"; "March 21, 2019"; and the "1st week of Feb. 2019." ECF No. 408-11.

Regarding the March 5, 2019, incident, Ms. Jordan wrote:

March 5, 2019, I was at the computer in the break room and was approached by DQ regarding the schedule. Upon discussion, DQ grew upset and frustrated about scheduling issues. This is not the first encounter regarding this specific issue. During the conversation, DQ felt the necessity to say " I just continue to pray for this unit everyday". I personally think religious views should not be of topic at work and should be kept private. Further, as DQ walked away from me, she whispered/muttered under her breathe that "I should just be selfish". She continued to speak to me in an unprofessional matter that was inappropriate but aggressive. Lastly during this interaction, she proceeded to state " Well Lindsay you are very sharp. You are definitely not a warm person." This attitude has become an ongoing issue and is not the first incident.

*Id.* Ms. Jordan included this in her email because, in her words, she "never had anybody speak to [her] like this," ECF No. 387 at 201, and she thought this behavior was "bizarre,

---

[5] Ms. Jordan copied Cherlynn Guy on her email but addressed it only to "Paul." *Id.* Ms. Guy was for a while the director of the ICU. *See* ECF No. 388 at 143. Mr. Page testified that Ms. Guy resigned between March 12 and 20, 2019, after which Breanne Burley became the interim director of the ICU. *See, e.g.,* ECF No. 388 at 161. However, subsequent testimony and evidence suggests that Ms. Guy resigned between March 8 and March 12, 2019. *See id.* at 202. Regardless, the precise date of Ms. Guy's resignation is immaterial, *cf. id.*, given it was established at trial she had resigned by March 12—as explained below, the date she originally intended to provide Ms. Joppy with the performance improvement plan (PIP) that Ms. Joppy ultimately received from Mr. Page on March 25, 2019.

unprofessional, and hostile," *id.* (citation modified). Ms. Jordan further testified that Ms.

Joppy was "consistently late" in making scheduling requests. *Id.* at 204.

Regarding the March 21, 2019, incident, Ms. Jordan wrote:

> March 21, 2019- DQ decided on her own volition to change the staff assignments posted. When approached she denied switching assignments becoming very defensive. Dana Olson the charge on explained that if she did not think the assignments would be appropriate then she should contact the charge and voice her concerns instead of going above her scope of practice- she continued to deny that she had done anything wrong and denied that anything had been changed. It was very difficult if not impossible to redirect her and continue the discussion. An hour later she was still sitting at the desk while interdisciplinary rounds were taking place and when they discussed a possible transfer on one of the patients she stated, "yeah that's why I tried to change the assignment".

ECF No. 408-11 at 1. According to Ms. Jordan, Ms. Joppy's decision to "change the staff

assignments [that were] posted," *id.*, "could throw off that whole pod," ECF No. 387 at

206. Ms. Jordan elaborated:

> There have also been multiple complaints with requests from night shift not to be placed in a pod with DQ. When asked why I have been told on many occasions that she exhibits odd behavior and is unwilling to help, staying in her rooms for multiple hours at a time "giving a bath". (Written by Dana Olson, RN- please contact with any questions/concerns. Dana.Lucas@HealthONEcares.com)

ECF No. 408-11 at 1.

As for the "1st week of Feb. 2019," Ms. Jordan said the following:

> Upon entering room that code blue was called (this was also called well after 0800, shift ends at 0730 give or take). DQ was asked by MD and myself what precipitated this event and her response was "I was praying" and she repeated this several times to Dr. Gruber. She was unable to provide an appropriate and safe response regarding the situation involving her patient's arrest. As an ICU nurse the expectation is to be able to explain specific situations in a professional and educated manner, which she was unable to deliver an educated and appropriate response in a emergency.

ECF No. 408-11 at 1. Ms. Jordan observed this "code blue" and Ms. Joppy's response.

ECF No. 387 at 208–09. *See also id.* at 211 (testifying she did not "make up" the incidents

in the March 7, 2019 email to Mr. Page). Ms. Jordan concluded her email by stating,

"Please feel free to explain any of the situations in more detail," before signing the email

with her name. ECF No. 408-11 at 1.

At trial, Ms. Jordan testified that she did not work the same shift as Ms. Joppy, *see*

ECF No. 387 at 142, but that due to "some overlap of the nightshift and dayshift" she had

6

some firsthand knowledge of Ms. Joppy's behaviors that she reported in her email to Mr. Page, *id. See also id.* at 199.[6] Regarding the reporting of the March 21 incident to Mr. Page in an email dated March 7, Ms. Jordan explained herself by testifying that it was "[a] mistype. I must have mistyped." ECF No. 387 at 143. Regarding the March 5 "incident" as described in her email to Mr. Page, Ms. Jordan testified that it was not a "patient safety issue" for Ms. Joppy to discuss religion or the schedule. *See* ECF No. 408-11; ECF No. 387 at 144.[7] Between March 5 and March 7, Ms. Jordan did not have any conversations with Ms. Joppy to try and rectify the issues Ms. Jordan identified in her email to Mr. Page. *See id.*

Regarding the "mistyped," *id.* at 143, March 21 incident, Ms. Jordan testified that she did not know whether the accusation that Ms. Joppy was "going above her scope of practice," ECF No. 408-11, was recorded in writing, ECF No. 387 at 143.[8]  Ms. Jordan provided no testimony as to the actual date on which this incident referred—i.e., Ms.

---

[6] Ms. Jordan did testify that, in contrast, some of complaints regarding Ms. Joppy were hearsay. *See* ECF No. 387 at 158.

[7] Further, Ms. Jordan testified that "there's not" anything wrong with Ms. Joppy praying with patients. ECF No. 387 at 145.

[8] Specific testimony attendant to this matter reads as follows:

> Q. But my question is is this accusation of her [Ms. Joppy] going above her scope of practice, is that in writing? The scope of practice that's being reference[d] with regard to Ms. Joppy, where is it?
>
> A. I don't know.

*Id.* at 146. Later during the trial, Mr. Page, who previously practiced as a nurse for twenty-five years, provided testimony in understanding, from his perspective, what constitutes the "scope" of a nurse's practice. *See* ECF No. 388 at 184. From Mr. Page's perspective, a nurse could know their own scope through orientation, and that absent training on a specific task such a task is beyond the nurse's scope of practice. *See id.* at 185. Mr. Page further testified that "ICU policy and procedures" determined a nurse's scope of practice. *Id.* at 186.

Jordan offered no testimony that corrected her "mistype." *Cf.* ECF No. 387 at 482 (testifying this was "a typo"). And as for the "multiple complaints" that Ms. Jordan included in the paragraph under her explanation of the "mistyped" March 21 incident, Ms. Jordan testified that she did not personally observe the at-issue behavior—e.g., giving patients baths for multiple hours—but rather that she took the word of Dana Olson, another charge nurse, in reporting this behavior to Mr. Page in her March 5, 2019, email. *See* ECF No. 387 at 147.

On March 25, 2019, Mr. Page placed Ms. Joppy on a performance improvement plan (PIP). *See* ECF No. 407-8 at 1.[9] Although Mr. Page presented Ms. Joppy with the PIP on March 25, Ms. Guy sent Ms. Lesley and Mr. Page an email dated March 8, indicating that a PIP was prepared for presenting to Ms. Joppy on March 12, 2019. *See* ECF No. 408-8 at 1 ("DQ is scheduled for 7:30AM on Tuesday March 12, 2019."). Nonetheless, due to Ms. Guy's resignation, *see* ECF No. 388 at 202, the PIP was not presented to Ms. Joppy until March 25, *see* ECF No. 407-8. It recited "areas of focus" for Ms. Joppy's work performance, and improvement objectives along with examples of prior conduct that resulted in Ms. Joppy receiving the PIP. *See generally id.* For instance, regarding the "overall theme" of "[maintaining a] respectful work environment," *id.* at 1, the PIP specified the following "examples":

---

[9] Consistent with both this PIP and the prior reviews of Ms. Joppy's work performance, Mr. Page reported Ms. Joppy as a "low performer" in January, February, and March of 2019. *See, e.g.,* ECF No. 388 at 198; ECF No. 409-4; ECF No. 409-5. Ms. Joppy was eligible for a "low," "solid," or "exceptional" rating. *See, e.g.,* ECF NO. 388 at 198. Receipt of a "low" score for any Medical Center employee was intended to serve as a tool for performance improvement. *See id.* Reports of Ms. Joppy's "low performance" were not shared with her until she received her PIP. *See* ECF No. 389 at 101.

**Examples**

- January 28th during your verbal warning of an obscene gesture to a MD behind his back witnessed by two RN's you denied that it happened. It was

then I gave you resources to help your personal life and informed you that you cannot let your personal life affect your job.
- March 5th: It was reported that you were unprofessional and disrespectful towards the charge nurses in regards to the schedule. You have been shown on three separate occasions how to use Facility Schedule and how to access it on your personal phone.

ECF No. 407-8 at 1[10]–2.[11] Attendant to these examples, the PIP set forth the following

"improvement objectives":

---

[10] Mr. Page denied at trial having observed this incident himself but represented that he "believed [he] did" interview two nurses who observed this incident. ECF No. 388 at 210. An email message from Mr. Page to Linda Pilon contains an attachment with competing recollections from such nurses and Ms. Joppy regarding this incident. *See* ECF No. 408-10 at 2. Nonetheless, Mr. Page testified he was able to substantiate that Ms. Joppy "flipped off" a physician, in the words of these nurses, notwithstanding Ms. Joppy's denial that she did so. *Id.* When asked on redirect examination how he substantiated that Ms. Joppy engaged in this conduct, Mr. Page testified as follows:

> Q. You substantiated it by believing two people over Ms. Joppy, right?
>
> A. That is correct.

ECF No. 388 at 234. Mr. Page clarified he also found out about this incident from Ms. Jordan. *See id.* at 234–35.

[11] Regarding Ms. Joppy's "personal life," Mr. Page stated in an email sent to Ms. Burley and Ms. Lesley Rehak, the Medical Center's Assistant Chief Nursing Officer, on March 23, 2019—two days before issuing Ms. Joppy's PIP, and in seeming contradiction to this provision in the PIP—that:

9

| Improvement Objectives |
|---|
| DQ must remain respectful towards the charge nurses and any other employee within the hospital |
| - Value differences of others<br>- Use proper body language and tone. |

| |
|---|
| - Learn how to use Facility Scheduler and have your requests in within the first week of the new schedule being open. |

ECF No. 407-8 at 1–2.[12]

---

> I have heard that she [Ms. Joppy] shares too much of her personal life with patients and families but have not received *any concerns* from patients or family members. The two service recoveries I have are the only two that I have heard about. I receive compliments on how good her care is.

ECF No. 409-8 at 1 (emphasis added). To the extent that Mr. Page identified issues regarding Ms. Joppy's personal life in this email, it concerned her comments to staff. *See id.* This is consistent with an email that Christopher Donnelly, an ICU charge nurse, sent to Mr. Page on December 3, 2018, mentioning, among other things, that Ms. Joppy frequently discussed "inappropriate things at the nurses [sic] station and with other nurses, i.e. personal life, marijuana use . . ." ECF No. 409-2 at 1. Ms. Joppy testified that "[w]e all discuss our personal lives at the nurse's station," and that that to the extent she discussed any marijuana use it was in connection with her ex-husband's cancer. ECF No. 389 at 222; *see also id.* (testifying that "I talked about my ex-husband's cancer, and then his cannabis use and full remission in less than six months . . . ."). Ms. Joppy explicitly testified that she did not discuss any personal "marijuana use": "I didn't discuss my marijuana use." ECF No. 389 at 223. On redirect examination, Ms. Joppy explained she uses marijuana medicinally for scoliosis. *See id.* at 228. She never used marijuana when actively working at the Medical Center. *See id.* at 239.

[12] Mr. Page's trial testimony explored this aspect of Ms. Joppy's PIP. *See, e.g.,* ECF No. 388 at 172. This testimony revealed as well that Ms. Jordan herself had "problems" using Facility Scheduler, but, unlike Ms. Joppy, was not put on a PIP for this problem:

> Q. Do you remember . . . we talked about the problem that Lindsay Jordan said I'm going to keep the schedule open to the 4th –
>
> A. Yes.
>
> Q. You need to do it early, but if you can't do it early because things change, I'm going to leave it open by the 4th, and she did not. You saw that?
>
> A. Yeah, I did see that.
>
> Q. Okay. So that's a problem with the scheduling facility, true?

The PIP also discussed the "Basic Job Function" of "Provid[ing] exceptional patient experience" and related "overall theme" of "Patient complaints specific to listening and attending to patient needs." *Id.* at 2. It recited the following examples as to Ms. Joppy's behavior regarding this "job function" and "theme":

> - March 5th: During nurse leader rounding a service recovery was performed for a patient and family member voicing a complaint of being "man handled" by DQ. The patient stated you repositioned him yourself and told him to keep his arm straight so the IV pump will not alarm. He attempted to make his needs known but you left the room saying you will pray for him. He felt you were not listening to his needs which goes against the ICARE values of

A. Yes.

Q. And she's not put on a PIP for that, correct?

A. Lindsey Jordan?

Q. Yes.

A. No. But I instructed her –

Q. Okay.

*Id.* at 172–73 (citation modified).

11

> compassion and respect. The patient's wife was also a witness to this.
>
> - March 20th: During nurse leader rounding a service recovery was performed on a patient who informed me that you did not listen to the requests of the patient when her IV pump was alarming as well as her monitor alarms. The patient stated you were aloof to her issues and were not paying attention. When the next RN came on her issues were fixed immediately. This is another example of your lack of attentiveness to the patient's needs.

*Id.* at 2–3. Ms. Joppy testified that the patient who accused her of "man handling" was not her patient, was experiencing alcohol withdrawal, and had a "very, very strong opinion about [her] being an African American." ECF No. 389 at 86. She further testified that, as a factual matter, she simply asked the patient to "keep [his] arms straight." *Id.* at 87. As for the patient with the alarming IV pump, Ms. Joppy testified that this was the result of having three patients while being assigned to work in a pod alone, without support. *See id.* at 89.

Continuing, the PIP recited the following "improvement objectives" regarding its "theme" of "Patient complaints specific to listening and attending to patient needs":

DQ will have no further patient or family
complaints.
DQ will actively listen to her patient's
needs.
DQ will look for solutions.
DQ will advocate for her patients.
DQ will act professionally at all times.
DQ will bring report patient issues to her
supervisor in a timely manner.

ECF No. 407-8 at 2.

Finally, the PIP discussed the "Basic Job Function" of "Provid[ing] safe patient care

at all times," and related "overall theme" of "Witnessed distracting and unsafe behaviors

by charge nurses and physicians." *Id.* at 3. It provided the following examples:

**Examples**

- February 21st: It was reported that you changed the patient assignments in the pod without consulting the charge RN. When the charge nurse discovered the assignment change and asked why it happened you become defensive and denied it when approached. This put patient safety at risk. It also demonstrates a lack

> of teamwork and
> communication.
>
> • February/March: Multiple
>   charge nurses has
>   witnessed you listening to
>   ear buds while working
>   which puts patient safety
>   at risk because you are not
>   focused on your job.
>   When RN's charge has
>   addressed this behavior
>   you have been witnessed
>   having a negative attitude
>   towards them when asked
>   to take the ear buds out.
>   A physician noticed you
>   listening to music and
>   dancing on the night of
>   March 18th. This behavior
>   is not adhering to
>   maintaining a professional
>   demeanor at all times.

*Id.* at 3–4.[13] As to this "theme," the PIP recited the following "improvement objectives":

> **Improvement Objectives**
>
> DQ will not listen to music on personal
> devices which includes ear buds and
> phones.
>
> DQ will not change patient assignments
> unless discussed with the charge nurse
> first.
>
> DQ will immediately report unsafe
> practices to supervisor.
>
> DQ will maintain the highest quality
> standards and take initiative to improve
> service and care.

---

[13] In addition to signing the PIP, Ms. Joppy essentially acknowledged listening to music while working in her trial testimony. *See* ECF No. 389 at 211. Whether other nurses in the ICU listened to music themselves—and at least one did—while working is discussed further below.

> DQ will value teamwork to provide
> excellent patient care.
>
> DQ will check in with charge nurse once a
> shift by one AM to maintain
> communication and address any patient
> concerns or support needed.

*Id.* at 3–4. The PIP was signed by Mr. Paul and Ms. Joppy. *See id.* at 5.[14]

On March 30, 2019, Mr. Page sent an email to several ICU charge nurses, including Ms. Jordan and Ms. Burley regarding Ms. Joppy's PIP. *See* ECF No. 407-10.[15] In this email, Mr. Page set forth Ms. Joppy's obligations under the PIP:

> 1) She is not to be using earbuds in while working.
> 2) She is to check in with the charge by 0100 every night she works. You need to let me know if she does not do it.
> 3) She is to make sure her schedule needs are in within the first week of the new schedule being open.
> 4) She is to have respectful conversations with the charge RN's.
> 5) She is not to have any patient complaints.

*Id.* Mr. Page also set forth the charge nurses' "responsibilities" regarding Ms. Joppy and her work performance following her placement on the PIP:

> These are your responsibilities:
> 1) She is to not be a pod by herself.
> 2) Rhonda and Lindsay is to have the schedule released promptly.
> 3) The charge RN's are supposed to check in with her during the shift to make sure she is doing well with her assignments and help if needed.

*Id.*

---

[14] Mr. Page testified that he did not consider the PIP disciplinary in nature. *See* ECF No. 388 at 167. Ms. Burley perceived the PIP differently, agreeing in her testimony that a PIP is disciplinary in nature. *See* ECF No. 388 at 250.

[15] To summarize, and consistent with prior excerpts of the Court's factual recitation: Ms. Jordan was one of "several charge nurses." *Id.* Until late April 2019, Paul Page was the charge nurses' "manager," and Ms. Burley was the interim "director of the ICU" at the Medical Center in May 2019. *Id. See also* ECF No. 388 at 248. Lesley Rehak, also CC'd on Mr. Page's March 30, 2019, email regarding Ms. Joppy's PIP, was the Medical Center's Assistant Chief Nursing Officer. *See* ECF No. 387 at 151. According to Ms. Jordan, Nikki Schoolcraft was the "ICU manager," serving in an "interim" capacity. ECF No. 387 at 165. In her capacity as interim supervisor, Ms. Hayes replaced Mr. Page. *See* ECF No. 387 at 263.

15

After receiving Mr. Page's March 30 email, Ms. Jordan did not "recall any" experiences working with Ms. Joppy or instances where Ms. Joppy needed help. ECF No. 387 at 154. Nor did Ms. Jordan recall any conversation among the ICU charge nurses as to help or support they could provide Ms. Joppy regarding her work performance. *See id.* at 155. *Cf.* ECF No. 407-10.

Until he stepped down from his position as ICU manager in late April 2019, *see* ECF No. 388 at 206, Mr. Page met with Ms. Joppy several times concerning her work progress following the issuance of her March 25, 2019 PIP, *see, e.g.,* ECF No. 409-11 at 6. The two met on April 4, April 13, and April 23. *See id.* At each meeting, Mr. Page reported that Ms. Joppy was performing within "PIP guidelines":

> Progress Noted weekly; 4/4 AM  4/13 AM  4/17 AM  pending completion of next schedule for further dates.
>
> 4/4:  DQ is performing within the PIP guidelines. She placed her days in Facility Scheduler per instructed. Has talked to CNC in a constructive manner.  No music at the nurse's station.  Per CNC's she has been checking in with them with no issues.  She did talk to the CNC to get permission to change assignments.
> 4/13:  DQ continues to perform within the PIP guidelines.  She has not received any concerns with patient care, she is checking in with CNC's. Continues not to play music as nurse's station.
> 4/23:  DQ continues to perform within the PIP guidelines.  No further issues to report.
> 5/2, 5/9, 5/13

*Id.* After leaving his manager role in late April 2019, at which time Mses. Hayes and Schoolcraft assumed shared responsibilities for such a role in interim capacities, Mr. Page stopped conducting his meetings with Ms. Joppy. Ms. Burley testified she could not recall if anyone else continued to meet with Ms. Joppy, despite the PIP's requirement that someone at the Medical Center continue to do so. *See* ECF No. 389 at 21.

### C. Ms. Joppy's Complaints of Discrimination and Retaliation

Prior to receiving her PIP, Ms. Joppy personally corresponded with Mr. Page several times in which she lodged complaints of discrimination. This background

regarding Ms. Joppy's own correspondence is appreciable in understanding the nature of her claims and the testimony of additional witnesses at trial.

On March 20, 2019, before being placed on her PIP, Ms. Joppy sent Mr. Page a series of text messages. *See generally* ECF No. 407-7. The first, sent at 10:02 a.m., stated, "Sir I was just informed I'm under an action plan on the unit." *Id.* at 1. Approximately twenty-one minutes later, Ms. Joppy sent another message to Mr. Page, stating "I will be waiting and awake sir not going to lie thinking of now filing a grievance this is over the top and I just spoke to you this morning." *Id.*[16]

Ms. Joppy sent Mr. Page another series of text messages on March 21, 2019. *See* ECF No. 407-7 at 2. In these text messages, she communicated the following:

---

[16] Ms. Weihe testified that such a text message could be an example of a discrimination complaint:

> Q. An example of a discrimination complaint could be I'm going to file a grievance because this is honestly too much, true?
>
> A. True.

ECF No. 386 at 86. *See also id.* at 88. The Court discusses the remainder of the text messages that Ms. Joppy sent to Mr. Page on March 20 and March 21, 2019, further below. *See, e.g.,* ECF No. 407-7 at 2–3.

————— Mar 21, 2019 —————

2 hrs before MY interview I have a action plan I have bullied at work for eat buds that Desi has in his ear all the time No one ever spoke to me about it... I listen to music because they put me in pods by myself over and over they have me working every weekend I can't go to church all... Only to push me out I have 3 Daisy Nominations in 1.5 yrs and a Google review and cards galore.

7:58 AM

Sorry Sir this is over the top and why you have no staff

8:00 AM

*Id.* Mr. Page testified that the "Desi" to whom Ms. Joppy referred in her first text message was Desi Diaz, a registered nurse and "traveler that worked nights." ECF No. 388 at 162–63.[17] Mr. Page also understood Ms. Joppy to be complaining about her work schedule in

---

[17] Mr. Page had been told that Mr. Diaz wore earbuds while working, in contravention of ICU policy. *See id.* at 163. Regarding this policy, Mr. Page agreed that it should be enforced equally. *See id.*

18

this first text message. *See id.* at 163.[18] As for Ms. Joppy's bullying and problems with other staff, Mr. Page testified that at the time he received her messages he was in the "process of working it out." *Id.* at 165. Mr. Page elaborated that he was not, as a "formal matter" in connection with Ms. Joppy's PIP, addressing or investigating Ms. Joppy's complaints that she was enduring cruel treatment at work. *Id.* at 170.[19] This was, according to Mr. Page, the first time that he learned Ms. Joppy had an interview scheduled to transfer out of the ICU to the Medical Center's "critical float pool." *Id.* at 203; *see also id.* at 207.[20]

On May 30, 2019, Ms. Joppy submitted a complaint of discrimination to "HCAhrAnswers," ECF No. 407-12 at 1, which Ms. Weihe testified was the functional equivalent of "like an intake, like a call center," ECF No. 386 at 93. Ms. Joppy's complaint reads:

> Donquenick stated she feels she is being bullied. She has been suspended and doesn't know why. She has received 3 Daisy awards and she wants off her unit. Several people have left. Donquenick stated her unit is understaffed. She stated was supposed to have an interview and she got written up right before the interview to block the interview. She said she feels targeted as a woman of color. She was placed alone in a pod. Her new interim manager said there was a "cultural issue" on the unit.

---

[18] Ms. Joppy testified that she was scheduled "every weekend," which was a problem because in her words "I have a very strong faith, and I worship and keep the Sabbath." ECF No. 389 at 97. According to Ms. Joppy, white co-workers had weekend activities accommodated in the schedule, whereas she did not. *See id.* at 98.

[19] Mr. Page's complete testimony on this point reads as follows:

> A. Not any formal matter as a performance improvement plan, but during all of this time, I was very -- I was very direct, and I was very plain with the charge nurses that you need to give her a chance, and that you need to help her succeed. I was planning on telling them all that, the day and nightshift charge nurses.

ECF No. 388 at 170.

[20] Discussed further below, Ms. Burley was aware of Ms. Joppy's request to transfer to the critical float pool, but "did support not wanting her [Ms. Joppy] to transfer at that time." ECF No. 389 at 45. Ms. Joppy testified she was motivated in part to request this transfer to avoid working with co-workers she perceived as "mean girls." *See* ECF No. 389 at 104–05.

ECF No. 407-12 at 1. *See also* ECF No. 388 at 21.[21] Ms. Weihe assigned April Ulrich, a Senior Human Resources Business Partner, to investigate Ms. Joppy's discrimination complaint. *See* ECF No. 388 at 8–9; ECF No. 386 at 95. Ms. Ulrich testified it was important to take Ms. Joppy's complaints seriously, notwithstanding the pending investigation into her professional conduct, pertaining to Ms. Joppy's conduct on May 24, 2019, that would have been ongoing at the time she lodged her May 30, 2019, complaint. *See* ECF No. 388 at 22. The Court now turns to the events of May 24, 2019.

---

[21] Regarding this complaint, Ms. Weihe offered the following testimony:

> Q. If you see that language, woman of color, targeted, bullied, would you in your 20-plus years experience in HR, would you classify that as a complaint of discrimination?
>
> A. Yes, ma'am.

ECF No. 386 at 94. Ms. Jordan also testified that bullying can be a form of race discrimination, as well as that the Medical Center had a duty to investigate claims of bullying:

> Q. And you do acknowledge, though, that bullying can be a form of race discrimination, correct?
>
> A. Yes.
>
> Q. And you agree that The Medical Center of Aurora has the duty to investigate bullying complaints, correct?
>
> A. Correct.

ECF No. 387 at 157. According to Ms. Jordan, Ms. Joppy never told Ms. Jordan that she felt Ms. Jordan bullied her. *See id.* at 207.

**D. Patient Stewart Brown's May 23, 2019 Admission to the Medical Center and Subsequent Death on May 24, 2019, and the Medical Center's Ventilator Policy**

**1. Mr. Brown's Death in the Medical Center ICU**

In the evening of May 23, 2019, Stewart Brown was admitted into the Medical Center's ICU as a patient. *See, e.g.,* ECF No. 386 at 91; ECF No. 387 at 13, 17, 25, 38. He died in the ICU on May 24, 2019. *See, e.g.,* ECF No. 386 at 91; ECF No. 387 at 44. Prior to his death, Mr. Brown's caregiver, Minerva Bodnarczuk—who considered herself to be Mr. Brown's niece—observed Ms. Joppy provide care for Mr. Brown. *See* ECF No. 387 at 9, 19. Ms. Bodnarczuk is a certified nursing assistant, *see id.* at 29, who never worked as a registered nurse, and whose license expired in 1999, *id.*

On the morning of May 24, prior to Mr. Brown's death, Dr. Joseph Forrester, a pulmonologist, critical care specialist, and sleep specialist at the Medical Center, *id.* at 34, who at the time was "one of the ICU pulmonolgists in the [ICU] unit," *id.* at 90, and dayshift doctor, *id.* at 91, gave a verbal order to "withdraw everything," meaning an order to "[t]o stop the medicines that were supporting [Mr. Brown] and remove him from the ventilator," *id.* at 40.[22]

---

[22] The Medical Center's policy regarding verbal orders, "Communication of Verbal or Telephone Orders, TX 331" (the verbal order policy) defines a "verbal order" as "any order received directly from a Licensed Independent Practitioner (LIP) or Allied Health Practitioner (AHP) privileged for prescribing." ECF No. 407-17 at 1. Regarding verbal orders in the Medical Center's ICU, Ms. Welter, *see* ECF No. 387 at 81, testified that [i]f a verbal order is given, it's expected that you kind of like say back what you heard to verify that you're getting the information correct, and then you can go act on that order or put it into the computer and then act on that order," *id.* at 86. Further, that it is "[v]ery common" for doctors at the Medical Center's ICU to give verbal orders, and that nurses "have to" follow verbal orders, *id.* at 87. Undisputed trial testimony established that Dr. Forrester qualified was as a Licensed Independent Practitioner for purposes of the verbal order policy at the Medical Center and in the ICU. *See* ECF No. 407-17 at 1; ECF No. 387 at 178.

Following Dr. Forrester's verbal order, Ms. Welter relayed the order to Ms. Joppy on the morning of May 24. *See* ECF No. 390 at 92, 110.[23] Ms. Welter testified that, from her perspective, removal of Mr. Brown's ventilator was "kind of implied with the end-of-life [ ] plan that [Dr. Forrester] was giving." *Id.* at 94; *see also id.* at 101 ("I didn't receive orders to do anything with the ventilator. It's implied with end-of-life measures, but I didn't – like, that's not the wording that I heard out of Dr. Forrester."); *id.* at 109. She continued that she understood Ms. Joppy would be the nurse to execute Dr. Forrester's verbal order. *See id.* at 110.

Dr. Forrester testified that he expected Ms. Joppy would "obey that order" and "comply with [Mr. Brown's] wishes," ECF No. 387 at 40–41, to be taken off life support, *id.* at 40.[24] *See also id.* at 60. Ms. Joppy, who stayed on prior to the end of her night shift to provide continuing care for Mr. Brown, subsequently turned off Mr. Brown's ventilator

---

[23] As registered nurses, both Mses. Welter and Joppy were authorized recipients of Dr. Forrester's verbal order under the verbal order policy. *See* ECF No. 387 at 180. Ms. Welter later input Dr. Forrester's order into Meditech, the Medical Center's electronic charting system. *See id.* at 109–10. She did not do so contemporaneously, due to an emergency that required her "immediate attention." *Id.* Ms. Welter testified it would be "best practice" to contemporaneously enter such a verbal order. *Id.* at 111. Yet, and consistent with this testimony, Ms. Jordan's testimony shows there is nothing that categorically prohibits providing a verbal order for extubation or end-of-life care:

Q. So in end of life, is it *best* to have a written order?

A. Yes, *for me personally.* I would not take a verbal. I would have had the provider enter it.

ECF No. 387 at 198 (emphasis added). Mr. Brown's own medical records reflect this delay in Ms. Welter's entry of Dr. Forrester's order. *See* ECF No. 390 at 107; ECF No. 409-12 at 133.

[24] Ms. Jordan testified there is a typical order set for end-of-life care, which typically includes "medications [and] respiratory orders." ECF No. 387 at 195.

22

while he was still alive. *See id.* at 41, 101; ECF No. 389 at 121; ECF No. 388 at 183.[25]

Dr. Forrester elaborated at trial on the effect of this decision:

> Q. And tell us about turning off the ventilator. Would that prevent Mr. Brown from breathing?
>
> A. No. And I think that's part of the confusion of reviewing this record and everything is that we have these – they're called Hamilton ventilators, but they're similar to most ventilators. When you turn them off, it doesn't have a shutter valve. It does not have any restriction to the person's ability to take a breath in, but there is tubing that's attached. There's the endotracheal tube that's inside the throat, and then there's tubing that attached to the endotracheal tube, and those things can have some resistance to them, but it's not difficult usually to breathe through them.

ECF No. 387 at 41.[26] Dr. Forrester testified that turning off the ventilator would not cause

Mr. Brown to suffocate or experience a drowning sensation. *Id.* at 43.[27] Prior to removing

---

[25] Ms. Joppy described Mr. Brown as "actively transitioning." ECF No. 389 at 149; *see also id.* at 150.

[26] Darryl Shafer, the respiratory therapist at the ICU on May 24, 2019, offered conflicting testimony regarding resistance and a patient's ability to breathe when a ventilator is turned off. *See* ECF No. 389 at 261.

[27] In contrast to this testimony, Ms. Jordan testified that she later told Ms. Schoolcraft it was her, Ms. Jordan's, impression that Mr. Brown had suffocated prior to his death. *See* ECF No. 387 at 166. When asked what this statement to Ms. Schoolcraft was "based on," Ms. Jordan testified that:

> It's based upon that when you have a tube -- I've always been told when we are weaning patients, so when the breathing tube is in them, we wean them off if we're trying to get the breathing machine off of them, that you want to provide PEEP, because if you don't have any kind of positive pressure, it's like breathing through a straw, so it's very uncomfortable. So taking that component out and not providing any pressure, from what I've learned from respiratory and from my experience, it's like suffocating. I don't think anybody wants to breathe through a straw.

ECF No. 387 at 166. Ms. Jordan elaborated that use of ventilator and breathing tube did not *prohibit* a patient from breathing on their own, as well as that "breath[ing] through a straw," *id.*, still permitted a patient to breathe:

> Q. If you're breathing through a straw, you can still breathe, correct?
>
> A. It's not comfortable.

*Id. See also id.* at 168 (citation modified):

23

this ventilator, Ms. Joppy also stopped pressors—in Dr. Forrester's words, "intravenous medicines that are given to maintain someone's blood pressure"—prior to turning off Mr. Brown's ventilator. *Id.*[28] Dr. Forrester concluded that there was no problem with this sequence. ECF No. 387 at 44.[29] Specifically, regarding Mr. Brown's ventilator and endotracheal tube, Dr. Forrester testified that "[s]ometimes we leave the tube in, but I don't think it's causing restriction, and particularly in this case I don't think it was causing any restriction." *Id.* at 67.[30]

---

Q. [I]f you're breathing through a straw, you can still breathe; is that correct?

A. The way you put it in, yes.

Ms. Jordan offered the following testimony as to breathing through a straw and Mr. Brown's perceived suffocation: "I still disagree with it. So I don't know if it was a straw, and I don't know if he suffocated. We will never know, and that's the whole – that's the whole issue here." *Id.* at 187. *See also id.* at 188 (testifying "[a]bsolutely" in response to the question "You said nobody will ever know if the patient suffocated. I'm kind of paraphrasing, but is that right?"). Ms. Hayes's testimony is consistent with Ms. Jordan's. *See* ECF No. 387 at 242. Noted below, Ms. Schoolcraft testified that Mr. Brown did not suffer at the time of his death. *See* ECF No. 390 at 42.

[28] This is consistent with Mr. Page's testimony and description regarding a nurse's general responsibilities following the provision of a physician's end-of-life order set; e.g., "[t]urning off medications that's keeping [a patient's] blood pressure up. Giving medications such as morphine and Ativan for comfort. Other basic needs like turn, oral care, stuff like that." ECF No. 388 at 188.

[29] Dr. Forrester further testified on cross examination that the Medical Center's ICU protocols applied to Mr. Brown and the care he received. *See* ECF No. 387 at 60. In Ms. Welter's words, turning off the ventilator prior to extubating the patient was not typical protocol, and she considered such a decision outside a nurse's scope of practice. *See id.* at 118. Instead, she believed that it was proper for respiratory therapists to manage patient ventilators. *See id.* at 119. However, Ms. Welter also testified that "we try to make sure that the patient is off of the ventilator before they pass away, and it's just like a good standard." *Id.* at 114. *See also* ECF No. 387 at 196 (testimony from Ms. Jordan explaining typical non-emergent nature and strategies of end-of-life care).

[30] Consistent with this testimony, Ms. Welter, discussed further below, testified that at the time of death Mr. Brown's breathing tube was "still in his mouth" and he remained connected to the ventilator. *Id.* at 114. Despite Dr. Forrester having no apparent disagreement with Mr. Brown's end-of-life care, Bonnie Andrews, Head of Risk Management at the Medical Center, testified that in her opinion Dr. Forrester did not provide a valid order authorizing Ms. Joppy's conduct. *See* ECF No. 390 at 84.

Before turning off the ventilator, Ms. Joppy called for a respiratory therapist—specifically, she contacted Mr. Darryl Shafer. ECF No. 389 at 122, 240. She informed Mr. Shafer of Mr. Brown and his status. *See id.* at 123. Mr. Shafer informed Ms. Joppy that he could arrive "in 30 to 40 minutes." *Id. See also id.* at 247. Ms. Joppy soon called Mr. Shafer again, escalating her concerns that Mr. Brown's death was imminent. *See id.* at 123. Ms. Joppy testified that during this second phone call, Mr. Shafer "instructed [her] on how to turn off the ventilator." *Id. See also id.* at 124 (testifying that "[h]e's giving me instructions step by step on the phone"). She stated that she "followed the instructions to the T" when turning off Mr. Brown's ventilator. *Id.* Moreover, Mr. Shafer never told Ms. Joppy she was prohibited from touching the ventilator. *See id.* at 238. And Ms. Joppy testified that she "would not have turned off the ventilator if [she] was instructed not to do that." *Id.*[31]

Ms. Joppy did not observe any reaction or signs of distress from Mr. Brown after turning off the ventilator. *See id.* at 124. Within approximately thirty seconds of turning off the ventilator, Mr. Shafer entered Mr. Brown's room. *See id.* At no point did Mr. Shafer ever inform Ms. Joppy that she did "anything wrong," *id.*, by unplugging the ventilator. Indeed, Ms. Schoolcraft testified that Mr. Brown did not suffer at the time of his death. *See* ECF No. 390 at 42.

---

[31] Mr. Shafer offered conflicting testimony at trial, stating that in her second phone call Ms. Joppy represented that Mr. Brown had already died when she asked how to turn off the ventilator. *See* ECF No. 389 at 248. According to Mr. Shafer, he "[d]efinitely [would] not" have given these instructions had Mr. Brown been alive. *Id. Cf.* ECF No. 389 at 168 (testimony from Ms. Joppy that Mr. Brown was "actively transitioning").

Regarding past practices, Dr. Forrester testified that it was "not convention" to turn off a ventilator on a still living, intubated patient, ECF No. 387 at 60, as well as that he had never seen someone at the Medical Center turn off a patient's ventilator while the patient was alive and intubated, *id.* at 61. However, although this is not what medical providers "typically do, [ ] it's not wrong." *Id.* at 61. *See also id.* at 77 (testifying that turning off a ventilator while a patient is intubated was "not a harmful protocol either").[32]

Ms. Bodnarczuk testified that Ms. Joppy provided Mr. Brown with sufficient medical care. *See* ECF No. 387 at 22.[33] At no time did Ms. Bodnarczuk contact or file a complaint

---

[32] This testimony is consistent with Ms. Welter's testimony that she "never witnessed" Mr. Brown drowning or suffocating. *Id.* at 96. Further, Ms. Welter testified that "if you're connected to this piece of equipment that's supposed to be delivering breaths, but it's not, and it's still totally in your trachea, then it *could have*, you know, made it hard for him to breathe on his own simultaneously." *Id.* at 116 (emphasis added). On redirect examination, Ms. Welter also testified that she believed that a policy prohibiting nurses from turning off patient ventilators was "facility-dependent," and "[not] really laid out in the statutes of Colorado." *Id.* at 124. *See also id.* at 128 (testifying that "ventilator management is a facility-driven policy"). Mr. Shafer also testified that "[n]urses do touch the ventilator, but they're not supposed to," ECF No. 389 at 255, as well as that "[i]t doesn't appear there's much discipline for it," *id.* at 256.

[33] The colloquy between Ms. Joppy's counsel and Ms. Bodnarczuk reads as follows:

> Q. Was there anything that you saw that Ms. Joppy did that indicated she did anything in your eyes that was wrong?
>
> A. No. Not while I was present, no.
>
> Q. Okay. Did you see anything that gave you concern?
>
> A. No.
>
> Q. Did you agree with what you saw in the treatment [Ms. Joppy] was providing?
>
> A. Yes. She was very, very helpful to me as far as when I was in that room.

ECF No. 387 at 22. Consistent with this testimony, Ms. Bodnarczuk later testified, *see id.* at 27, that she was satisfied with Ms. Joppy's care:

> Q. You were satisfied with Nurse Joppy's care of your uncle?
>
> A. Yes, yes, yes.

26

with the Medical Center regarding Ms. Joppy. *See id.* at 27. Ms. Bodnarczuk had no concerns regarding the care Ms. Joppy provided. *See id.* at 23, 28.[34] Following Mr. Brown's death, Ms. Bodnarczuk received no communications from the Medical Center regarding Mr. Brown's care. *See id.* at 26, 32.

### 2. The Ventilator Policy

The Medical Center's ventilator policy, titled "Ventilator Management Adult, Pediatric, Infant," does not explicitly prohibit nurses in the Medical Center ICU from handling or turning off ventilators. *Cf.* ECF No. 408-1; ECF No. 387 at 126, 128.[35] Yet according to Mr. Page, in the ICU, and following a physician's orders, "respiratory therapist[s] [are] responsible for removing the patient from a ventilator." ECF No. 388 at 186. The Medical Center's "End of Life/Intensive Comfort" set document, ECF No. 409-14, referred to at trial as the end-of-life order set template, *see* ECF No. 388 at 188, provides indications of the same:

---

[34] Specifically:

> Q. As far as you recall, you didn't have any issues with Ms. Joppy, her performance or anything?
>
> A. No.

ECF No. 387 at 28. Ms. Bodnarczuk provided additional context to his testimony upon cross examination:

> Q. So you don't remember her turning off the ventilator?
>
> A. No. No.

*Id.* at 31–32.

[35] Nor does such policy make explicit mention of, for example, phlebotomists. *See, e.g.,* ECF No. 408-1; ECF No. 387 at 131. In any event, the policy does not address what a nurse should or should not do regarding the handling of ventilators. *See* ECF No. 388 at 261.

```
Respiratory
☒  RT Oxygen Therapy/Pulse Ox  (Physician)
    Priority:Routine Date:TODAY Time:NOW
          .
          O2 Therapy: DO NOT TITRATE
    Pulse Ox Monitor: Pulse Ox Unnecessary
    Comment: O2 per SOB, DO NOT TITRATE SATS
             :
☐  RT Discontinue BiPAP/CPAP  (Physician)
    Priority:Routine Date:TODAY Time:NOW
     RT Comment: Discontinue BiPAP and/or CPAP
☐  RT Extubate  (Physician)
    Priority:Routine Date:TODAY Time:NOW
     Comment:
☐  Other _____
```

ECF No. 409-14 at 9.[36] Thus, the set template contemplates that generally a physician should enter end-of-life orders, the respiratory therapy department and a respiratory therapist are then alerted to the orders, and a respiratory therapist then typically performs whatever respiratory procedures are necessary for the patient as specified by the physician in the end-of-life order. *See* ECF No. 388 at 191. This template does not recite any procedure involving the deactivation of a ventilator on a living patient. *Cf. id.* At the time of Mr. Brown's death, the Medical Center did not place signs at or near ventilators communicating that they could only be used by members of the respiratory therapy department. *See* ECF No. 388 at 245–46.

### E.  The Medical Center Investigates Ms. Joppy's Conduct

Following Mr. Brown's death, Human Resources (HR) at the Medical Center began an investigation into Ms. Joppy's conduct on the morning of May 24, when she turned off

---

[36] While perhaps obvious, Mr. Page confirmed that "RT" as used on the end-of-life order set template means "Respiratory therapy." ECF No. 388 at 190.

Mr. Brown's ventilator. *See id.* at 102. April Ulrich, along with Mses. Schoolcraft and Hayes, conducted this investigation. *See, e.g., id.* at 105; ECF No. 388 at 36; ECF No. 390 at 31, 38.[37] An email discussion between Stephanie Garrett, an HR Business Partner, Ms. Burley, and Ms. Rehak began on May 29, 2019, regarding the incident that occurred on May 24, 2019. *See generally* ECF No. 409-17.[38]

In the course of the investigation into Ms. Joppy's conduct, Ms. Ulrich interviewed four people: Ms. Welter, Ms. Jordan, Ms. Joppy, and Mr. Shafer. *See id.* at 41.

The Medical Center contacted Dr. Forrester in 2022. *See* ECF No. 387 at 57. Yet although he was contacted, Ms. Ulrich testified that Dr. Forrester was not formally interviewed as part of her investigation. *See* ECF No. 388 at 41.[39] Dr. Forrester testified at trial that any information he would have provided to any Medical Center investigator would be the same as his testimony, *see* ECF No. 387 at 57, as well as that he was not a decisionmaker regarding Ms. Joppy's subsequent termination, *id.* at 69–70. Nonetheless, Dr. Forrester testified that he was "concerned" no one in the Medical

---

[37] In the immediate aftermath of Mr. Brown's death, but before this investigation began, Ms. Jordan reported her concerns regarding Ms. Joppy's conduct, rather than filing an incident report. *See* ECF No. 387 at 185. On May 29, 2019, Ms. Hayes also completed an incident report regarding Mr. Brown's death. *See generally* ECF No. 407-9.

[38] Ms. Burley testified that she understood this as an "*initial* email." ECF No. 389 at 56 (emphasis added). That same day, and shortly after receiving Ms. Rehak's initial email, Ms. Burley "found" the ventilator policy, ECF No. 409-17 at 1, that she later testified provided the sole basis for Ms. Joppy's termination, *see also* ECF No. 407-13 at 1.

[39] In Ms. Ulrich's words, "[w]e wouldn't interview a doctor because they weren't an employee of the hospital." ECF No. 388 at 49. She testified that regardless of his employment status, it would have been "helpful" to get Dr. Forrester's perspective on the events of May 24, 2019. ECF No. 388 at 114. However, Ms. Burley testified that, regarding any possible interview with Dr. Forrester as part of this investigation: "I must have had a conversation, because I documented that I had a conversation with him in the report." ECF No. 388 at 267. Other evidence indicates that Dr. Forrester was contacted in some capacity in connection with the investigation into Mr. Brown's death and Ms. Joppy's conduct on May 24, 2019. *See* ECF No. 407-11 at 5.

Center's HR department contacted him regarding Ms. Joppy's termination, *id.* at 71. Similarly, Ms. Hayes was not interviewed as part of the investigation into Ms. Joppy's conduct. See ECF No. 387 at 245.

Noted above, the Medical Center interviewed Ms. Welter regarding its investigation into Ms. Joppy. *See id.* at 96; *id.* at 119. At trial, Ms. Welter testified that she has "no complaints" regarding Ms. Joppy's work performance. *Id.* at 98; *see also id.* at 108.[40] Regarding her role in the investigation into Ms. Joppy's conduct, Ms. Welter was never given her statement to review and sign for accuracy. *See id.* at 106.[41] Like Dr. Forrester, Ms. Welter was not a decisionmaker regarding Ms. Joppy's termination. *See id.* at 108. Nor was Ms. Hayes, or Mr. Page. *See id.* at 263; ECF No. 388 at 182.

Ms. Ulrich interviewed Ms. Joppy on May 31, 2019. *See, e.g.,* ECF No. 388 at 79.[42] During this interview Ms. Ulrich discussed with Ms. Joppy her conduct on the day of May 24, 2019, as well as—as indicated in Ms. Ulrich's notes—some of Ms. Joppy's concerns regarding Ms. Jordan, including feeling bullied, and the clique of mean girls.[43] *See* ECF

---

[40] While Ms. Joppy was a night shift nurse, and Ms. Welter was a day shift nurse, Ms. Welter explained that the two overlapped in the morning and that "[she] didn't have any issues that [she] noticed with DQ." *Id.* at 98. Recall also that Ms. Welter had "no issues" working with Ms. Joppy. *Id. See also* ECF No. 387 at 108.

[41] Nonetheless, Ms. Welter testified at trial that her statement was "accurate." ECF No. 387 at 107. The same is true for the other individuals that Ms. Ulrich interviewed: She never showed any her investigation notes to verify their accuracy. *See* ECF No. 388 at 41–42.

[42] This is one day after Ms. Joppy filed her complaint of discrimination through HCAhrAnswers. *See* ECF No. 407-12 at 1.

[43] One aspect of Ms. Joppy's complaints concerned a clique of "mean girls" at the Medical Center and ICU. *See, e.g.*, ECF No. 387 at 231. Ms. Jordan was included in this clique of mean girls. *See id*. at 232. Ms. Jordan testified that she was never investigated as part of Ms. Joppy's discrimination complaints, nor was there any investigation into any "mean girls issues" or a "clique" related to Ms. Jordan. ECF No. 387 at 157.

30

No. 402-4 at 4.[44] Ms. Ulrich permitted Ms. Joppy to prepare a written statement regarding the events of May 24, 2019, but Ms. Joppy did not finish it due to Ms. Ulrich's decision to begin her interview with Ms. Joppy. *See* ECF No. 388 at 105; ECF No. 408-5; ECF No. 389 at 154.

According to Ms. Ulrich, she spoke to Ms. Joppy about her May 30, 2019, complaints, but did so in the same interview regarding Ms. Joppy's conduct on May 24, 2019. *See, e.g.,* ECF No. 388 at 59. The same is true of Ms. Jordan (whose interview is more fully discussed in a moment). However, Ms. Ulrich's interview notes with Ms. Jordan make no mention of Ms. Joppy's complaints, nor do they reflect that Ms. Ulrich asked any questions, or sought any information, about Ms. Joppy's complaints of discrimination. *Cf.* ECF No. 402-3 at 2. Ms. Ulrich's own testimony reflects the limited nature of her interview notes with Ms. Jordan.[45]

Ms. Weihe testified that no investigation report was prepared following Ms. Ulrich's investigation into Ms. Joppy's complaints of discrimination, despite that being a "best

---

[44] Ms. Joppy testified that no one, including Ms. Ulrich on May 31, "talked to [her] about [her] complaint" filed through HCAhrAnswers. ECF No. 389 at 132–33.　Moreover, Ms. Ulrich testified that she never saw the March 20 and March 21, 2019, text messages that Ms. Joppy sent to Mr. Page, nor that she recalled anyone in Human Resources, or Mr. Page, bringing Ms. Joppy's text messages to her attention. *See, e.g.*, ECF No. 388 at 33–34.

[45] Specifically:

> Q. Do you see anywhere in your notes where you talk about Ms. Joppy being treated differently?

> A. Not specifically, right? I mean, but she does say she thinks that Ms. Joppy knew the right process, but didn't do it. So, again, it's been so long. I can't remember the specific questions. And like you asked me earlier, in hindsight could we have done things differently and better? Absolutely, we could have. I could have done a better job of documenting my questions and documenting responses.

ECF No. 388 at 61.

practice." *See* ECF No. 386 at 95.; *see also id.* at 96. In Ms. Ulrich's own words: "I didn't do a separate report, no." ECF No. 388 at 62.

On June 3, 2019, Mses. Ulrich, Burley, and Schoolcraft interviewed Ms. Jordan. *See* ECF No. 387 at 171–72. Regarding her role in providing Ms. Joppy with any discipline, Ms. Jordan testified that she lacked any power to do so, and that "that's what our manager was there and our director and HR and all the other entities." *Id.* at 200. Ms. Jordan was not involved in the decision to terminate Ms. Joppy. *Id.* at 222.

On June 3, 2019, Ms. Ulrich prepared her investigative report about Ms. Joppy's conduct from May 24, 2019. *See* ECF No. 402-5; ECF No. 388 at 42. Regarding her findings and conclusions, Ms. Ulrich testified at trial that "while the doctor can give verbal [orders], you want it to be written before moving forward." *Id.* at 48. Ms. Ulrich further testified that she found Ms. Joppy practiced outside of her scope and violated the ventilator policy, which she testified was a policy that did not apply to Ms. Joppy. *See id.* at 58.[46] Ms. Schoolcraft who, as indicated above, also participated in this investigation, testified at trial that Ms. Joppy's conduct was not consistent with the Medical Center's protocols. *See* ECF No. 390 at 58.[47]

---

[46] As for whether Ms. Joppy violated this policy intentionally, Ms. Andrews provided the following testimony:

Q. Do you think she [Ms. Joppy] can intentionally fail to follow a policy she'd never seen?

A. Stated that way, probably not.

ECF No. 390 at 99.

[47] The Medical Center's expert, Yolanda Anderson, testified at trial that Ms. Joppy "did not follow what should be the scope of practice" because she "deviated from that by turning off the ventilator" of Mr. Brown. ECF No. 390 at 146. While Ms. Anderson opined that operating the ventilator was outside the scope of nursing practice, *see id.*, unlike Mr. Page, whose *scope* testimony is referred above, Ms. Anderson did not *herself* precisely define the scope itself of Ms. Joppy's practice—only that turning off the ventilator exceeded

That same day, at approximately 7:41 p.m., Ms. Burley sent Ms. Ulrich the following email regarding her investigative report:

> April,
>
> Please add any additional policies/statements to the event. I could not find practicing outside of scope, which I know we have somewhere???
>
> Bre

ECF No. 407-14. On June 4, 2019, the day after Ms. Ulrich prepared her report, she responded to Ms. Burley:

> I think this is perfect. The respiratory policy shows practicing out of scope so I think it is enough. Thank you!

*Id.*[48]

Although offered outside the context of Ms. Ulrich's investigation, Mr. Page testified at trial that he believed where a nurse does not harm a patient, such a situation does not amount to a fireable offense:

> Q. So a situation where someone gives the wrong -- attempts to give the wrong medicine to a patient is a teaching moment, but a situation where someone follows direction of a doctor and an RT to turn off a ventilator that doesn't cause any harm is a fireable offense?
>
> A. That doesn't cause any harm to the patient?
>
> Q. Yes.
>
> A. If it doesn't cause any harm to the patient, I believe it would not be a fireable offense.

---

it. Instead, Ms. Anderson provided testimony as to the Colorado Board of Nursing's "Is this Task Within My Scope of Practice?" document. *See* ECF No. 408-18; ECF No. 390 at 149.

[48] To the extent that Ms. Burley played an *investigative* role in analyzing Ms. Joppy's May 24, 2019, conduct, such role did not include investigating or interviewing Mr. Shafer. *See* ECF No. 388 at 264.

ECF No. 388 at 232.

### F.  The Medical Center Suspends and Terminates Ms. Joppy

On May 29, 2019, the Medical Center suspended Ms. Joppy. *See, e.g.,* ECF No. 388 at 78; ECF No. 389 at 129. Ms. Burley was involved in this suspension decision. *See* ECF No. 389 at 54. At trial, Ms. Burley explained that she believed suspension was proper as part of a "standard process for the investigation" into Ms. Joppy's conduct on May 24, 2019, particularly where her conduct, from Ms. Burley's perspective, raised concerns regarding patient outcomes, *id.*

Discussed above, Ms. Ulrich completed her investigation on June 3, 2019. *See, e.g., id.* at 42; ECF No. 402-5. Ms. Joppy was terminated on June 4, 2019. *See, e.g.,* ECF No. 407-13 at 2; ECF No. 390 at 42.

In a draft final occurrence report attached to an email sent from Bonnie Andrews, Head of Risk Management at the Medical Center, *see* ECF No. 390 at 66, to Ms. Burley dated May 31, 2019, whose subject is "Neglect SB 5.24.19 ICU.docx," Ms. Andrews indicated that Ms. Joppy had already been terminated. *See* ECF No. 390 at 90; ECF No. 407-11 at 6 ("The nurse was terminated.").[49] Ms. Andrews prepared this draft, final report

---

[49] The same trial exhibit demonstrates that Ms. Andrews appears to have forwarded the May 31, 2019, email to Ms. Burley again on June 3, 2019 ("FW: Neglect SB 5.24.19 ICU.docx"), stating to Ms. Burley: "Just a gentle *reminder* that I will need to have this information by end of day today for timely filing with CDPHE thanks!" ECF No. 407-11 at 1 (emphasis added). Ms. Andrews testified that she did not know that Ms. Joppy was the nightshift nurse who turned off Mr. Brown's ventilator at the time she prepared the May 31, 2019, draft final report for the CDPHE, and that she relied at least in part on Ms. Hayes's preliminary investigative report in preparing her own for the CDPHE. *See* ECF No. 390 at 109–11. Yet Ms. Andrews provided this additional testimony on redirect examination:

Q. There's no reason to believe that the ICU personnel – they knew who it was about, correct?

A. They would have known, yes.

herself, with the intention to send it to the Colorado Department of Public Health and Environment (CDPHE) and sought Ms. Burley's assistance in completing the document. *See* ECF No. 390 at 93. Ms. Andrews intended to send the report to the CDPHE to report Ms. Joppy's conduct on May 24, 2019, which Ms. Andrews had by May 31, 2019, determined was qualified to be a "neglect" "occurrence type." ECF No. 407-11 at 2; *see also* ECF No. 390 at 92.[50]

Ms. Burley was the decisionmaker for Ms. Joppy's termination. *See, e.g.,* ECF No. 390 at 42; ECF No. 388 at 248. She received input from others, including Mses. Ulrich and Schoolcraft, *see id.*, in reaching this decision. Ms. Burley did not "remember [having] a conversation" with Dr. Forrester prior to terminating Ms. Joppy. ECF No. 388 at 256. Nor did Ms. Burley herself speak to Ms. Joppy "directly" prior to terminating her. *Id.* at 276. Ms. Burley testified that the reason for Ms. Joppy's termination was Ms. Joppy's decision to turn off Mr. Brown's ventilator prior to his death. *See id.* at 249.[51]

---

ECF No. 390 at 125.

[50] Recall that Ms. Andrews testified that it would not be possible for Ms. Joppy to intentionally violate a policy she had never previously seen. *See* ECF No. 390 at 99. *Cf.* ECF No. 408-6 at 35 (providing basis for Ms. Andrews's report and specifying that an element of neglect is that "[s]taff member intentionally failed to follow standard of practice and/or facility policy with significant potential of harm"). On cross examination, Ms. Andrews testified that she "felt . . . Ms. Joppy intentionally failed to follow the standard of practice," ECF No. 390 at 103, based on Ms. Joppy asking Mr. Shafer how to turn the ventilator off, signaling she had "never been trained in it," *id.* at 104.

[51] Indeed, Ms. Burley clarified that her termination decision was premised *only* on Ms. Joppy's May 24, 2019 conduct:

> Q. So it [the PIP] was disciplinary. Did that have a role in your decision to terminate Ms. Joppy?
>
> A. It did not in relation to this one specific event.
>
> Q. So it was just this event. It had nothing to do with the performance improvement plan, correct?

In Ms. Joppy's termination letter, Ms. Burley cited the Medical Center's ventilator policy as justification for Ms. Joppy's termination:

> Under Policy, *Ventilator Management Adult, Pediatric, Infant*, it is the listed responsibility to the respiratory therapist to manage the ventilator. "*Respiratory Care Department is responsible for the set up, management and monitoring of the ventilator in all patient care units including but not limited to the ICU, NICU, ED, PACU, Cath lab, MRI, and CT.*" Donquenick turned off the ventilator without a physician order present and practiced out of her scope, as well as not waiting for the Respirator Therapist to assist with end of life care.

ECF No. 407-13 at 1. This was the sole policy that Ms. Burley identified as having been violated by Ms. Joppy on May 24, 2019. *See generally id.* And although some of her trial testimony concerned whether Ms. Joppy practiced outside of her scope, Ms. Burley's decision concerned Ms. Joppy's decision to turn off Mr. Brown's ventilator. *See* ECF no. 389 at 60–62.

Consistent with the limited explanation provided for Ms. Joppy's termination, Ms. Burley testified at one point that Ms. Joppy was not terminated for violating any other policy, including the Medical Center's verbal order policy. *See* ECF No. 388 at 253; ECF No. 407-17. Nor was Ms. Joppy terminated for violating the Medical Center's "Critical Care Unit Basic Standard of Patient Care" policy (the ICU standard of care policy). *See* ECF No. 388 at 254; ECF No. 407-20. Regarding the ICU standard of care policy, Ms. Burley further testified that she was "not . . . aware of" Ms. Joppy having violated it. ECF No. 388 at 254. In sum, Ms. Burley, when offered several Medical Center policy documents at trial, confirmed that Ms. Joppy was not terminated for violating them. *See,*

---

A. Correct.

ECF No. 388 at 250.

36

*e.g., id.* at 255; ECF No. 389 at 62 ("Because the circumstances of Mr. Brown's case was around her turning a ventilator off, which is out of her scope of practice, so it had – it had nothing to do with the other policies.").[52]

As for the termination letter's description of Ms. Joppy's conduct on May 24, 2019, the termination letter states:

> **DETAILED SUMMARY OF OFFENSE(S) LEADING TO THIS ACTION:**
> On 5/24, it was discovered Donquenick Joppy put a patient at risk for dignity, safety, and comfort during end of life measures.
>
> The appropriate process to provide end of life care was not followed and Donquenick practiced out of the nursing scope in relation to this patient and her actions associated with the ventilator. Donquenick was the night shift nurse, staying after her assigned shift, continuing to provide care to the patient unnecessarily. Since Donquenick chose to stay into the following shift, she was told by the day shift nurse that the physician wanted the "drips turned off" and medications were being ordered for comfort. Orders for the transition of care were not entered into the charting system for Donquenick. It is standard practice for nurses to ensure orders are being followed as received and entered. This was not done by Donquenick, as no order was placed into the chart until after the patient had deceased. Her actions to turn off the vaso-active medication drips and ventilator without an order present is in direct conflict with a nurses scope of care, in which Donquenick practiced beyond what her nursing license allows.

ECF No. 407-13 at 1. And as for Dr. Forrester's "orders" mentioned in the termination letter, Ms. Burley testified that, in her estimation, it was "a problem" for Ms. Welter to delegate such orders to Ms. Joppy. ECF No. 388 at 274.[53] Ms. Burley continued: "You can't have a verbal order go to another nurse for a verbal order," as this amounts to "practicing out of scope." *Id.*[54]

---

[52] Ms. Joppy testified that working with and under the direction of a respiratory therapist was within her scope of practice as a registered nurse. *See* ECF No. 389 at 127.

[53] Ms. Burley acknowledged that the letter's phrase "[o]rders for the transition of care were not entered into the charting system" ECF No. 407-13 at 1, was "vague," ECF No. 388 at 274, as well as that the word "verbal" was "not in the write-up," *id.* It follows that the termination letter fails to reflect that Dr. Forrester provided verbal orders, despite Ms. Burley's apparent acknowledgment that Dr. Forrester did provide verbal orders that day. *See id.* ("There was a verbal order that was given to Karen [Welter], yes.").

[54] Noted below, and taking Ms. Burley at her word that such conduct is practicing outside of a nurse's scope, Ms. Welter was not disciplined for doing the same on the morning of May 24, 2019, when she relayed Dr. Forrester's verbal order to Ms. Joppy.

At trial, Ms. Burley appeared to offer a new and additional theory supporting her termination decision. Whereas the termination letter itself made no mention of any Medical Center policy regarding the protocols to which a nurse must adhere when administering care, and Ms. Burley disclaimed that such a policy was a basis for Ms. Joppy's termination, *see* ECF No. 388 at 279, she testified that Ms. Joppy "would have been required to hear the verbal order[s] to carry them out from the physician or a written order from the physician, or if a nurse had entered those orders." *Id.* at 278. The remainder of this colloquy reads as follows:

> Q. So this is a new one then. Now she's [Ms. Joppy's] required to have heard the orders from Dr. Forrester?
>
> A. A nurse has to receive orders from a provider.

*Id.*

Mr. Shafer was not disciplined for directing Ms. Joppy to turn off Mr. Brown's ventilator. *See* ECF No. 389 at 257–58. Nor was Ms. Welter. Ms. Welter was never disciplined for relaying the order to Ms. Joppy rather than following the order herself. *See* ECF No. 390 at 123.[55] Relatedly, Ms. Jordan testified that she was unaware of anyone at

---

[55] Ms. Burley made this point explicit in her testimony, in response to a jury question that the Court posed to her at the end of her examination:

> The Court: Was Nurse Welter suspended or disciplined for passing on a verbal order from a doctor to another nurse?
>
> Ms. Burley: She was not.

ECF No. 389 at 77.

the Medical Center ICU being disciplined for carrying out a verbal order. *See* ECF No.

387 at 163.[56]

### G.  How Ms. Joppy's Termination Affected Her

Ms. Joppy provided testimony at trial as to how her termination adversely affected

her. Given its relevance in the Court's later *damages* analysis, the Court quotes such

testimony in full below:

> As a newly single mother new to Colorado, I felt outside of my body. It was
> cold. What they were writing made absolutely no sense. I think I was just
> praying in the name of Jesus. I actually even had a scheduled therapy
> session that day, so I was grateful for it. But I also decided to seek justice
> after that, because I just felt like this was the most racist retaliatory thing I
> ever -- that I -- that I -- that I've experienced. Like, I didn't -- I've never had
> anything like this.

ECF No. 389 at 134.

> I didn't trust them. I didn't trust to tell or write anything. I was shell shocked,
> and I was terrified, and how am I going to feed and take care of myself?
> And days later getting a letter -- no one ever told me that they felt like --
> when I was being terminated, they never said that they were reporting me
> to the state. They never said that I committed a crime. It wasn't until I got a
> letter from the Board of Nursing just days later, and it was so quick. I even
> e-mailed April Ulrich like and told her, You didn't even allow me to finish my
> paper in writing. It was so unfair. And no one else was treated like this. I
> remember even texting Karen [Welter], and nobody else was in trouble
> except for me.

*Id.*

Q. And tell me how that has affected you up to today?

A. I lost the ability to provide shelter for myself and my daughter.

Q. Why is that?

---

[56] Neither nurse identified a category of verbal order called a "hearsay order," which Ms. Andrews defined as an order relayed from one nurse to another, and characterized as invalid. *See* ECF No. 390 at 107.

A. I didn't have a job, and my license was being investigated, so –

Q. What about your ability to trust?

A. I didn't trust anyone.

Q. Does that affect working?

A. Who am I supposed to go to protect me from behaviors like that? Medicine, nursing is a practice. It ain't perfection, and I did not harm, nor did I ever intend to harm or do something wrong. There was no grace, even in the situation that they knew was hostile, antagonizing, discriminatory, retaliatory. I have not been the same.

*Id.* at 135.

Q. Has it affected you physically?

A. I don't sleep well. I wake up because I haven't been with my daughter in over six years. I would wake up crying looking for my job. And I haven't had a place to live. I've been couch surfing. I lived in Massachusetts with a stranger just so I wouldn't sleep outside. The community that I served, it just put all this shame and these words on my back and shoulders. And I'm like 80 pounds lighter than before. Like, I'm not even the same person.

*Id.*[57]

Q. Is this ever going to go away?

A. I have no malice, but this hurts so bad. It hurts so bad, and it don't go away.

. . .

Q. Is this still going to affect you for the rest of your life?

A. Always.

---

[57] Carla Banks, a friend of Ms. Joppy's, provided further testimony regarding Ms. Joppy's physical condition following her termination. For instance, that following Ms. Joppy's termination, "it just seemed like she couldn't focus, and she was scattered, and sometime it was hard to figure out where she was going." ECF No. 390 at 8. Linda Bryant, a "motherly" figure to Ms. Joppy, *id.* at 13, likewise offered testimony as to how Ms. Joppy "started faltering" after her termination from the Medical Center, *id.* at 15. Melinda Wilkins, who attended Ms. Joppy's church, offered similar testimony. *See, e.g., id.* at 20, 23.

. . .

Q. How?

A. I'm the oldest of seven kids, and my dad, the only biological daughter. He can't even see anymore. It's stressed us out. I have a startle reflex, and I hear a sound or noise, I automatically jump and go. I get scared. I weep a lot. But I know that with the prayer and love of Jesus, that is my strength and my encouragement, but it's always there.

ECF No. 389 at 136 (citation modified).

On cross examination, Ms. Joppy provided testimony and further context regarding her life and what she described as "[e]veryday life stressors." ECF No. 389 at 215; *see also id.* at 219. As for a question regarding "trauma and stress" that she experienced prior to coming to work at the Medical Center in 2017, Ms. Joppy testified that she "experienced life." *Id.* at 217. Further, that changes in her life were due "mostly because of [her] ex-husband's [Stage IV] cancer." *Id.* at 217; *See also id.* at 218, 219 (testifying that "[l]ife after cancer is really rough" as well as that "[c]ancer costs a whole lot of money"). To the extent that Ms. Joppy's therapist prescribed her medications in approximately July 2017 for, among other things, a depressive disorder and anxiety disorder, Ms. Joppy testified that these prescriptions were for "medications that [she] had been on. [The therapist] was just re-prescribing the things that [she] had been on." *Id.* at 217–18. *See also id.* at 219 (testifying that "I've been taking these meds since I was 28 years old").

## H.  The Jury's Verdict

After the close of evidence and the parties' closing arguments, the jury deliberated for over one day. *See* ECF Nos. 391, 392. The jury found Ms. Joppy proved her § 1981 claims for discrimination and retaliation claims by a preponderance of the evidence. *See*

ECF No. 392 at 5. The jury found that Ms. Joppy proved by a preponderance of the evidence that she was entitled to recover compensatory damages and awarded her $5,000,000 in compensatory damages. *See id.* The jury found that Ms. Joppy proved by a preponderance of the evidence that she was entitled to punitive damages and awarded her $15,000,000 in punitive damages. *See id.*[58]

## II.    ANALYSIS

Following this seven-day trial, the Medical Center filed the instant Opposed Renewed Motion for Judgment as a Matter of Law, Or in the Alternative, Motion for a New Trial, Remittitur, and Review of the Damages Award. ECF No. 402. Ms. Joppy also filed her Motion for Reasonable Fees and Related Non-Taxable Expenses. ECF No. 411. Both motions are fully briefed. The Court addresses them in turn below.

### A.  The Medical Center's Motion

The Medical Center seeks two basic forms of relief—relief from the jury's *liability* findings, and relief from the jury's *damages* findings—under two basic legal standards— Federal Rules 50 and 59 of Civil Procedure.

*First*, the Court sets forth the applicable legal standards under these Federal Rules of Civil Procedure, elaborating on them as necessary in the Court's analysis of the Medical Center's arguments.

*Second*, the Court addresses the Medical Center's arguments as to its liability and the jury's damages awards. To again preview the Court's conclusion: the Medical Center

---

[58] Relevant to this issue, the parties stipulated at trial that HCA-HealthOne LLC's net patient revenue for the year ending December 31, 2023 "was 3.2 billion," and that HCA-HealthOne LLC's net worth for the year ending December 31, 2023 "was 8.1 billion." ECF No. 390 at 160.

is not entitled to a new trial as to the jury's *liability* findings, nor is remittitur of the jury's *compensatory damages* verdict proper. However, the Court agrees with the Medical Center that the evidence cannot sustain the jury's *punitive damages* finding and award.

### 1. Legal Standards

### a. Rule 50

Judgment as a matter of law under Rule 50 is appropriate only where evidence "points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1129 (10th Cir. 2019); *see also Bill Barrett Corp. v. YMC Royalty Co.*, LP, 918 F.3d 760, 766 (10th Cir. 2019) ("A party is entitled to [judgment as a matter of law] only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." (citation modified)); *Stroup v. United Airlines*, Inc., 26 F.4th 1147, 1156 (10th Cir. 2022) (observing that "[t]he quantum of evidence necessary to defeat a [Rule 50 motion] is slight"). In reviewing a Rule 50 motion, courts draw all reasonable inferences "in favor of the nonmoving party" and do not make "credibility determinations[,] weigh the evidence," or "challenge the factual conclusions of the jury." *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 983 (10th Cir. 2019) (citation modified); *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002) (asking whether jury verdicts are "supported by substantial evidence" when record is viewed "most favorably to the prevailing party" (citation modified)). Judgment as a matter of law under Rule 50 is "cautiously and sparingly granted," and granted only when courts are certain that the evidence "conclusively favors

one party such that reasonable [people] could not arrive at a contrary verdict." *Mountain Dudes*, 946 F.3d at 1130 (citing *Bill Barrett*, 918 F.3d at 766); *Stroup*, 26 F.4th at 1158 ("We affirm denials so long as there was sufficient evidence—viewing the evidence in the light most favorable to the non-moving parties—for the jury to reasonably find as it did.").[59]

### b. Rule 59

Following a jury trial, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A motion for a new trial is "generally not regarded with favor," and is "granted only with great caution." *Nosewicz v. Janosko*, 857 F. App'x 465, 468 (10th Cir. 2021) (citing *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972)). It is inappropriate to grant a new trial "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Id*. (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2803); *see also Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019) (noting that a district court abuses its discretion in Rule 59(a)

---

[59] A party seeking Rule 50(b) relief must have first sought the same under Rule 50(a). *See, e.g., Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1266 (10th Cir. 2016) ("[A] party may only pursue a ground for relief in a postverdict Rule 50(b) motion if that same ground for relief was first asserted in a preverdict Rule 50(a) motion." (citation modified)). Ms. Joppy argues that the Medical Center has waived numerous Rule 50(b) arguments by failing to adequately advance—and therefore preserve—them at the Rule 50(a) stage. *See, e.g.,* ECF No. 406 at 7 ("In its Rule 50(a) motion [the Medical Center's] only mention of retaliation was a passing acknowledgment of [Ms. Joppy's] May 29 complaint." (citation modified)); *id.* at 8 (arguing that the Medical Center "partially waived Rule 50(b) relief on the punitive damages claim" (citation modified)). The Court has reviewed the Medical Center's Rule 50(a) motion and is assured that its motion adequately preserved all its Rule 50(b) post-verdict challenges. *See, e.g.,* ECF No. 410 at 5; ECF No. 390 at 128–135. This is not a circumstance where there is "too great a mismatch between the premises of [the Medical Center's] Rule 50(a) and Rule 50(b) motions" that might otherwise preclude the Court from proceeding to analyze the entirety of the Medical Center's motion on the merits. *Capture Eleven Grp. v. Otter Prods., LLC*, 777 F. Supp. 3d 1239, 1244 (D. Colo. 2025).

context "if it [makes] a clear error of judgment or exceed[s] the bounds of permissible choice in the circumstances." (quotation omitted)).

## 2. Causation Evidence & Instruction

The Medical Center challenges the Court's § 1981 *but for* causation instruction on the grounds that it "misstated" the applicable causation standard. *See* ECF No. 402 at 15–16. Thus, the Medical Center argues, it is entitled to a new trial under Rule 59(a) on this basis, *see id.* at 16, but is separately entitled to a new trial under Rule 59(a) because Ms. Joppy "introduced legally insufficient evidence of but-for causation" at trial, *id.* Ms. Joppy disagrees, arguing that the tendered *but for* causation instruction was sufficient and her causation evidence were sufficient to survive the Medical Center's Rule 59(a) challenge. *See* ECF No. 406 at 3, 25. The Court agrees with Ms. Joppy on both counts. In explaining why, the Court first addresses the Medical Center's instructional challenge, turning then to its evidentiary challenge.

### a. Causation Instruction

The Medical Center challenges the Court's *but for* causation instruction as to Ms. Joppy's § 1981 discrimination and retaliation claims. *Compare* ECF No. 402 at 16, *with* ECF No. 377 at 17, 19. According to the Medical Center, the Court's instruction is inconsistent with the applicable causation standard set forth in *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327 (2020). The Court disagrees. *See also* ECF No. 406 at 26.

The Court's jury instructions for both Ms. Joppy's § 1981 claims are consistent with *Comcast*. 589 U.S. 327. Take *Comcast*: "[A] plaintiff bears the burden of showing that

45

race was a but-for cause of its injury." *id.* at 333, and the Court's jury instructions, "read and evaluated in their entirety," *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1109 (10th Cir. 1998) (citation modified):

- from Instruction No. 16, reciting the elements of Ms. Joppy's claim for "racial discrimination": "Defendant would not have terminated Plaintiff Joppy but for her race";

- from Instruction No. 16: "[R]ace must be a 'but-for' cause of the adverse employment action";

- from Instruction No. 18, reciting the elements of Ms. Joppy's claim for "retaliation": "Defendant would not have terminated Plaintiff Joppy but for Plaintiff Joppy's protected activity";

- from Instruction No. 18: "[R]etaliation or retaliatory motive must be a 'but-for' cause of the adverse employment action."

ECF No. 377 at 17, 19. The Court's conclusion is bolstered by consideration of the verdict form, *see Jensen v. W. Jordan City*, 968 F.3d 1187, 1198 (10th Cir. 2020), which reads as to both of Ms. Joppy's claims:

> Question 1: Did Plaintiff Joppy prove by a preponderance of the evidence that *but for* her complaint about race discrimination [the Medical Center] would not have terminated her?

> Question 2: Did Plaintiff Joppy prove by a preponderance of the evidence that *but for* her race [the Medical Center] would not have terminated her?

ECF No. 380 at 1–2 (emphases added). *See also* ECF No. 406 at 26; *Jensen*, 968 F.3d at 1198 (considering the verdict form in *instructional error* analysis).

These instructions and verdict forms are unlike the causation standard applied by the Central District of California, affirmed by the Ninth Circuit, of which the Supreme Court ultimately disapproved in *Comcast. See* 589 U.S. at 331 (describing the Ninth Circuit's application of *but for* test "as whether 'discriminatory intent play[ed] *any role*'" (original

emphasis)). Indeed, and contrary to the Medical Center's suggestion, they are entirely consistent with the plain language of *Comcast*, which contemplates application of a *but for* causation standard. *See, e.g.,* 589 U.S at 336; ECF No. 406 at 25.

To the extent that the Court provided any elaboration on its *but for* instruction, such elaboration is entirely consistent with decisional law interpreting this causation standard. *Compare, e.g.,* ECF No. 377 at 17 ("Plaintiff Joppy's race does not need to be *the sole cause* of Defendant's action, but Plaintiff Joppy must show that it played a part."), *with Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 665 (2020) (interpreting *but for* causation standard in Title VII context as one under which "[a] plaintiff's sex need not be *the sole or primary cause* of the employer's adverse action" (citation modified)); *Sethi v. Potomac Valley Orthopaedic Assocs., Chartere*d, Civil No. TDC–24–1062, 2024 WL 3606595, at *5 (D. Md. July 31, 2024) (observing in § 1981 and following *Comcast* that "the plaintiff's burden is only to show that the protected activity was a but-for cause of the termination, not that it was the sole cause." (citation modified)).[60] Indeed, Ms. Joppy's race and protected activity need not be the "sole cause" of the Medical Center's action, *see, e.g., id.*, but of course, and consistent with the Court's instructions, the Medical Center must "rel[y] in part on [Ms. Joppy's [race]" when discriminating against or

---

[60] Regarding *Bostock* and its role in the Court's *causation* analysis, of course § 1981 and Title VII are different statutory regimes. But, as with the Court's analysis of Ms. Joppy's punitive damages, cases interpreting Title VII's *but for* causation standard are cross-applicable in the Court's analysis of its *but for* instructions for Ms. Joppy's § 1981 claims. *See, e.g., Barton v. Unity Health Sys.,* No. 14–CV–6658–FPG–JWF, 2018 WL 1383229, at *3 n.7 (W.D.N.Y. Mar. 19, 2018), *aff'd*, 768 F. App'x 83 (2d Cir. 2019) ("The but-for causation standard applies to Title VII . . . and Section 1981 cases." (citation modified)). The Court's observation is underscored by *Comcast* and *Bostock*'s citation to *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), in their analyses of the *but for* causation standard for § 1981 and Title VII, respectively. *Compare Bostock*, 590 U.S. at 656, *with Comcast*, 589 U.S. at 336.

terminating her in order for her to meet her *but for* causation burden. *Compare Bostock*, 590 U.S. at 659 (citation modified), *with, e.g.,* ECF No. 377 at 17.[61]

Regardless, as Ms. Joppy notes, *even if* a small portion—an "isolated" clause, or in the Medical Center's words an "elaboration"—of the Court's instructions provided an imprecise articulation of the applicable causation standard, this alone does not amount to instructional error to the need for a new trial under Rule 59(a). *See* ECF No. 406 at 27.[62] Recall jury instructions are read in their entirety, *see Roberts*, 149 F.3d at 1109, and as explained above—and conceded by the Medical Center, *see* ECF No. 402 at 17— the entirety of the Court's instructions and verdict form accurately instructed the jury that they

---

[61] The Medical Center contends that the Court essentially tendered a "motivating factor" instruction in violation of *Comcast. See, e.g.,* ECF No. 402 at 17. As explained above, as the Medical Center essentially concedes, that misreads the entirety of the Court's instructions. *See id.* ("Instructions 16 and 18 *correctly stated* that Plaintiff bore the burden of proving that 'Defendant would not have terminated [her] but for' her race or protected activity." (citation modified)). In any event, as explained below, the isolated language upon which this argument is premised does not demand a new trial, and is regardless consistent with *Bostock*'s observation that *but for* causation contemplates the Medical Center's "rel[iance] in part on [Ms. Joppy's race]." 590 U.S. at 659 (citation modified).

[62] As to whether the Court's instructions could even be read as instructing the jury as to the *motivating factor* standard—which, explained below, the instructions did not—the Fifth Circuit has opined, in analyzing a jury instruction for plain error, that:

> The question before us is whether the inclusion of "motivating factor" alongside "but for" is plain error.
>
> The two standards are different points along the same continuum— 'but for" is inclusive of "motivating factor." If an employer would not have acted but for the improper characteristic, the improper characteristic is necessarily a motivating factor in the employer's decision.
>
> The inclusion of the "motivating factor" question did not create any extra burden for [the plaintiff]: he had to prove that he did not receive the promotion but for his age. If [the plaintiff] had successfully shown that his age was the but-for cause, it would have necessarily been a motivating factor as well. In this context, the addition of "motivating factor" to the jury instructions was merely superfluous. Though unnecessary, the inclusion of the lesser standard did not impact [the plaintiff's] substantial rights.

*Guerra v. N. E. Indep. Sch. Dist.*, 496 F.3d 415, 418 (5th Cir. 2007).

were tasked with finding whether Ms. Joppy had met her *but for* burden, *see also* ECF No. 406 at 27.[63]

Yet—again, assuming imprecision—jury verdicts are "not set aside [for] *lack of clarity*, *or even outright error in some* of the instructions, unless—having due regard for the unrealism of assuming that *isolated passages* in a long set of instructions are likely to have made the difference—we are convinced that the instructions, taken as a whole . . . are likely to have impaired *substantially* the jury's ability to understand the case." *Needham v. White Lab'ys*, Inc., 847 F.2d 355, 358 (7th Cir. 1988) (citation modified). *See also Int'l Air Indus., Inc. v. Am. Excelsior Co.*, 517 F.2d 714, 728 (5th Cir. 1975) ("In evaluating the adequacy of a charge to the jury, we consider the charge as a whole, and if the instructions taken together properly express the law applicable to the case, there is no just ground of complaint, even though an isolated and detached clause is in itself inaccurate, ambiguous, incomplete, or otherwise subject to criticism." (citation modified)). And the jury can hardly be said to be *misled* when the jury was instructed numerous times as to Ms. Joppy's *but for* causation burden, and the Court's articulation of this burden is consistent with governing law. *Cf. Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001) ("In considering the instructions . . . we take into account all the jury

---

[63] On the flip side of its concession that the jury instructions correctly recited and instructed the jury as to the applicable *but for* causation standard, *see* ECF No. 402 at 17, the Medical Center *cannot* argue the Court instructed the jury to find any "motivating factor." These words—"motivating factor"—appear nowhere in the Court's instructions. *Compare generally* ECF No. 377, *with* ECF No. 402 at 16.

49

heard, and from the standpoint of the jury, decide not whether the charge was faultless *in every particular*, but whether the jury was misled in any way." (citation modified)).[64]

At last, the Court turns to the Medical Center's contention that the Court's *but for* instructions were prejudicial. *See* ECF No. 402 at 19. This argument stumbles out of the gate. There can be no instructional prejudice where, as the Medical Center acknowledges, there is no instructional error in the first instance. *Compare* ECF No. 402 at 17, *with Slane v. Jerry Scott Drilling Co.*, 918 F.2d 123, 126 (10th Cir. 1990) ("*Where an erroneous instruction is given*, we review the record to determine if prejudice resulted." (citation modified)). However, as for whether there is sufficient evidence to support the jury's *but for* causation finding, *cf.* ECF No. 402 at 19, the Court addresses it now, *id.* ("*As explained below*, the evidence that race or protected activity was actually a 'but for' cause of Plaintiff's termination was thin to nonexistent." (citation modified)).

### b. Causation Evidence

The Medical Center challenges the sufficiency of Ms. Joppy's causation evidence, *see id.*, arguing that its *insufficiency* demands a new trial under Rule 50(b), *id.* Ms. Joppy

---

[64] In reply, *see* ECF No. 410 at 9, the Medical Center directs the Court to *Miller, v. City of Ithaca, New York*, 758 F. App'x 101, 104 (2d Cir. 2018), where the Second Circuit reversed based on a district court's erroneous provision of the "less rigorous motivating factor standard," *id.*, in a retaliation case. *See also id.* (observing "original jury" returned retaliation verdict on "less rigorous standard" that was subsequently "'superseded by the but-for standard set forth in *Nassar*" (citation modified)) But—as with the Central District of California's instruction that was disapproved of by the Supreme Court in *Comcast*—the district court's causation instruction in *Miller* made absolutely no mention of the governing "but for" standard: "Accordingly, to make a claim of retaliation plaintiff must prove . . . that the defendant took the adverse action, *at least in part*, because of the plaintiff's complaints." *Miller*, Case No. 16–4258, 2d Cir., Dkt. No. 65 at 280 (emphasis added). *See also Comcast*, 589 U.S. at 331 (describing the Ninth Circuit's application of but for test "as whether 'discriminatory intent play[ed] *any role*'" (original emphasis)). In other words, *Miller* is distinguishable because, unlike the district court there, here the Court *did* provide the jury with a *but for* causation instruction, as further reflected in the plain language of the verdict form. *See, e.g.,* ECF No. 377 at 17, 19; ECF No. 406 at 26.

disagrees, arguing that, "[s]ubstantial evidence" supports the jury's verdict as to both her

claim of discrimination, ECF No. 406 at 3 (citation modified), and her claim for retaliation,

*id.* at 7. The Court agrees with Ms. Joppy. As with prior arguments, the Court addresses

the Medical Center's in turn, mindful throughout its analysis that Rule 50(b) demands

considering the record in its entirety, *see Capture Eleven Grp. v. Otter Prods., LLC*, 777

F. Supp. 3d 1239, 1246 (D. Colo. 2025), and drawing all inferences in Ms. Joppy's favor,

*Mountain Dudes*, 946 F.3d at 1130.

As a preliminary matter, the Medical Center argues that "all [of its] witnesses

testified" that Ms. Joppy was terminated because she practiced "beyond the scope of her

nursing license," ECF No. 402 at 20, and that "[n]othing in the record" showed that Ms.

Burley "did not honestly believe that [Ms. Joppy] violated" the Medical Center's policies,"

*id.* But the Medical Center's narrow emphasis on *its* witnesses and *Ms. Burley's* testimony

ignores other evidence in the record. For instance, Ms. Joppy testified that she did feel

as if the Medical Center retaliated against her, *see* ECF No. 389 at 134, and Dr. Forrester

concluded that there was no problem with the sequence of care that Mr. Brown was

provided, *see, e.g.,* ECF No. 387 at 44. Accordingly, the Court rejects the Medical

Center's apparent argument that this limited evidence in the record is sufficient to demand

a new trial under Rule 50(b)—particularly where, under this Rule, the Court is required to

consider the *entirety* of the trial record. *See, e.g., Capture Eleven*, 777 F. Supp. 3d at

1246. It considers the entirety of this evidence below in addressing the Medical Center's

challenges to the jury's discrimination and retaliation findings.

51

### i. Race Discrimination

The Medical Center challenges the evidence that Ms. Joppy put forward as to any race discrimination she suffered, arguing that neither such evidence nor that any of Ms. Joppy's arguments attendant to it "provide a legally sufficient basis for a finding of but-for causation in [her] favor." ECF No. 402 at 20. The Court addresses the categories of evidence that the Medical Center identifies below.

*Comparators*. The Medical Center argues that the comparators offered by Ms. Joppy, Mr. Shafer and Ms. Welter, are improper comparators for purposes of proving race discrimination. *See* ECF No. 402 at 21. The Court agrees as to Mr. Shafer, but not as to Ms. Welter.

*First*, as to Mr. Shafer, although he received no discipline for his conduct on May 24, 2019, as the Medical Center argues there are simply too many discrepancies between Mr. Shafer's responsibilities and reporting structure to make him a proper comparator to Ms. Joppy. *See* ECF No. 402 at 21 (citing *Payan v. United Parcel Serv.*, 792 F. App'x 634, 646 (10th Cir. 2019). The Court agrees he is an improper comparator. *See, e.g., E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007).

*Second*, as to Ms. Welter, she, unlike Mr. Shafer, was an ICU nurse. And although Ms. Welter was a daytime ICU nurse, whereas Ms. Joppy worked during the night shift, the two were both ICU nurses who often overlapped in the morning, *see, e.g.,* ECF No. 307 at 98, and were similarly situated when it comes to the Medical Center's policies, including the verbal policy, *see* ECF No. 407-17 at 1. On these bases the two nurses are similarly situated in terms of their applicable "employment circumstances." *See McGowan*

*v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) ("In determining whether two employees are similarly situated, a court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." (citation modified)).

The Medical Center argues that Ms. Welter is *not* similarly situated in terms of the "comparable seriousness," ECF No. 402 at 21, of the conduct giving rise to the investigation into her from May 24, 2019: "failing to enter a verbal order." *Id.* To be sure, the Medical Center is correct that it is undisputed that Ms. Welter did not unplug Mr. Brown's ventilator. Only Ms. Joppy did so. So if this was the *only* incident giving rise to the nurses' relative discipline, the Court would agree with the Medical Center that Ms. Welter is an improper comparator. *Cf. McGowan*, 472 F.3d at 745 ("[E]ven employees who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant." (citation modified)).

However, Ms. Joppy correctly argues that Ms. Burley recited errors regarding Dr. Forrester's orders as a rationale for Ms. Joppy's termination. *See* ECF No. 406 at 5; ECF No. 402 at 21 ("[Ms.] Burley determined that [Ms.] Welter's error was failing to enter a verbal order." (citation modified)); ECF No. 407-13 at 1 ("It is standard practice for nurses to ensure orders are being followed as received and entered. This was not done by [Ms. Joppy]."); *Starks v. Coors Brewing Co.*, 954 F. Supp. 1463, 1468 (D. Colo. 1997) "[T]he employees with whom plaintiff seeks to compare herself need not have committed identical infractions." (citation modified)). Ms. Burley offered testimony consistent with this excerpt of Ms. Joppy's termination letter. *See* ECF No. 388 at 278. Thus, Ms. Burley's

53

testimony, coupled with the trial record, shows that Ms. Joppy was not terminated solely for violation of the ventilator policy—despite *some* testimony from Ms. Burley and *some* excerpts from the termination letter that might, in isolation, suggest otherwise. *Cf. Capture Eleven*, 777 F. Supp. 3d at 1246; *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002) ("[T]he mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings." (citation modified)). Ms. Joppy's implementation and adherence to Dr. Forrester's verbal order also affected her termination—and a jury certainly could have concluded, based on both the totality of Ms. Burley's testimony and the termination letter, that it was a consideration in her decision to terminate Ms. Joppy. *See, e.g.,* ECF No. 407-13 at 1 (stating that "[Ms. Joppy] turned off the ventilator *without a physician order present*" (citation modified)); ECF No. 388 at 278 (testimony from Ms. Burley that "[a] nurse has to receive orders from a provider"); *id*. at 279 (testimony from Ms. Burley that Ms. Joppy "would have been required to hear the verbal order[s] to carry them out from the physician or a written order from the physician, or if a nurse had entered those orders"). The same cannot be said of Ms. Welter. *See, e.g.,* ECF No. 388 at 274 (testimony from Ms. Burley that it was a "problem" for Ms. Welter to delegate Dr. Forrester's orders to Ms. Joppy); *id*. ("You can't have a verbal order go to another nurse for a verbal order."); ECF No. 390 at 123; ECF No. 389 at 77.

And so, consistent with controlling law, Ms. Welter *is* a proper comparator for the Court's Rule 50(b) assessment of the jury's *discrimination* finding because she, like Ms. Joppy, failed to adhere to the verbal order policy, but did *not* receive a formal write-up or

termination premised on the same. *See, e.g., Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1198 (10th Cir. 2021) (concluding that "factfinder could reasonably regard" two individuals as "similarly situated" where defendant determined that "both individuals *had violated the same policies*" (citation modified)); *id.* at 1199 (observing that a factfinder can "reasonably infer pretext" from, among other things, "greater leniency to similarly situated employees"). In Ms. Burley's own words, Ms. Welter "was not" suspended or even disciplined for passing on a verbal order from a doctor—Dr. Forrester—to another nurse—Ms. Joppy. ECF No. 389 at 77. Accordingly, Ms. Welter is a "proper comparator," ECF No. 402 at 22, and the evidence regarding her comparative treatment was properly within all the evidence the jury could permissibly consider in assessing the Medical Center's liability.

Regardless, as Ms. Joppy notes, comparator evidence at this stage is "[not] *required* to prove race discrimination." ECF No. 406 at 7 (emphasis added). *See also Mehta v. Syngenta Corp.*, No. 1:19–cv–3011–RCL, 2020 WL 2198088, at *5 (D.D.C. May 6, 2020) ("Comparator evidence is only one means of proving a § 1981 claim, and . . . is not required." (citation modified)); *Han v. Temple Univ.*, 807 F. Supp. 3d 442, 459 (E.D. Pa. 2025) ("[W]hile many plaintiffs rely on comparator evidence to support an inference of employment discrimination, nothing requires such evidence." (citation modified)); *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1139 n.13 (10th Cir. 2024) ("[W]e have described the 'similarly situated' question as *only one method* by which a plaintiff can show the adverse employment action took place under circumstances that give rise to an inference of discrimination." (citation modified)). Thus, *even if* the Court puts to the

side any such comparator evidence between Ms. Welter and Ms. Joppy, this does not

doom the jury's discrimination finding, nor does it demand a new trial under Rule 50(b).[65]

***Prior Treatment.*** Regarding Ms. Joppy's "prior treatment," the Medical Center

essentially argues that any way in which Ms. Joppy was treated by employees *other than*

Ms. Burley—the decisionmaker for her termination—and *prior to* her termination is

immaterial to, and thus cannot support, the jury's discrimination finding. *See* ECF No. 402

at 22 ("None of that conduct is probative of Burley's motive."). However, the Court agrees

with Ms. Joppy that this argument overlooks the ability of the jury to consider the totality

of the trial evidence in assessing whether Ms. Joppy met her burden of proving her claims

---

[65] To this end, the Court makes what it believes to be an important doctrinal point. Issues regarding *comparators* typically arise at the summary judgment stage, in asking whether a plaintiff has met their *pretext* burden under the familiar *McDonnell Douglas* framework. One case the Medical Center cites in advancing its *comparator* arguments illustrates the point. *See Payan*, 792 F. App'x at 644. There is new— or renewed—debate as to whether *McDonnell Douglas* applies to Title VII and § 1981 claims before or beyond the summary judgment stage. *See, e.g., Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 951 (11th Cir. 2023) (Newsom, J., concurring); *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 323 (2025) (Thomas, J., concurring); *Galindo v. Taylor*, 723 F. Supp. 3d 1008, 1026 n.6 (D. Kan. 2024). Neither party engages with the nuances of this debate. Nonetheless, the Court—for the sake of completeness— addresses all the Medical Center's arguments as to whether trial evidence supports the jury's liability and attendant causation findings. Including, for example, the Medical Center's *comparator* arguments, and, seen immediately below, arguments regarding Ms. Joppy's prior treatment. *See In re Sharp*, No. 24–cv– 02873–CNS, 2025 WL 1378494, at *1 (D. Colo. May 13, 2025), *aff'd*, No. 25–1268, 2026 WL 913813 (10th Cir. Apr. 3, 2026) (unpublished). In doing so, the Court rejects any suggestion that a post-trial evidentiary insufficiency as to *one* of the Medical Center's *pretext* challenges is fatal to the jury's entire *discrimination* finding. In other words, although the Court analyzes, consistent with the parties' presentation of this issue, discrete categories of trial evidence as set forth in the Medical Center's motion through the *pretext* prism, the outcome of its analysis is the same under Rule 50(b). *See, e.g., State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 885 (10th Cir. 2021). The trial evidence, considered in its entirety and with all inferences from it drawn in Ms. Joppy's favor, sustain the jury's *discrimination* finding. *See, e.g., Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1161 (10th Cir. 2022) (concluding "there was sufficient evidence for [a] jury to reasonably determine that [a defendant's] stated reasons for disciplining [p]laintiffs were a pretext for unlawful age discrimination" where "substantial evidence . . . support[ed] the jury's verdict," and such evidence was "considered, along with all of the other evidence before the jury, [and] construed in the light most favorable to [p]laintiffs"). *Cf. Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, No. 1:12–cv–122–RLM, 2015 WL 1013783, at *3 (N.D. Ind. Mar. 9, 2015) ("Once the case gets to trial, the only issue the jury decides is whether, based on all the evidence in the case, it's more likely than not that things would have been different had the plaintiff not been in the protected class and everything else remained the same." (citation modified)). At bottom, there is sufficient evidence to sustain the jury's verdict, and the Court therefore denies the Medical Center's Rule 50(b) request on *insufficiency* grounds. *See, e.g., Stroup*, 26 F.4th at 1161.

by a preponderance of the evidence. *Cf.* ECF No. 406 at 28. *See also Burnett v. Sw. Bell Tel., L.P.*, 471 F. Supp. 2d 1121, 1134 (D. Kan. 2007) ("[E]vidence of pretext may include 'prior treatment of plaintiff.'" (citation modified)); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) ("[E]vidence of pretext may include, but is not limited to . . . 'prior treatment of plaintiff.'" (citation modified)).

Further, as Ms. Joppy observes, the Court provided the jury with a limiting instruction that, to the extent the jury considered any evidence that attends what the Medical Center now calls "prior treatment," such evidence was *not* related to any hostile work environment claim, given that Ms. Joppy did not pursue such a claim. *See* ECF No. 377 at 14 ("You have heard significant evidence throughout this case about the entirety of Plaintiff Joppy's employment. However, the legal questions before you to decide, as a jury, by a preponderance of the evidence, relate solely to those claims listed in these instructions. Plaintiff Joppy is not pursuing a hostile work environment claim."). Thus, not only was the jury *permitted* to consider such evidence in its discrimination and retaliation deliberations, but it was explicitly instructed that such evidence was not to be considered for purposes of a separate claim that Ms. Joppy did not assert.[66]

---

[66] The Medical Center challenges this limiting instruction as "confusing" and "contradictory" when considered next to Instruction No. 19, ECF No. 402 at 25, the Court's *pretext* instruction, which specified the jury may consider "[p]rior treatment of [Ms.] Joppy," ECF No. 377 at 20. The Court discerns no confusion. The Court's limiting instruction specified that Ms. Joppy was not pursing a hostile work environment *claim*, *id.* at 14, but that, when considering whether the Medical Center's "stated reasons for [Ms. Joppy's] termination [were] a pretext . . . to cover up for race *discrimination* and/or *retaliation*," *id.* at 20 (emphases added), the jury could consider her prior treatment as an example of pretext. *See, e.g., Burnett*, 471 F. Supp. 2d at 1134. There is nothing contradictory in these instructions, where one explained the limitation on what claims Ms. Joppy was pursuing, and another instruction provided one example among many of how Ms. Joppy could prove pretext as to the two claims the jury was to consider when deliberating. If anything, the jury instructions did exactly what the Medical Center argues they failed to do in its post-trial motion. *Compare* ECF No. 402 at 26 ("The instructions also did not include an explanation as to the claim and actions which were not at issue."), *with* ECF No. 377 at 14 ("[Ms.] Joppy is not pursuing a hostile work

***Investigation Integrity.*** According to the Medical Center, Ms. Joppy's "critiques" of its investigation into Ms. Joppy's May 24, 2019, conduct "miss the mark," ECF No. 420 at 22, given that such an investigation need not be "optimal" in order to be "fair," *id.* (citation modified). Yet the Medical Center is wrong to suggest that the only putative errors in its investigation concern the failure to interview certain witnesses, including Dr. Forrester. *See id. Cf. Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008) (observing in pretext analysis that "the company seemingly [and improperly] relied only on evidence to the detriment of the [plaintiffs] and *failed to interview key witnesses*" (citation modified)). Instead, the Court agrees with Ms. Joppy that numerous "[o]ther irregularities were also present" in the Medical Center's investigation. ECF No. 406 at 5.

Take, for instance, Ms. Burley's decision not to interview Ms. Joppy before terminating her. *See id. See also* ECF No. 389 at 132 (testimony from Ms. Joppy that no one "talked to [her] about [her] complaint"). Or that, when Ms. Joppy *was* interviewed by Ms. Ulrich, Ms. Ulrich conducted such interview in the context of Ms. Ulrich's investigation into the events of May 24, 2019, and did not even provide Ms. Joppy sufficient time to complete her written statement regarding the events of that day. *See, e.g.,* ECF No. 388 at 59, 105; ECF No. 408-5; ECF No. 389 at 154.[67] Further, as for the investigation into

---

environment claim."). To paraphrase Ms. Joppy, the instructions told the jury she was not pursuing a hostile work environment claim, while also instructing the jury they could consider prior treatment for the "limited purpose of evaluating" pretext. ECF No. 406 at 28.

[67] And Ms. Ulrich's interview notes with Ms. Jordan make no mention of Ms. Joppy's complaints, nor do they reflect that Ms. Ulrich asked any questions, or sought any information, about Ms. Joppy's complaints of discrimination. Cf. ECF No. 402-3 at 2. Ms. Ulrich admitted as much. See ECF No. 388 at 61. Ms. Weihe testified that no report was prepared following Ms. Ulrich's limited questioning as to Ms. Joppy's complaint of discrimination, despite preparing such a report being a "best practice." ECF No. 386 at 95; ECF No. 388 at 62. Indeed, Ms. Ulrich herself testified that it was important to take complaints such as Ms. Joppy's seriously. *See, e.g.,* ECF No. 388 at 22. The Tenth Circuit has observed that a failure to adequately

Ms. Joppy's conduct on May 24, 2019, on June 4, 2019, the day *after* completing her report into the events of May 24, 2019, Ms. Ulrich corresponded with Ms. Burley—at Ms. Burley's urging—stating that she had found the "respiratory policy" supporting Ms. Joppy's termination. ECF No. 407-14. This is all to say nothing of the concurrent CDPHE report prepared by Ms. Andrews in consultation with Ms. Burley, where by May 31, 2019, Ms. Andrews had determined the events of May 24, 2019, amounted to a "neglect" occurrence type, without the benefit at that time of Ms. Ulrich's report. *See, e.g.,* ECF No. 390 at 93; 407-16 at 2, 6. And, as Ms. Joppy notes, Ms. Burley did not herself speak to Ms. Joppy before terminating her, bolstering the conclusion that the investigation into Ms. Joppy's conduct was more pretextual than fair. *See* ECF No. 406 at 5; ECF No. 388 at 276; *Smothers v. Solvay Chemicals, Inc*., 740 F.3d 530, 542 (10th Cir. 2014) (concluding "a reasonable jury could find that" an investigation was not "fair or adequate" and thus pretextual where "[t]hree *decision makers* personally spoke" with certain employees but "[n]one heard [the plainitff's] version of the [at issue] encounter" (citation modified)).

These examples, which are supported by the trial record, do more than expose the Medical Center's investigation as—to paraphrase the Medical Center—suboptimal. *See* ECF No. 402 at 22; *Dean v. Stryker Emp. Co., LLC*, No. CIV–23–886–D, 2025 WL 1679535, at *11 (W.D. Okla. June 13, 2025). *Cf. Ibrahim*, 994 F.3d at 1197 ("A failure to conduct what appears to be a fair investigation of the violation that purportedly prompted

---

investigate a claim of discrimination—separate from the failure to fairly and adequately investigate the events giving rise to an adverse action—can support an inference of pretext. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1201 (10th Cir. 2015) ("For example, [the plaintiff] produced evidence demonstrating that [the defendant] did not fully investigate his ethics line complaint and complaint of race discrimination.").

adverse action may support an inference of pretext." (citation modified)). Instead, they reveal inconsistencies and—in the case of Ms. Ulrich, the Medical Center employee tasked with investigating Ms. Joppy, admitted shortcomings—to such a degree as to permit the jury to infer that the Medical Center intentionally discriminated against Ms. Joppy. *See* ECF No. 406 at 5. *See, e.g., Ibrahim*, 994 F.3d at 1200 (concluding that employer's "limited investigation also suggest[ed] pretext" where during investigation employer inadequately interviewed plaintiff); *Smothers*, 740 F.3d at 542. Considering the trial testimony and the timeline it creates as a whole, it provides substantial evidence from which the jury could find, in Ms. Joppy's words, that "the termination decision had been made and reported before any final review or meeting with Ms. Joppy, demonstrating that [the Medical Center's] stated reasons were merely a post hoc justification for a decision that was already finalized." ECF No. 406 at 6. *See also Smothers*, 740 F.3d at 542 ("A failure to conduct what appeared to be *a fair investigation* of the violation that purportedly prompted adverse action may support an inference of pretext" (citation modified)); *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) ("Post-hoc justifications for termination constitute evidence of pretext." (citation modified)); *Stroup*, 26 F.4th at 1160.

Accordingly, reading the trial record in its entirety, there are inconsistencies and deficiencies in the Medical Center's investigation into the events of May 24, 2019, that sufficiently support the jury's discrimination finding.

*Inaccuracy of Stated Reasons.* Next, the Medical Center contends that the reason provided by Ms. Burley for Ms. Joppy's termination—turning off Mr. Brown's

ventilator—was "accurate," ECF No. 402 at 23, and that the factual accuracy of this reason "belies," *id.*, Ms. Joppy's argument that her termination was discriminatory. Ms. Joppy argues that Ms. Burley failed to "accurately acknowledge" many facts in her termination letter, including Dr. Forrester's order, which "could have led the jury to conclude [she] was attempting" to falsify information to justify Ms. Joppy's termination. ECF No. 406 at 6. *See also id.* (arguing that Ms. Burley sought to "mak[e] it appear that Ms. Joppy was acting on her own and independently made the decision to remove ventilator support"). The Court agrees with Ms. Joppy that, in this Rule 50(b) posture, there is sufficient evidence from which the jury could conclude that Ms. Burley's stated reason for terminating Ms. Joppy was inaccurate.

For instance, Ms. Joppy cites—and the Medical Center does not challenge— testimony from Ms. Burley that some information in the termination letter was "not 100 percent clinically accurate." *Id.* at 4; *see also* ECF No. 402 at 23 ("[Ms.] Burley testified that only a single phrase in Plaintiff's termination document was 'inaccurate.'" (citation modified)). It is not the Court's role to make "credibility determinations" as to the consistency of Ms. Burley's testimony regarding clinical or factual accuracy, *Liberty Mutual*, 913 F.3d at 983 (citation modified), nor is it the Court's job to essentially weigh, or reweigh, Ms. Burley's testimony regarding the termination letter and her decision to terminate Ms. Joppy against other evidence in the record, *see id.* The Medical Center's argument is tantamount to an invitation to do exactly this, and fundamentally challenge the "factual conclusions of the jury." *Compare id.*, *with* ECF No. 402 at 23 (premising argument on whether Ms. Joppy's argument is "belie[d]" by trial record, that it is

61

"*undisputed* that [Ms.] Burley believed [her termination rationale] to be accurate," and that "whether verbal orders were generally permitted or 'common practice' [was] *irrelevant*" (citation modified)). The Court declines, as it must, the Medical Center's invitation. Issues of disputed fact, relevance, and witness credibility are, by trial, to be answered by the jury. *See Webco Industries*, 278 F.3d at 1128.

Separately, the Court agrees with Ms. Joppy that there is evidence revealing inaccuracies or inconsistencies between the termination letter's justification for Ms. Joppy's termination and evidence in the trial record. *See* ECF No. 406 at 4. For instance, the termination letter states that Ms. Joppy acted "without a physician order present," ECF No. 407-13 at 1, but Dr. Forrester testified that he gave a verbal order to "withdraw everything," including to "remove [Mr. Brown] from the ventilator," ECF No. 387 at 40. Dr. Forrester also testified that he expected Ms. Joppy would "obey that order." *Id.* There is certainly an inconsistency between what the termination letter says—*Ms. Joppy acted without an order from a doctor*—and what Dr. Forrester said at trial—*I gave Ms. Joppy an order and expected her to act on it.* This inconsistency is probative of pretext. *See, e.g., Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) ("Pretext can be shown by such weaknesses, implausibilities, *inconsistencies*, incoherencies, or *contradictions* in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." (citation modified)); *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005) ("Pretext exists when an employer does not honestly represent its reasons for terminating an employee." (citation modified)). A

62

conclusion underscored where, as here, the Court must construe the record in Ms. Joppy's favor. *See, e.g., Stroup*, 26 F.4th at 1160.[68]

And so, as for the *evidentiary* issue regarding the accuracy of the reason or reasons underlying Ms. Burley's termination decision and the termination letter, the Court cannot conclude that evidence conflicting with the Medical Center's interpretation of such evidence—which requires drawing evidentiary inferences *away* from Ms. Joppy—is so deficient as to warrant a new trial. *Cf. id.* ("Unless the evidence is 'lopsided' in the defendant's favor, ordinarily the jury's handling of pretext evidence will be dispositive." (citation modified)).[69]

***Other "Pretext" Indicators.*** Finally, the Medical Center identifies three other "'pretext' indicators," ECF No. 402 at 23, arguing that none "suggests pretext," *id.* The Court briefly addresses them in turn.

*First*, as to Ms. Hayes's "incident report," *id.* at 24, Ms. Joppy does not appear to advance any counterargument as to this report in response to the Medical Center's motion. *Compare generally* ECF No. 406. Regardless, this absence of argument is hardly

---

[68] Considering the record in its entirety, a jury could also have identified inconsistencies in the rationales provided by Mr. Page in his March 25, 2019 PIP. Recall that, in testifying as to "job functions" and "themes" outlined in the PIP, *see, e.g.,* ECF No. 407-8 at 2, Ms. Joppy testified that the patient who accused her of "man handling" was experiencing alcohol withdrawal and that she simply asked him to "keep [his] arms straight," ECF No. 389 at 87. And as for listening to music while in the ICU, evidence indicated that Mr. Diaz also engaged in the same conduct.

[69] The Court is persuaded by Ms. Joppy's additional argument that a jury could further infer Ms. Burley's rationale for terminating Ms. Joppy was pretextual, given that Ms. Burley testified she terminated Ms. Joppy for violating the ventilator policy but that such policy was silent as to the role of ICU nurses, nor that it prohibited a nurse from receiving support from a respiratory therapist. *See* ECF No. 406 at 4. *See also* ECF No. 408-1; ECF No. 387 at 126; ECF No. 388 at 261. Further, there were no signs located at or near ventilators explicitly limiting their operation to respiratory therapists, *see, e.g.,* ECF No. 388 at 245, and Ms. Joppy testified that working with and under a respiratory therapist was within her scope of practice, ECF No. 389 at 128.

dispositive of the Court's Rule 50(b) analysis, where the Court is tasked with evaluating the *entirety* of the trial record in assessing whether this record sustains the jury's liability finding as to Ms. Joppy's discrimination claim. *See, e.g., Capture Eleven*, 777 F. Supp. 3d at 1246.

*Second*, as to whether the reason provided for Ms. Joppy's termination provided a "substantial," objective basis for Ms. Joppy's termination, ECF No. 402 at 24, as Ms. Joppy observes there was evidence that provided the jury with a "basis to doubt [Ms.] Burley's neutrality," ECF No. 406 at 6, in offering this reason for Ms. Joppy's termination. While the Court disagrees with Ms. Joppy that her termination was wholly "untethered" to "objective standards," *id.*—Ms. Burley, after all, did at least *cite* and reference the ventilator policy in the termination letter, *see* ECF No. 407-13—the use of some objective criteria does not immunize an employer from *discrimination* liability, or undermine as a Rule 50(b) matter the jury's causation finding. *See, e.g., Salemi v. Colorado Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 691–92 (10th Cir. 2018) ("[C]loaking s[ubjective] criteria with an appearance of objectivity does not immunize an employment decision from a claim of discrimination." (citation modified)). Especially where—again— the Court must review the trial record in its entirety, *see, e.g., Capture Eleven*, 777 F. Supp. 3d at 1246, and in any event the Medical Center's argument is once again tantamount to an invitation to reweigh evidence and determine that such evidence cannot

sustain the jury's verdict. *Compare* ECF No. 402 at 24, *with Webco Industries,* 278 F.3d at 1128. At the expense of repeating itself: The Court simply cannot do this. *See id.*[70]

*Third*, as to whether Ms. Burley accused Ms. Joppy of "suffocating" Mr. Brown, ECF No. 402 at 24, while this language may be absent on the face of the termination letter, *cf.* ECF No. ECF No. 407-13, the Court—again—declines to read the *absence* of such language as a marker that a new trial is required, *cf. id*. at 23, particularly—again— where the Court must consider the entirety of the trial record, including the evidence the Court has exhaustedly discussed in its analysis of the Medical Center's Rule 50(b) arguments that attend the jury's *discrimination* finding. *See also Stroup*, 26 F.4th at 1157 ("[T]he mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings." (citation modified)).

\* \* \*

The Medical Center identifies and challenges several categories of *pretext* evidence. And in doing so, makes some salient points—e.g., that Mr. Shafer is not a proper comparator. But the Court reiterates that, in considering the entirety of the pretext evidence heard by the jury at trial, its job is to ask whether the "evidence points but *one way* and is susceptible to *no reasonable inferences* which may support" Ms. Joppy's position and the jury's liability findings, including its causation finding. *Stroup*, 26 F.4th at 1156 (citation modified). *See also Mountain Dudes*, 946 F.3d at 1129. Asking this question—*Does the evidence point only in the Medical Center's favor?*—yields this

---

[70] The parties' *pretext* arguments, presented in this Rule 50(b) post-trial posture, demonstrate that the jury could have—and most certainly did—consider other evidence of pretext beyond those set forth in the Medical Center's challenge to the jury's findings.

answer—*No.* Indeed, "[u]nless the evidence is 'lopsided' in the defendant's favor, ordinarily the jury's handling of pretext evidence will be dispositive." *Stroup*, 26 F.4th at 1160 (citation modified). This is not the "lopsided," *id.*, case that demands reversal of how the jury handled pretext evidence, nor is it—as a matter of blackletter Rule 50 law—a case where it may "certainly . . . be said that the evidence points but one way" in the Medical Center's favor, *id.* (citation modified), as to its liability. *See also Liberty Mutual*, 913 F.3d at 984 ("The evidence *must* point but *one way*." (citation modified)).

### ii. Retaliation

The Medical Center mounts a Rule 50(b) challenge to the jury's *retaliation* finding. ECF No. 402 at 24. Its challenge is straightforward: "[Ms. Joppy's] only evidence [of retaliation] was her formal pretermination complaint of race discrimination," *id.*, and any "temporal proximity," *id.* between this complaint and her termination is insufficient to establish pretext. *See also id.* at 25 ("[Ms. Joppy] offered no other evidence from which a reasonable jury could conclude that retaliation caused her termination."). Ms. Joppy counters that evidence of discrimination likewise supports the jury's *retaliation* finding, *see* ECF No. 406 at 7, as well as that temporal proximity between Ms. Joppy's complaint and termination is sufficient to establish pretext for *retaliation* purposes, *id.* The Court agrees with Ms. Joppy that—fundamentally, reading the record in its entirety, including evidence attending the temporary proximity between her complaints and termination— the Medical Center's Rule 50(b) challenge to the jury's *retaliation* finding fails.[71]

---

[71] To the extent the parties attempt—in passing—to relitigate aspects of the jury's *discrimination* finding in their *retaliation* briefing, *see, e.g.,* ECF No. 402 at 25, the Court will not redundantly readdress those arguments. It's done so above, and concluded the entirety of trial evidence and testimony supports the jury's *discrimination* finding under Rule 50(b).

Central to the parties' post-trail *retaliation* dispute is the temporal proximity between Ms. Joppy's complaints and her termination. These events are close in time. Five days, to be exact, if one counts from the date of her May 30, 2019, complaint. To be sure, some cases, cited by the Medical Center, support its position that this temporal proximity is not enough to establish pretext. *See, e.g.,* ECF No. 402 at 25; *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1237 n.10 (10th Cir. 2015) ("[I]t is enough to note our circuit's unmistakable position that temporal proximity *alone* is insufficient to raise a genuine issue of material fact concerning pretext." (citation modified)). Ms. Joppy cites a competing line of authority supporting her own position, especially given the extremely close temporal proximity—a mere five days—between her May 30, 2019 complaint and June 4, 2019 termination. *See, e.g.,* ECF No. 406 at 7; *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." (citation modified)).

These authorities are reconcilable—and ultimately supportive of the jury's verdict—in two ways. *First*, Ms. Joppy offered more than proximity evidence—which, regardless, is evidence of a *five day* separation—of retaliation. *See Anderson*, 181 F.3d at 1179. As she observes, she offered evidence at trial that, at a minimum, supports the jury's *discrimination* and *retaliation* findings, given that a pretextual explanation concealed the retaliatory nature of her termination. ECF No. 406 at 7. And in this Rule 50(b) posture, the Court declines to reweigh this evidence. *Second*, the Court, in this same Rule 50(b) posture, is required—as its now observed to the *blue in the face* point—to consider

evidence in its entirety. And the entirety of the trial evidence returns the Court to where it was a few sentences ago: At trial, Ms. Joppy offered more than just proximity evidence in support of the jury's *retaliation* finding.

Accordingly, the Court disagrees with the Medical Center that decisional law demands a new trial, or that the "clear weight of the evidence," ECF No. 402 at 25, is against Ms. Joppy and the jury's *retaliation* verdict. As with the jury's *discrimination* finding, regarding the Medical Center's *retaliation* "the jury—as the trier of fact—has spoken." *Stroup*, 26 F.4th at 1162.

### 3. The Jury's $5,000,000 Compensatory Damages Award

#### a. Remittitur

The Medical Center challenges the jury's $5,000,000 compensatory damages award on the grounds that it is "excessive and unsupported." ECF No. 402 at 3. Ms. Joppy counters that this award is entitled to deference, *see* ECF No. 406 at 11, meaning that the Medical Center is wrong to urge its disturbance. The Court agrees with Ms. Joppy that deference is owed to the jury's compensatory damages award, which is sufficiently supported by trial evidence. Accordingly, the Medical Center is entitled to neither a new trial nor a remittitur as to this award. *Cf.* ECF No. 403 at 3.

As a threshold matter, the Court notes that the Medical Center seeks remittitur of the jury's compensatory damages award under Rule 59, *see, e.g., Bond v. Sheriff of Ottawa Cnty.*, 173 F.4th 1265, 1305 (10th Cir. 2026). In this post-trial posture, a jury's award is entitled to deference because "the jury has wide latitude to choose an award based on the evidence." *Id.* (citation modified). *See also Prager v. Campbell Cnty. Mem'l*

*Hosp.*, 731 F.3d 1046, 1063 (10th Cir. 2013) ("The jury, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages[.]" (citation modified)). The moving party—here, the Medical Center—bears a "heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence." *Bond*, 173 F.4th at 1305 (citation modified). Ultimately, at both trial and appellate levels, courts ask whether a jury's compensatory damages award is "is so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." *Id.* (citation modified). *See also Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1256 (D. Colo. 2009) ("[A]bsent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate." (citation modified)). Fundamentally, "[i]t is within the virtually exclusive purview of the jury to evaluate credibility and *fix damages.*" *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1230 (10th Cir. 2000) (citation modified).

After reviewing the trial evidence and the parties' arguments, the Court declines to intrude upon this "exclusive purview," *id.*, and grant the Medical Center any relief that attends the jury's compensatory damages award.

*First*, the Medical Center argues that Ms. Joppy presented no "objective evidence of emotional distress that comes close" to supporting the jury's compensatory damages award. ECF No. 402 at 3. But she offered precisely such evidence in the form of her own

testimony, which the jury had "wide latitude," *Bond*, 173 F.4th at 1305 (citation modified), to assess both for its credibility and whether such testimony was capable of "fixing [compensatory] damages," *id.* (citation modified), for the jury's determination and calculation. As quoted fully above, Ms. Joppy testified, among other things, that following her termination she "felt outside her body," was "shell shocked [and] terrified," lost her ability to trust anyone, and that she has "not been the same" since. ECF No. 389 at 134–35. This also affected Ms. Joppy physically. She testified that she doesn't "sleep well," and that now, following her termination, she is "like 80 pounds lighter than before." *Id.* at 135. *See also* ECF No. 406 at 14. She further testified that she "lost the ability to provide shelter for [herself] and [her] daughter." ECF No. 389 at 135.

Moreover, this is not a case where the *only* evidence of Ms. Joppy's anguish the jury had to consider was her own testimony. *Cf.* ECF No. 402 at 4. Three additional witnesses testified as to how her termination affected her: Carla Banks, Linda Bryant, and Melinda Wilkins. *See* ECF No. 406 at 13–17. Their testimony is consistent in that, in Ms. Banks's words, Ms. Joppy's termination affected her in an outwardly discernible way, causing Ms. Joppy to lose "focus [and appear] scattered," and that "sometime[s] it was hard to figure out where she was going." ECF No. 390 at 8. *See also id.* at 13, 15, 20, 23. Accordingly, given the weight of this testimony from other witnesses, the Court disagrees with the Medical Cetner that the evidence Ms. Joppy offered at trial was too "generalized" or "thin" to sustain the jury's compensatory damages award. ECF No. 402 at 4. *Cf. Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989) (remanding for recalculation of award of "mental and emotional pain" where plaintiff "provided no other testimony or

70

evidence of his emotion or mental suffering" beyond his own testimony and testimony of his wife that plaintiff was under "'tremendous emotional strain'").[72]

Simply stated, Ms. Joppy offered the testimony of four witnesses, including herself, that supports the jury's compensatory damages award. Review of their testimony does not shock the Court's conscience or "raise an *irresistible inference*," *Blangsted*, 642 F. Supp. 2d at 1256 (citation modified), that any improper cause "invaded," *id.* the jury's finding as to Ms. Joppy's compensatory damages award. *See also Bond*, 173 F.4th at 1307 ("Resolving a motion for remittitur, therefore, is a fact-intensive inquiry, requiring courts to focus specifically on *the evidence presented to the jury at trial*." (emphasis added)); *Russo v. Ballard Med. Prods*., 550 F.3d 1004, 1018 (10th Cir. 2008) ("In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes." (citation modified)).

The Medical Center further argues that Ms. Joppy did not testify "she sought health care treatment specific to the termination," ECF No. 402 at 4. *See also* ECF No. 410 at 3. But the Medical Center identifies no authority to support the proposition that a plaintiff seeking compensatory damages must offer some kind of *affirmative* evidence of health care treatment. *Cf.* ECF No. 402 at 4. To the contrary, cases in separate but related doctrinal areas of employment law indicate otherwise. *See, e.g., Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1417 (10th Cir. 1997) (rejecting argument in Title VII

---

[72] To the extent the Medical Center suggests that "objective evidence," ECF No. 402 at 3, of emotional distress is required to sustain a compensatory damages award, the case that the Medical Center itself marshals undermines this argument. Noted above, although *Wulf* remanded for recalculation for a damages award regarding the plaintiff's "mental and emotional pain," *Wulf* discerned no error in providing "*some* award for such anguish and distress" based on the trial testimony of the plaintiff and his wife. 883 F.2d at 875 (original emphasis).

context that "a plaintiff must have the testimony of a treating physician to prove her compensatory damages"). In any event, such an inquiry—*Did the plaintiff offer medical evidence of compensatory damages?*—improperly narrows what the Court must ask at this stage: Whether the evidence at trial "supports the compensatory damages award." *Bond*, 173 F.4th at 1308. *See also id.* ("In the remittitur context, our precedent has described the requisite evidence as 'supporting the verdict,' 'ample,' 'sufficient,' and 'substantial.'" (citation modified)); *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019) ("To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict." (citation modified)). And as indicated above, evidence does support the jury's damages award, *see id.*, and nothing about such an award shocks the judicial conscience, *Blangsted*, 642 F. Supp. 2d at 1256.

Yet in terms of the testimony Ms. Joppy *did* offer, the Medical Center contends that "[n]otably," ECF No. 402 at 4, Ms. Joppy "admitted that other circumstances could have caused her distress . . . all of which occurred prior to her termination," *id.* The Court agrees with the Medical Center that, as a factual matter, Ms. Joppy did testify on cross examination as to other stressors in her life that occurred prior to her termination—*e.g.*, her ex-husband's cancer diagnosis and treatment. ECF No. 389 at 217. But again: This "admission"—that Ms. Joppy experienced stressors and hardships prior to her termination—does not demand relief from the jury's compensatory damages award. Instead, this "admission" is one piece of testimony among many from Ms. Joppy—who herself is one witness among many who offered testimony that attends her compensatory damages—the jury had available during their deliberations about damages. And the

72

Court's role in this context, *see Bond*, 173 F.4th at 1307, is simply to ask whether, even considering this "admission" as one piece of evidence among all the evidence at trial, the trial evidence remains sufficient to support the jury's compensatory damages award, *see id.* It does. *See id.* ("For over a week of trial, the jury heard ample proof of the actual harm sustained by[the plaintiff]. [The defendant] simply points to conflicting evidence, which is not our duty to resolve."); The Court cannot second-guess how credible the jury found Ms. Joppy's testimony, or reweigh possibly conflicting testimony she may have provided. *See, e.g., Bond*, 173 F.4th at 1308; *Russo*, 550 F.3d at 1018.

*Second*, the Medical Center argues that Ms. Joppy's termination—the "sole adverse action" that she suffered—was "not itself 'severe.'" ECF No. 402 at 5. *See also id.* ("Nor is there anything inherently severe about being terminated from a position.").[73] The Medical Center elaborates that Ms. Joppy offered "no evidence of having been subject to such severe or retaliatory treatment to warrant" her compensatory damages award. *See id.* However, Ms. Joppy offered such testimony herself: "There was no grace, even in the situation that they knew was hostile, antagonizing, discriminatory, retaliatory. I have not been the same." ECF No. 389 at 135. As for the Medical Center's argument that Ms. Joppy testified her prior termination from St. Joseph's Hospital in Texas was simply a "change," rather than a severe or traumatic experience, this again amounts to an invitation for the Court to reweigh "conflicting evidence," *Bond*, 173 F.4th at 1308, regarding Ms. Joppy's damages. *Compare* ECF No. 402 at 5, *with* ECF No. 389 at 144.

---

[73] The Court pauses at this statement to observe—should this argument be mistaken as suggesting otherwise—that "termination, regardless of the terms, certainly constitutes an adverse employment action." *Cowden v. Bd. of Governors of Colorado State Univ. Sys. by & through Colorado State Univ.-Pueblo*, 622 F. Supp. 3d 1019, 1036 (D. Colo. 2022) (citation modified).

The Court cannot do this and so it declines the Medical Center's invitation. *See, e.g.,
Bond*, 173 F.4th at 1308; *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir.
2006) ("[T]he awarding of damages is traditionally within the province of the jury.").

The Medical Center tries bolstering its *severity* argument by reading Ms. Joppy's
testimony as improperly including "events that are [too] attenuated from the alleged
discrimination or retaliation," ECF No. 402 at 5, including the Colorado Attorney General's
investigation into her conduct, *see id.* at 6. But this elides the precision with which Ms.
Joppy testified as to how the termination *by itself* uniquely affected her: "[T]his was the
most racist retaliatory thing I ever – that I – that I that I've experienced. Like, I didn't – I've
*never had anything like this.*" ECF No. 389 at 134 (emphasis added). *See also id.*
("[N]obody else was in trouble except for me."). And other witnesses, such as Ms. Banks,
provided testimony as to how Ms. Joppy's termination specifically affected her. *See* ECF
No. 390 at 8. Thus, to the extent that Ms. Joppy testified as to how other events affected
her, including any investigation from the Attorney General, the Medical Center errs in
arguing that Ms. Joppy's testimony as to her termination was based *solely* on additional
testimony regarding these events. *Cf.* ECF No. 402 at 5. If anything, in terms of
"attenuated" events, *id.*, the cart followed the horse: "And *days later* getting a letter . . .
when I was being terminated, they never said that they were reporting me to the state . .
. . It wasn't until I got a letter from the Board of Nursing *just days later*." ECF No. 389 at
134 (emphases added).

The Medical Center also directs the Court to purportedly improper opening
statements from Ms. Joppy's counsel regarding the Attorney General's investigation. *See*

74

ECF No. 402 at 6. The Court has reviewed these statements and does not find them improper in the context of assessing whether the trial evidence supports the jury's compensatory damages award. Regardless, even assuming Ms. Joppy's counsel made improper remarks in her opening statement, the Court's task is singular: "[A]sk[ing] only whether the trial evidence supports the compensatory damages award." *Bond*, 173 F.4th at 1308. *See also id.* (concluding that trial evidence supported compensatory damages award even "assum[ing] [the plaintiff] made improper remarks in its rebuttal closing argument").

*Third*, the Medical Center argues that because Ms. Joppy's nursing license was "never revoked or suspended," ECF No. 402 at 6, and therefore she can "continue working," *id.*, this somehow "confirms" the compensatory damages award is "grossly disproportionate" to any harm Ms. Joppy suffered following her termination. ECF No. 402 at 6. This argument fails to persuade. There is a mismatch between the fundamentally *economic* argument that the Medical Center advances—*The plaintiff could go make more money, so any non-economic harm caused by a termination is minimal*—and the nature of non-economic, compensatory damages themselves. Which is to say nothing of the evidence at trial that supports the jury's *compensatory damages* finding and award. *See, e.g., Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1172 (10th Cir. 2017) (noting "the wide discretion afforded to juries to fix the amount of noneconomic compensatory damages").[74]

---

[74] As the Medical Center correctly observes, Ms. Joppy did not seek economic damages at trial. *See, e.g.,* ECF No. 406 at 28 ("Plaintiff did not seek economic damages.").

*Fourth*, and finally, the Medical Center argues that the Court should compare the jury's compensatory damages award to awards in other cases, *see* ECF No. 410 at 3; ECF No. 402 at 6. These comparator cases, the Medical Center says, teach that the jury's award in this case is "manifestly excessive, and [therefore] a substantial remittitur is warranted." *Id.* at 7. Cases cited by the Medical Center endorse this comparative analysis. *See Blangsted*, 642 F. Supp. 2d at 1258; *Wulf*, 883 F.2d at 875 (remanding for the district court "to reconsider damages" after a "review of the record, informed by a review of awards granted in other comparable cases"). But *Wulf*'s "informed" review of other awards, *id.*, is gentle relative to the Tenth Circuit's forceful guidance as to the comparative analysis offered in subsequent cases: "[W]e have repeatedly disapproved of the comparative analysis [the defendant] urges." *Bond*, 173 F.4th at 1306. *See also Hoskie v. United States*, 666 F.2d 1353, 1358 n.4 (10th Cir. 1981) ("It is a difficult and often fruitless task to compare damages in one case with those in another, and we do not generally countenance such comparisons.").[75] Given this guidance, *see Bond*, 173 F.4th at 1306, the Court declines to consider the cases that the Medical Center cites in its remittitur analysis of the jury's compensatory damages award and whether they support the Medical Center's argument that the jury's award is "manifestly excessive." ECF No. 402 at 7. *Cf. Bond*, 173 F.4th at 1306 ("We cannot say the district court abused its discretion by declining to engage in an inquiry we have discouraged."); ECF No. 406 at 18.

---

[75] Notably, *Hoskie* disapproved of this comparative analysis years before *Wulf* appeared to practice it. For this reason, the Court is essentially required to disregard the Medical Center's litany of comparator cases, given that *Hoskie* binds. *See, e.g., Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1292 n.8 (10th Cir. 2005) ("Nevertheless, we, like the district court, are bound by prior panel decisions.").

In any event, the Court follows the Tenth Circuit's guidance that such a comparative analysis runs afoul of the Court's task. "[S]uch comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations, [and] such comparisons detract from the appropriate inquiry, which is whether the verdict" is supported by trial evidence. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1252 (10th Cir. 2000).

* * *

The Court has addressed all the Medical Center's arguments that attend remittitur of the jury's compensatory damages award. These arguments are reducible to a core contention: That evidence in the trial record does not support, or conflicts with, the jury's compensatory damages award. *See, e.g.,* ECF No. 402 at 6 ("Here, the damages verdict lacks sufficient record support . . . ."). That is wrong. Review of the entire trial record confirms there is sufficient evidence—in the form of four witnesses' testimony, for instance—to support an award of compensatory damages in this case. *See, e.g., Burke*, 935 F.3d at 1035 ("To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict.").

As for the amount of this award, which the Medical Center argues is "manifestly excessive," ECF No. 402 at 7, it is not the Court's job to narrow the "wide discretion afforded to [the jury] to fix the amount of noneconomic compensatory damages," *Racher*, 871 F.3d at 1172, that it found Ms. Joppy suffered. That this amount is $5,000,000 cannot distract the Court from its limited role at this juncture, *see Murphy Oil*, 438 F.3d at 1021, or diminish the role the jury performed at the close of evidence, *see Racher*, 871 F.3d at

77

1172. See *also Bond*, 173 F.4th at 1308 ("[W]e . . . ask *only* whether the trial evidence supports the compensatory damages award." (citation modified)). Especially where the Medical Center fails to persuade that this amount is "*so* excessive as to *shock* the judicial conscience." *Murphy Oil*, 438 F.3d at 1021 (emphasis added). Nor has the Medical Center raised the "*irresistible inference* that passion, prejudice, corruption or another improper cause invaded the trial," *id.* (emphases added). To the contrary: the Court discerns no such invasion.

Accordingly, the Court denies the Medical Center's request for remittitur of the compensatory damages award. *See, e.g., Bond*, 173 F.4th at 1309 ("We will defer to the jury's award of damages when it is supported by *any competent evidence* tending to sustain it, as is plainly the case here." (citation modified)).

### b.  New Trial

Seeking relief from the jury's well-supported compensatory damages award from an *instructional* perspective, the Medical Center argues that the jury instructions and verdict form "broadly"—and thus improperly—"allowed the jury to award economic damages." ECF No. 402 at 7; ECF No. 410 at 4. Ms. Joppy counters that the jury's *compensatory damages* instruction "correctly" instructed the jury, ECF No. 406 at 28, and that moreover the verdict form provided no "mechanism to award" any economic damages, *id.* The Court agrees with Ms. Joppy that the *compensatory damages* instruction and verdict form survive the Medical Center's challenge and do not require a new trial as to the jury's compensatory damages award.

*First*, take the *compensatory damages* instruction:

78

**Instruction No. 21**

If you find that Defendant unlawfully discriminated or retaliated against Plaintiff Joppy, then you must determine an amount that is fair compensation for her losses. You may award compensatory damages for injuries that Plaintiff Joppy proved were caused by Defendant's wrongful conduct. The damages that you award must be fair compensation, no more and no less.

You may award damages for any emotional distress, pain, suffering, inconvenience or mental anguish that Plaintiff Joppy experienced as a consequence of the wrongful conduct. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for setting the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

ECF No. 377 at 22.

The Medical Center challenges isolated excerpts from this instruction: "you must determine an amount that is fair compensation for her losses"; "fair compensation, no more and no less." *Id. See also* ECF No. 402 at 7 (quoting the same). The Medical Center also reads the phrase "compensatory damages" itself as one that was "not defined or limited in any way," ECF No. 402 at 8, and thus the jury "had no reason to think such damages did *not* include lost wages and benefits," *id.* (original emphasis).

"When reviewing a claim of error relating to jury instructions, the instructions must be read and evaluated in their entirety." *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1109 (10th Cir. 1998) (citation modified). And reading this instruction, and all the jury instructions in their entirety, *see, e.g., id.*, the Medical Center's challenge to the *compensatory damage* instruction fails. Nowhere in the *compensatory damages* instruction does it, in the Medical Center's words, "allow" the jury to award economic damages. *Cf.* ECF No. 377 at 22. In fact, nowhere do the jury instructions mention any

form of economic injury that Ms. Joppy may have suffered—for example, lost wages or backpay—and by extension any economic, compensatory damages to which she could be entitled or that the jury could award.

Simply because the instruction used the phrases "fair compensation" and "compensatory damages" in the first paragraph does not amount to a freewheeling authorization to award economic damages. *Cf.* ECF No. 402 at 7. Especially where the second paragraph of the instruction *specified* for the jury what constituted "compensatory damages": "You may award damages for any emotional distress, pain, suffering, inconvenience or mental anguish that Plaintiff Joppy experienced as a consequence of the wrongful conduct." *Compare* ECF No. 377 at 22, *with* ECF No. 402 at 8.[76] Indeed, and contrary to the Medical Center's arguments during trial and in its motion, the Court "does not have an obligation to refute every possible, impermissible inference from the jury instructions." *Thomas v. Texas Dep't of Crim. Just*., 297 F.3d 361, 367 (5th Cir. 2002). *See also id.* ("Reversing on this basis would make it impossible for the court to instruct a jury: The court would have to preempt every possible impermissible inference."). Its *compensatory damage* instruction provided the jury with an "ample understanding," *Martinez v. Caterpillar, Inc*., 572 F.3d 1129, 1132 (10th Cir. 2009), of the damages that Ms. Joppy sought and what damages the jury could award. *Cf.* ECF No. 410 at 4.

---

[76] This language is consistent with a relevant model jury instruction regarding compensatory damages in § 1981 actions. 3C Fed. Jury Prac. & Instr. § 170:60 Compensatory damages (6th ed.) (reciting "the nature, character, and seriousness of any pain and suffering, inconvenience, mental anguish, or loss of enjoyment of life plaintiff experience" in model instruction). Notably, this instruction includes language defining *economic* harm that does not appear in the Court's own *compensatory damage* instruction. *See id.* ("Damages include wages or fringe benefits [that plaintiff] would have earned in plaintiff's employment[.]").

*Second,* the verdict form bolsters the Court's conclusion. As for compensatory damages, the verdict form provided:

> Question 3: Did Ms. Joppy prove by a preponderance of the evidence that she is entitled to recover compensatory damages from [the Medical Center] for past and present emotional distress, pain, suffering, inconvenience, mental anguish, humiliation, embarrassment, or damage to reputation?

ECF No. 380 at 3.

The verdict form *explicitly* limits any award for compensatory damages to these enumerated forms of noneconomic loss. *See id.* Meaning that the verdict form does exactly what the Medical Center accuses the jury instruction of failing to do. *See* ECF No. 402 at 8. Thus, even if the Medical Center's argument as to the *compensatory damages* instruction held weight—and it doesn't—this argument collapses upon consideration of the verdict form's plain language. *See Jensen v. W. Jordan City*, 968 F.3d 1187, 1198 (10th Cir. 2020) (considering the verdict form in *instructional error* analysis).

*Finally,* the Medical Center directs the Court to purportedly "prejudicial" and "misleading" statements made by Ms. Joppy during trial and closing argument that "compounded" the Court's instructional error regarding compensatory damages. ECF No. 402 at 8. The isolated excerpts of trial testimony and argument that the Medical Center identifies fail to persuade that any instructional error regarding compensatory damages— which, in any event, has not been committed—was "compounded." *Id.* Take the portion of Ms. Joppy's testimony that the Medical Center identifies regarding her inability to get her "daily bread," ECF No. 402 at 8, and a jury question about whether Ms. Joppy lost "six years of earnings," ECF No. 389 at 235. The Court did not ask Ms. Joppy that jury question. *See id.* ("We're not going to ask that."). And no matter what happened in trial—

81

which, so far as the Medical Center identifies, amounts to some passing comments in testimony and closing—the Court addressed such comments in the instructions and verdict form.[77] Both of which, as discussed above, clearly explained for the jury the damages that Ms. Joppy sought, and what damages they could award her. *See, e.g.,* ECF No. 380 at 3 (defining "compensatory damages" as "past and present emotional distress, pain, suffering, inconvenience, mental anguish, humiliation, embarrassment, or damage to reputation").

Accordingly, and for the reasons set forth above, there was no instructional error regarding the Court's *compensatory damages* instruction. The Medical Center fails to persuade that, after reading the instructions and verdict form in their entirety, that the jury's compensatory damages award "*most likely* reflected [its] assessment of [Ms. Joppy's] economic damages." ECF No. 402 at 9 (emphasis added). Particularly where—again—the instructions and verdict form explained throughout what constituted the compensatory damages that Ms. Joppy sought, and did not authorize the jury to impermissibly award economic damages. *See, e.g.,* ECF No. 380 at 3; ECF No. 377 at 22.

### 4. The Jury's $15,000,000 Punitive Damages Award

The Medical Center seeks "judgment as a matter of law as to [the jury's] punitive damages" award or, at a minimum, its reduction. ECF No. 402 at 9. *See also* ECF No.

---

[77] The Medical Center's arguments about Ms. Joppy's comments in closing are better considered as attendant to whether remittitur is proper, not whether there is an error in the jury instructions or verdict form that the jury received. And as explained in the Court's *remittitur* analysis, even if Ms. Joppy "made improper remarks" in closing, this does not disturb the *trial evidence* that "supports the compensatory damages award." *Bond*, 173 F.4th at 1308.

410 at 5. Ms. Joppy argues that the jury's punitive damages award is not "constitutionally excessive," ECF No. 406 at 21, and that its ratio relative to Ms. Joppy's $5,000,000 compensatory damages award—3:1—is "well within constitutional limits," *id.* at 22. Thus, judgment as a matter of law as to this award is not improper, and it should not be reduced. *See, e.g., id.* at 25. The Court agrees with Ms. Joppy that judgment as a matter of law as to the entirety of the jury's award of punitive damages is improper. However, the Court agrees with the Medical Center that the jury's punitive damages award of $15,000,000 is constitutionally excessive and must be reduced. The Court addresses the evidentiary sufficiency of the jury's punitive damages award and the constitutionality of that award in turn.

### a. Evidentiary Sufficiency

In the § 1981 context, the evidentiary standard for punitive damages is exceeds the standard for proving liability. *See, e.g., Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 636 (7th Cir. 1996) ("This is a higher hurdle than merely proving the underlying unlawful discrimination."). "Punitive damages require proof that the defendant engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual . . . which the Supreme Court has interpreted as knowingly discriminating 'in the face of a perceived risk that its action will violate federal law.'" *Griffin v. Steeltek, Inc.*, 261 F.3d 1026, 1029 (10th Cir. 2001) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). *See also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1280 (11th Cir. 2008) ("[I]n a section 1981 case, the plaintiff must come forward with substantial evidence that the employer acted with actual malice

83

or reckless indifference to his federally protected rights." (citation modified)); *Kolstad*, 527

U.S. at 536 ("[A]n employer must at least discriminate in the face of a perceived risk that

its actions will violate federal law to be liable in punitive damages.").[78] *See also* ECF No.

377 at 26.[79]

The Medical Center's argument proceeds across two fronts. *First*, that there is a

*lack* of sufficient evidence regarding its requisite mental state to sustain the jury's punitive

damages award. *See* ECF No. 402 at 9. *Second*, that trial evidence *affirmatively*

demonstrates it lacked such a mental state. *See id.* at 10. The Medical Center fails to

persuade on both.

Regarding the Medical Center's *first* argument, it argues specifically that there is

"no evidence" the Medical Center "knew it may be acting in violation of [§ 1981] when

terminating [Ms. Joppy] or that it was disregarding complaints while it had knowledge of

serious discriminatory harassment." ECF No. 402 at 10. The Court disagrees that there

is an absence of such evidence. There are notable—and acknowledged—deficiencies

and inconsistencies in the Medical Center's investigation into Ms. Joppy's complaints of

discrimination, which, coupled with the remainder of trial evidence, of course support the

jury's *liability* findings. *See, e.g.,* ECF No. 388 at 61 (testimony from Ms. Ulrich that

---

[78] To the extent the Court references or cites cases that analyze punitive damages awards under Title VII, their analyses are cross-applicable to the Court's own analysis because "any case law construing the standard for punitive damages set forth in title VII is equally applicable to clarify the standard for punitive damages in a section 1981 claim." *Gooden v. Timpte, Inc.*, Civ No. 99 N 795, 2000 WL 34507333, at *14 (D. Colo. June 29, 2000) (citation modified); *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 526 (8th Cir. 2019).

[79] The Medical Center does not challenge the jury's punitive damages award as an *instructional* matter—only as an *evidentiary* matter, *see* ECF No. 402 at 9, and quotes the Court's *punitive damages* instruction in articulating the standard under which it contends the jury's award is "[in]appropriate." ECF No. 402 at 9 (quoting ECF No. 377 at 26).

"Absolutely, we could have [done things better] . . . in hindsight. I could have done a better job of documenting my questions and documenting responses." (citation modified)). Yet this evidence also provides sufficient proof that the Medical Center acted with "reckless indifference" to Ms. Joppy's "federally protected rights." *Griffin*, 261 F.3d at 1029 (citation modified). Ms. Ulrich did not complete a separate report into Ms. Joppy's complaint of discrimination, *see* ECF No. 388 at 62, nor did Ms. Ulrich permit Ms. Joppy to finish her written statement when Ms. Ulrich interviewed Ms. Joppy in the context of Ms. Ulrich's investigation into the events of May 24, 2019, *see, e.g.,* ECF No. 388 at 105. Ms. Ulrich's own testimony—that she did not conduct an independent investigation into Ms. Joppy's complaint of discrimination, as well as that she did not prepare a separate report regarding Ms. Joppy's complaint—is consistent with Ms. Joppy's testimony that her complaint was never investigated. *See* ECF No. 389 at 132. And notably, although Ms. Ulrich's interviews do reflect that she discussed the "mean girls" with Ms. Joppy, they do not reflect that such notes were taken in connection with Ms. Joppy's *discrimination complaint. See* ECF No. 402-4 at 4. Indeed, there is no mention of Ms. Joppy's complaint at all on the face of Ms. Ulrich's notes from her interview with Ms. Joppy, which almost entirely concern the events of May 24, 2019. *See generally id.* And as Ms. Joppy observes, Ms. Weihe testified herself that it would be "reckless" to fail to investigate a complaint of discrimination. ECF No. 386 at 68. And Ms. Burley premised her termination decision in part on this deficient investigation, without speaking to Ms. Joppy. *See, e.g.,* ECF No. 388 at 276. Further, the Medical Center acknowledges it did not formally interview Dr. Forrester *at all* in connection with its investigation into the events of May 24, 2019, even

85

though evidence and trial testimony showed that Dr. Forrester provided instructions to remove Mr. Brown from the ventilator, and that Dr. Forrester also testified he had no problem with the sequence of events regarding Mr. Brown's care, as well as that removal of the endotracheal tube would not have caused any restriction. *See, e.g.,* ECF No. 387 at 40, 67.[80]

Construing the trial record and the jury's punitive damages finding in the light most favorable to Ms. Joppy, *see, e.g., Liberty Mutual*, 913 F.3d at 983, this is evidence from which the jury could conclude that the Medical Center did more than "disregard complaints," ECF No. 402 at 9. And this evidence contradicts the Medical Center's argument that it "investigated" Ms. Joppy's complaint, as well as that this investigation was simply "lacking." *See* ECF No. 402 at 10–11 (citation modified).[81] Instead, as indicated above, this is evidence from which a jury could—and ultimately did—find that the Medical Center was recklessly indifferent to Ms. Joppy's federally protected rights. *See Griffin*, 261 F.3d at 1029; *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1059 (9th Cir. 2014) (affirming punitive damages ward where defendant "did have an anti-discrimination

---

[80] That Ms. Burley testified she had some kind of "conversation" with Dr. Forrester, ECF No. 388 at 267, belies Ms. Ulrich's testimony that the Medical Center "wouldn't interview a doctor because they weren't an employee of the hospital," ECF No. 388 at 49. There is certainly evidence from which the jury could find that the Medical Center *could have* indeed *formally* interviewed Dr. Forrester, and that no policy prohibited it from doing so, but nonetheless elected not to do so, despite the obvious relevance of his statements to its investigation. *See id.* at 114 (trial testimony from Ms. Uirich that Dr. Forrester's statements would be "helpful").

[81] The Court takes the Medical Center's point that Ms. Joppy may have made only one complaint directly to HR, *see* ECF No. 402 at 10, but, drawing all inferences from the record in her favor, she made explicit complaints to Mr. Page in her March 20 and 21, 2019, text messages, which Medical Center employees, including Ms. Weihe, the then-Vice President of Human Resources, acknowledged could constitute complaints of discrimination. *See, e.g.,* ECF No. 386 at 86. *See also id.* at 88.

policy in force [but] also . . . [evidence showed] specifically that [its] management did not provide prompt and effective remedial action when made aware of [an employee's] complaints" and evidence showed "[defendant] treated [the employee's] claims dismissively [and] did nothing to investigate [them]" (citation modified)) (en banc); *Kimzey v. Wal-Mart Stores*, Inc., 107 F.3d 568, 576 (8th Cir. 1997) (concluding that where plaintiff "complained to [a supervisor and store manager] directly several times about their behavior, but they ignored her complaints this evidence was among additional evidence showing "management took no action . . . [and was] sufficient to establish the reckless or intentional indifference to [plaintiff's] rights necessary for submitting punitive damages to the jury under" federal law).[82]

Fundamentally, the evidence as to the Medical Center's state of mind was "not so one-sided that the jury had *no* legally sufficient basis to award punitive damages." *Horinek v. Spirit Aerosystems, Inc*., Civil No. 24–1171–KHV, --- F. Supp. 3d ----, 2026 WL 1469796, at *3 (D. Kan. May 26, 2026) (citation modified); *Mountain Dudes*, 946 F.3d at 1129 (observing judgment as a matter of law is "appropriate *only* where evidence points but *one way* and is susceptible to no reasonable inferences which may support the

---

[82] The Medical Center cites *Zisumbo v. Ogden Reg'l Med. Ctr*., 801 F.3d 1185, 1202 (10th Cir. 2015), in support of its argument that there is no "malice or recklessness," ECF No. 402 at 11, supporting the jury's punitive damages award. To be sure, *Zisumbo* observed—uncontroversially—that an employee faces an "uphill battle" in proving the requisite mental state for punitive damages where an employer "submit[s] *substantial evidence* showing that [it] established comprehensive policies and training procedures to comply with" federal anti-discrimination laws." *Zisumbo*, 801 F.3d at 1202 (citation modified). But *Zisumbo* is factually distinguishable: "In addition to annually training its employees on its anti-discrimination policies, [the defendant] *consistently investigated* reports of discrimination and incorporated into every manager's or supervisor's performance evaluation their compliance with anti-discrimination policies." *Id.* (emphasis added). Here, there was evidence, construed in the light most favorable to Ms. Joppy, from which the jury "could reasonably find" the opposite, and consequently find that the Medical Center possessed the requisite mental state to award Ms. Joppy punitive damages. *Hampton v. Dillard Dep't Stores, Inc*., 247 F.3d 1091, 1115 (10th Cir. 2001).

nonmoving party's position" (citation modified)). Therefore, and for the reasons set forth

above, the Court rejects the Medical Center's first argument that there is insufficient

evidence to sustain the jury's punitive damages award.

*Second*, the Medical Center identifies evidence in the record that it argues

essentially undermines the notion that it possessed the requisite state of mind to sustain

the jury's punitive damages award. *See id.* Chiefly that the Medical Center introduced

evidence that it provided anti-discrimination training to its employees, as well as that it *did*

investigate Ms. Joppy's complaints. *See id.* Evidence of this sort, undisputably part of the

trial record, bears relevance in the Court's analysis of the Medical Center's Rule 50(b)

challenge to the jury's punitive damages award. *See, e.g., Harsco Corp. v. Renner*, 475

F.3d 1179, 1189 (10th Cir. 2007). But such evidence is not dispositive, nor would the

Court use it to draw inferences *against* Ms. Joppy in this Rule 50(b) posture. *Cf., e.g.,*

*Liberty Mutual*, 913 F.3d at 983; *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th

Cir. 2000) (observing a plaintiff "may still recover punitive damages" even if an "employer-

defendant adduces evidence showing it maintains on paper a strong non-discrimination

policy" and makes good faith efforts to educate employees regarding the same).[83]

Particularly where, notwithstanding the anti-discrimination training that Medical Center

employees received, the investigation into Ms. Joppy's May 30, 2019 complaint suffered

---

[83] Although Ms. Joppy's devotes the vast majority of her *punitive damages* arguments to whether the jury's
award was constitutional, rather than asking whether evidence supported such an award in the first place,
the Court takes its Rule 50(b) obligation seriously, and at all times considers and construes the totality of
the trial record in Ms. Joppy's favor when assessing the Medical Center's arguments. *Compare* ECF No.
406 at 21, *with Capture Eleven Grp. v. Otter Prods., LLC*, 777 F. Supp. 3d 1239, 1246 (D. Colo. 2025)
(considering "[trial] testimony and the trial record in its totality" when addressing Rule 50(b) arguments.

severe deficiencies, and did not even result in the preparation of an investigation report. *Cf. Goldsmith*, 513 F.3d at 1281 (affirming award of punitive damages where "the record support[ed] the finding of the jury that the antidiscrimination policy of [defendant] was *totally ineffective* [and defendant's managers] had actual notice that white employees had uttered racial slurs in the workplace but did not discipline those employees"). Thus, mindful of its obligation to draw inferences in Ms. Joppy's favor as to this investigation's adequacy—or inadequacy—the record contains sufficient evidence to sustain the jury's punitive damages verdict.

### b.  Constitutionality of Award

Having determined that sufficient evidence sustains the jury's award of punitive damages, the Court must now determine whether the amount of its award—$15,000,000—is excessive. The parties' briefs confirm their understanding of the core constitutional principles that underlie this issue and the jury's punitive damages award. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("[T]here are procedural and substantive constitutional limitations on these awards." (citation modified)). Having considered the parties' arguments, the Court agrees with the Medical Center that the jury's punitive damages award is "constitutionally infirm" and that remittitur is required. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1232 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001).

In assessing whether the jury's punitive damages award survives constitutional scrutiny, the Court considers the following "guideposts": "(1) the degree of reprehensibility of [the Medical Center's] conduct; (2) the ratio of the punitive damages award to the actual

or potential harm inflicted on [Ms. Joppy]; and (3) a comparison of the punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct." *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996)); *Peshlakai v. Ruiz*, 39 F. Supp. 3d 1264, 1326–27 (D.N.M. 2014) (describing the same as "three guideposts for [district] courts to considering when determining the constitutionality of a punitive damages award" (citation modified)). "The degree of reprehensibility of the defendant's conduct is 'the most important indicium of the reasonableness of a punitive damages award.'" *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1207 (10th Cir. 2012) (quoting *Gore*, 517 U.S. at 575). It considers these guideposts in turn below. *See, e.g., Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1061 (10th Cir. 2016) ("Due process requires federal courts to perform an 'exacting' de novo review of the constitutionality of punitive damages awards . . . ." (citation modified)).

### i.      Reprehensibility

*First*, regarding the *reprehensibility* of the Medical Center's conduct, the Medical Center argues that, under the applicable doctrinal framework, there is nothing to show that it acted "reprehensibly." ECF No. 402 at 12. Ms. Joppy counters that the jury "heard extensive evidence" of the Medical Center's "discrimination and retaliation" that "inflicted devastating emotional, reputational, and dignitary harms." ECF No. 406 at 21. The Court agrees with Ms. Joppy that, on net, the applicable *reprehensibility* factors favor her, but only slightly.[84]

---

[84] As discussed further below, that these factors, and thus the first *Gore* guidepost, favor her is not dispositive in the Court's *punitive damages* analysis, nor does it demonstrate the jury's punitive damages award is constitutional.

As the parties observe, in considering the *reprehensibility* of the Medical Center's conduct, the Court considers the following: "(1) whether the harm caused was physical as opposed to economic; (2) whether the [Medical Center] acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of [Ms. Joppy]; (4) whether the [Medical Center's] wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Jones*, 674 F.3d at 1207 (citing *State Farm*, 538 U.S. at 419). As to this first factor, Ms. Joppy essentially concedes that she suffered no physical harm. *Compare id.*, *with* ECF No. 406 at 21 ("[T]he jury heard extensive evidence that [she suffered] devastating *emotional*, *reputational*, and *dignitary* harms." (citation modified)). However, the Court notes that Ms. Joppy's harms were not purely economic. *Cf. Peshlakai v. Ruiz*, 39 F. Supp. 3d 1264, 1331 (D.N.M. 2014) ("Where a plaintiff experiences *purely economic harm*, on the other hand, a substantial punitive damage award is less justified." (citation modified)); *United International Holdings*, 210 F.3d at 1232. Because she suffered emotional and psychological harm, this factor favors her but only slightly. *See, e.g., Goldsmith*, 513 F.3d at 1283 ("One factor that suggests that the misconduct of [defendant] was reprehensible is that [the plaintiff] suffered both economic harm and *emotional and psychological harm*." (citation modified)).

Regarding the Medical Center's "indifference [or] reckless disregard for the health or safety of others," *Jones*, 674 F.3d at 1207, this factor is essentially neutral, given that while the Court agrees with the Medical Center that it did not act with indifference to the safety of a wide group of people, its conduct did harm Ms. Joppy. *Compare* ECF No. 406

at 21, *with T.R. v. Howard*, Civ. No. 20–276 GBW/JHR, 2024 WL 2795811, at *8 (D.N.M.

May 31, 2024) (noting in analysis of this factor that defendant's conduct affected "both

[the plaintiff] and other female students" which suggested that "he acted with reckless

disregard to the health and safety of [p]laintiff and other students"); *and DeYapp v. Tracy*,

Civ. No. 02–452 JP/RLP, 2006 WL 8443773, at *4 (D.N.M. Aug. 14, 2006) (finding factor

weighed in favor of a "finding of reprehensibility" where "the conduct showed a reckless

disregard of the health and safety of both" plaintiffs).

Concerning Ms. Joppy's *financial vulnerability*, *see Jones*, 674 F.3d at 1207, the

Medical Center concedes that there was "some evidence" of Ms. Joppy's "financial

situation," ECF No. 402 at 13, which as Ms. Joppy argues includes evidence that she was

a newly single mother and financially vulnerable, *see* ECF No. 406 at 21. Based on record

evidence, the Court concludes that Ms. Joppy was financially vulnerable at the time of

her termination—which, again, the Medical Center essentially concedes—and for this

reason that this factor favors her in the Court's *reprehensibility* analysis. The Court's

conclusion is bolstered by evidence demonstrating the numerous and severe adverse

effects Ms. Joppy suffered following her termination, including the inability to "provide

shelter for [herself] and [her] daughter." ECF No. 389 at 135; *Valenzuela v. Coleman*, No.

18–cv–00329–CMA–STV, 2022 WL 2528330, at *9 (D. Colo. July 7, 2022) (finding

plaintiff's financial vulnerability "tilt[ed] in favor of finding" reprehensibility where the

plaintiff was "sole breadwinner for his family" and he testified how "lost income had severe

repercussions on [his] family, including that [he and his wife] were unable to pay bills and

were forced to send their children to live in California because they were unable to support them").

As to whether the Medical Center's conduct was the result of *repeated behavior* or an *isolated incident*, the Court agrees with the Medical Center that the evidence put forth at trial tilts this factor in its favor. *See* ECF No. 402 at 13. Arguing otherwise, Ms. Joppy contends that the ICU was "in a state of chaos" and that the Medical Center let a "group of 'mean girls' wreak havoc on nurses they targeted." ECF No. 406 at 22. However, this argument much more closely attends whether Ms. Joppy suffered a hostile work environment—a claim she explicitly *did not* pursue—not whether the Medical Center engaged in "other *similarly deficient*," *Valenzuela*, 2022 WL 2528330, at *10 (citation modified), investigations of discrimination complaints, or had a pattern of retaliating against other nurses for lodging complaints of discrimination. Indeed, the Court agrees with the Sixth Circuit that "[i]t appears that the Supreme Court has interpreted this factor to require that the similar reprehensible conduct be committed against various different parties." *Bach v. First Union Nat. Bank*, 149 F. App'x 354, 365 (6th Cir. 2005) (citing *Gore*, 517 U.S. at 576–77). *See also Gore*, 517 U.S. at 576 (considering whether defendant's conduct "formed part of a nationwide pattern of tortious conduct" in *reprehensibility* analysis); *Peshlakai*, 39 F. Supp. 3d at 1343 ("[P]laintiffs seeking punitive damages on the basis of recidivism must identify similar conduct—that is, 'repeated misconduct of the sort that injured' the plaintiff." (quoting *State Farm*, 538 U.S. at 423–44)).

Finally, turning to whether Ms. Joppy's harm was the result of any "intentional malice, trickery, or deceit" on the part of the Medical Center, *Jones*, 674 F.3d at 1207, the

93

Court disagrees with the Medical Center that this factor does not favor Ms. Joppy. *See* ECF No. 402 at 13. However, this factor does not heavily favor her. As discussed in the Court's *sufficiency* analysis of the jury's punitive damages award, the Medical Center's investigation—which was not purely "accidental"—was so lacking as to sustain the award of punitive damages. *See DeYapp*, 2006 WL 8443773, at *4 (distinguishing "intentional malice" from "mere accident" in *reprehensibility* analysis). Yet, engaging in *de novo* review of the *constitutionality* of the $15,000,000 punitive damages award, *see Lompe*, 818 F.3d at 1061, there is not a tremendous amount of evidence indicating that the deficiency of that investigation, or Ms. Joppy's ultimate termination, was *malicious*. For instance, the Medical Center did not offer indefensible justifications for its investigative failures, or justifications as to why the underlying conduct should be overlooked. *See, e.g., Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1272 (10th Cir. 2000) ("Instead of taking immediate appropriate and corrective action reasonably calculated to end the harassment, [a general manager] offered [the plaintiff] legally indefensible reasons why the harassment should be overlooked."). Nonetheless, given the evidence adduced at trial, and the nature of this case, the Court finds that this slightly factor favors Ms. Joppy. *See, e.g., Perkins v. Fed. Fruit & Produce Co.*, No. 11–cv–00542–JAP-KLM, 2013 WL 2112425, at *8 (D. Colo. May 14, 2013) ("[T]he special egregiousness of racial discrimination supports the Court's conclusion the Defendants' conduct was sufficiently reprehensible to warrant punitive damages." (citing *Sherman v. Kasotakis*, 314 F. Supp. 2d 843, 872–73 (N.D. Iowa 2004)); *see also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043–44 (9th Cir. 2003).

For the reasons set forth above, the first *harm* factor weighs slightly in her favor; the second, *reckless disregard* factor is neutral; the third, *financial vulnerability* factor favors Ms. Joppy; the fourth, *repeated actions* factor favors the Medical Center; and the fifth, *intentional malice* factor slightly favors Ms. Joppy. Thus, these factors under the first *Gore* guidepost favor Ms. Joppy, but only slightly.

### ii.    Ratio

*Second,* the Court considers the ratio between the jury's compensatory and punitive damages awards. *See Gore*, 517 U.S. at 583. As both parties observe, the jury's award reflects a 3:1 ratio between its punitive damages award of $15,000,000 and its compensatory damages award of $5,000,000. *See* ECF No. 402 at 12; ECF No. 406 at 21. The Court agrees with the Medical Center that the ratio of the jury's punitive damages award must be reduced. *See* ECF No. 402 at 13.

The Supreme Court and Tenth Circuit have endorsed punitive damage ratios that exceed 3:1. *See, e.g., United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1230 (10th Cir. 2000) ("[T]he 10:1 ratio is not a sacred line in the sand."); *Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1272 (10th Cir. 2006); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991). While there is no "mathematical formula" for fixing punitive damages ratios, *Gore*, 517 U.S. at 582, "'[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" *Peshlakai*, 39 F. Supp. 3d at 1330–31 (D.N.M. 2014) (quoting *State Farm*, 538 U.S. at 425).

As the Medical Center observes, Ms. Joppy's *compensatory damages* award was substantial: $5,000,000. And although, on net, the *reprehensibility* factors favor Ms. Joppy, "the presence of all of the reprehensibility factors in [her] favor cannot mean that [the jury's] punitive damages award . . . will be constitutional." *T.R.*, 2024 WL 2795811, at *8; *Gore*, 517 U.S. at 580 ("[Punitive] damages must bear a *reasonable relationship* to compensatory damages." (citation modified)). And the punitive damages award in this case does not bear a "reasonable relationship," *id.*, to the jury's already substantial compensatory damages award—even if the jury's punitive damages award is within an otherwise constitutionally permissible range. *Cf. Haberman*, 443 F.3d at 1272.

Simply stated, after reviewing "the facts and circumstances of the [Medical Center's] conduct and the harm to [Ms. Joppy]," *Lompe*, 818 F.3d at 1068 (citation modified), the 3:1 punitive damages ratio in this case is constitutionally excessive. Even if the *reprehensibility* factors favor Ms. Joppy, the Court cannot ignore the fact that the compensatory damages that she was awarded are "substantial." *See id.* at 1069 ("[C]ompensatory damages have often been considered 'substantial' when they are over $1,000,000."); *id.* ("That is, where compensatory damages are already substantial, a ratio of 1:1 may be the most the Constitution will permit."); *Peshlakai*, 39 F. Supp. 3d at 1330–31. Accordingly, consideration of this *Gore* guidepost indicates that the jury's punitive damages award is "constitutionally suspect." *Lompe*, 818 F.3d at 1070. *See also Perkins*, 2013 WL 2112425, at *9 ("Although [the] punitive damages compared to compensatory damages are a single digit ratio, 6.5 to 1, it is a high single digit ratio . . . Therefore, the

96

Court believes that the ratio of punitive damages to compensatory damages is excessive and supports remittitur.").

### iii.    Comparative Penalties

*Third*, the Court compares the "punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct." *United International Holdings*, 210 F.3d at 1232 (citation modified); *Gore*, 517 U.S. at 583. The Medical Center, as it does with its challenge to the jury's compensatory damages award, directs the Court to other courts' reduction of punitive damages awards. *See* ECF No. 402 at 14 n.4. But under this guidepost the Court is directed to analyze the jury's punitive damages award relative to any applicable civil or criminal penalties. *See Gore*, 517 U.S. at 583 (observing third guidepost looks to comparison of "punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct" and then analyzing relative "statutory fines"); *White v. Wycoff*, No. 13–cv–01761–CMA–MJW, 2016 WL 9632873, at *5 (D. Colo. June 24, 2016); *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996).[85] The Court discerns no "legislative judgment," *Gore*, 517 U.S. at 583 (citation modified), that might itself otherwise indicate the jury's award is excessive. For instance, this is not a case, unlike *Gore*, where the "maximum [applicable] civil penalty . . . is $2,000." *Id.* at 584. *See also Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1117 (10th Cir. 2001) ("Section 1981 does not have a statutory cap that limits punitive damages as does Title VII."); *E.E.O.C. v. Wal-Mart Stores, Inc.*, 187 F.3d 1241,

---

[85] Where *Gore* spoke of "comparable cases," it did so within the confines of its discussion of *penalties*. *See Gore*, 517 U.S. at 575 (analyzing "the difference between [a] remedy and the *civil penalties* authorized or imposed in comparable cases").

1249 (10th Cir. 1999). Thus, the Court declines to consider the numerous cases that the Medical Center cites in its motion in its analysis of this *Gore* guidepost.[86]

\* \* \*

The Court has considered each *Gore* guidepost in its exacting review of the jury's punitive damages award. *See, e.g., Lompe*, 818 F.3d at 1061. As to the first, *reprehensibility* guidepost, as explained the factors that attend it favor Ms. Joppy but not overwhelmingly. As to the second, *ratio* guidepost, the ratio of the jury's punitive damages award of 3:1 is excessive. And as to the third, *comparative penalties* guidepost, there is no statutory or criminal fine that might otherwise indicate the jury's punitive damages award is excessive.

But the Court has not considered these guideposts in a vacuum. Recall the enormity of the jury's $5,000,0000 compensatory damages verdict, which the Court, as explained above, will not disturb. In the words of the Tenth Circuit, this award is "substantial," and "amply compensated" Ms. Joppy for the noneconomic harms that she suffered. *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1208 (10th Cir. 2012) (citation modified). In sum, the jury's punitive damages award bears no "reasonable relationship" to the jury's substantial compensatory damages award, *Gore*, 517 U.S. at 580 (citation modified), and must be reduced, even if the factors under *Gore*'s first guidepost favor her, *cf. T.R.*, 2024 WL 2795811, at \*8. And based on the Court's considerations, a 1:1 ratio

---

[86] Of course, it is fair game to analyze these cases in other contexts, including how they have discussed punitive damages under *Gore*'s first guidepost and its factors. The Court notes simply that it declines the Medical Center's invitation to consider these cases' own punitive damages awards in its analysis of this third *Gore* guidepost, given the plain language of the Supreme Court's own guidance in *Gore.* 517 U.S. at 575, 583.

98

sits at the *outermost* limit of any constitutional punitive damages award. *See Jones*, 674 F.3d at 1208 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (citation modified)); *State Farm*, 538 U.S. at 425.

A reduction of the jury's punitive damages award to $2,500,000 is proper. This bears a reasonable relationship to the jury's substantial compensatory damages award, *see Gore*, 517 U.S. at 580, without offending due process. To be sure, this falls below a 1:1 ratio, but the Court notes that the 1:1 ratio operates more as a suggestive outermost—but not controlling or dispositive—limit, rather than a ratio that binds the Court notwithstanding the jury's substantial compensatory damages award. *See, e.g., State Farm*, 538 U.S. at 425. And to the extent that the jury's punitive damages award serves the dual purpose of deterrence for comparable conduct, a $2,500,000 punitive damages award is ample deterrence for any comparable entities who may engage in racial discrimination or retaliation. *See State Farm*, 538 U.S. at 416 ("Punitive damages are imposed for purposes of retribution *and deterrence*." (citation modified)).

Accordingly, and for the reasons set forth above, the Court denies the Medical Center's motion to the extent it seeks judgment as a matter of law on the jury's punitive damages award. However, the Court grants the Medical Center's motion to the extent it seeks remittitur of the jury's punitive damages award. The jury's $15,000,000 punitive damages award is reduced to $2,500,000.

### 5. Evidentiary Issues

Finally, the Medical Center advances miscellaneous challenges to evidentiary rulings made at trial—"other errors," in the Medical Center's words. ECF No. 402 at 25.[87] The Court briefly addresses them.

***Pre-Termination Evidence.*** The Medical Center challenges the Court's "flawed" evidentiary rulings regarding "irrelevant and prejudicial evidence" related to Ms. Joppy's "pre-termination actions." ECF No. 402 at 26. The Medical Center cites Ms. Joppy's PIP, the "March 2019 interview cancellation," *id.*, and "'mean girl culture'" in making this argument, *id.* at 27. Respectfully: Nonsense. Admission of this evidence was discretionary, as Ms. Joppy observes, and the Medical Center argues only that such evidence was insufficiently probative of pretext. *Compare* ECF No. 406 at 29, *with* ECF No. 402 at 26. But this evidence was certainly relevant to provide background and context for later evidence of pretext, which the Court discussed extensively above. *See* ECF No. 406 at 29; *Williams v. Frank,* 757 F. Supp. 112, 118 (D. Mass. 1991), *aff'd*, 959 F.2d 230 (1st Cir. 1992) ("[T]he employer's prior treatment of plaintiff is relevant to a showing of pretext." (citation modified)); *Hysten v. Burlington N. Santa Fe Ry. Co.*, 372 F. Supp. 2d 1246, 1255 (D. Kan. 2005) ("Evidence of pretext may include prior treatment of plaintiff." (citation modified)). The same is true regarding evidence of Ms. Joppy's prior termination from St. Joseph's Hospital and the reason for this termination, whose admission the Court properly limited as an exercise of its discretion. *Compare* ECF No. 402 at 27, *with Equal*

---

[87] What is a wall, if not something at which to throw every noodle of spaghetti? *Cf. MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.*, No. 4:04–cv–445–Y, 2006 WL 680513, at *1 (N.D. Tex. Mar. 14, 2006) ("The Court is not suggesting that meritorious arguments should be ignored, but counsel should be mindful of their strongest arguments and should narrowly tailor them to produce their best chance of success.").

*Emp. Opportunity Comm'n v. Proctor Fin., Inc.,* 644 F. Supp. 3d 400, 409 (E.D. Mich. 2022) ("The fact that [an employee] was fired from a previous employer ten years ago is both irrelevant to the retaliation claim at bar and unduly prejudicial." (citation modified)). And as the Medical Center notes, the Court *permitted* the Medical Center to ask Ms. Joppy about her prior employment and the fact of her termination. *See* ECF No. 402 at 27.

**_Evidence Related to the Attorney General Prosecution._** The Medical Center also challenges Ms. Joppy's discussion of the Attorney General's criminal charge throughout trial. *See id.* at 29. But as the Medical Center concedes, the Court gave a curative, limiting instruction regarding precisely this issue. *See id. See also* ECF No. 377 at 9 ("This Court has already determined that the [Medical Center] *did not cause* any actions taken by the Attorney General *that you have heard*." (citation modified)). The Court agrees with Ms. Joppy that this instruction was sufficient to cure the post-trial issues that the Medical Center has conjured. *See, e.g.,* ECF No. 406 at 30; *United States v. Benson*, 957 F.3d 218, 235 (4th Cir. 2020) ("[C]urative instructions eliminate prejudice from improper closing arguments even when comments are both 'misleading and extensive.'" (citation modified)); *Castaneda v. Small*, No. ED CV 09–1848–DOC, 2011 WL 1935743, at *18 (C.D. Cal. Mar. 18, 2011) ("A judge's corrective instructions addressing improper comments made by attorneys are "usually sufficient to cure any problems arising from such improper comments." (citation modified)). And the instances that the Medical Center identifies—essentially periodic statements made by counsel throughout trial—in its motion hardly rise to the level of "cumulative harm," ECF No. 402

101

at 30, outweighing the curative effect of this limiting instruction, or to the degree of conduct other courts have determined are sufficient to justify a new trial. *Cf. Cadorna v. City & Cnty. of Denver, Colorado*, 245 F.R.D. 490, 492 (D. Colo. 2007) ("Such disrespectful cockalorum, grandstanding, bombast, bullying, and hyperbole as [counsel] exhibited throughout the trial are quite beyond my experience as a jurist, and, I fervently hope, will remain an aberration during the remainder of my time on the bench.").

**Net Worth.** At last—and truly, at last—the Medical Center objects to Ms. Joppy's reference to its net worth in trial. *See* ECF No. 402 at 31. The Medical Center stipulated to this fact, *see* ECF No. 390 at 160, and in its brief identifies no prejudice that may have *actually* flowed from any reference to its net worth, *cf.* ECF No. 402 at 31. *See also* ECF No. 406 at 31. Accordingly, the Medical Center fails to persuade that admission of this *stipulated* fact amounts to an error warranting a new trial.

\* \* \*

Consistent with the above analysis, the Court grants in part and denies in part the Medical Center's motion, ECF No. 402. It turns now to Ms. Joppy's motion.

### B. Ms. Joppy's Motion

Ms. Joppy seeks $2,703,055.00 in attorney fees—her own calculated lodestar amount—that she bore in litigating this case. *See generally* ECF No. 412.[88] She also seeks costs in the amount of $33,283.58. *See* ECF No. 413-1 at 3.[89] The Court agrees

---

[88] The Court discusses her separate request for fees in connection with her reply brief at the end of the Court's *fee* analysis.

[89] Ms. Joppy explained her in reply brief that she no longer seeks travel costs for her out-of-state attorneys, thus reducing her original $42,106.64 cost request to $33,283.58. *Compare id.*, *with* ECF No. 412 at 16.

102

with the Medical Center that it must reduce the exorbitance of this fee request, *see generally* ECF No. 412, as it is premised on an unreasonable number of hours worked and an unreasonable hourly rate as to one of Ms. Joppy's attorneys, Mr. Sanford. The Court also reduces the costs that Ms. Joppy seeks.

After setting forth the applicable legal standard, the Court first addresses the reasonableness of hours expended, and next addresses the reasonableness of the requested hourly rates. *See, e.g., Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998) ("After determining the number of hours reasonably expended, a reasonable hourly rate must be determined."); *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176 (10th Cir. 2010) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (citation modified)).

### 1. Legal Standard

In certain federal civil rights actions, including those brought "to enforce a provision of [§ 1981]," a court may, "in its discretion," allow the "prevailing party [to recover] a reasonable attorney's fee." 42 U.S.C. § 1988(b). "[A] prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Valdez v. Macdonald*, 66 F.4th 796, 836 (10th Cir. 2023) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)). An attorney's fee is typically determined through a "calculation of the lodestar amount," which is the "number of hours reasonably expended

on the litigation multiplied by a reasonable hourly rate." *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1102 (10th Cir. 2010) (citation modified).[90]

In first assessing the number of hours reasonably expended, *see Flitton*, 614 F.3d at 1176, courts consider "whether the attorney's hours were 'necessary' under the circumstances." *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). *See also id.* ("The prevailing party must make a 'good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" (citation modified)). Counsel for the party claiming fees "bears the burden to prove the hours they expended by submitting meticulous, contemporaneous time records that reveal, for each lawyer the amount of time expended and their 'specific tasks.'" *$114,700.00*, 2023 WL 142257, at *2 (citation modified).

Next, in assessing the reasonableness of an attorney's hourly rate, courts consider the "prevailing market rate in the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (citation modified). The prevailing party "must provide evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community." *Id.* (citation modified). *See also Ellis*, 163 F.3d at 1203 ("The relevant market value is not necessarily the price which a party's lawyer charged to prosecute the case, but, rather, the market value is the price

---

[90] The Court notes that, as a doctrinal matter, the Tenth Circuit has "marginalize[d] the twelve-factor *Johnson* analysis" in courts' fee calculations. *Anchondo*, 616 F.3d at 1103 (citation modified). *See also id.* ("[T]he [Supreme] Court clearly embraces the lodestar approach as the preferable alternative to the *Johnson* analysis." (citation modified)); *United States v. $114,700.00 in United States Currency*, No. 20–1387, 2023 WL 142257, at *3 (10th Cir. Jan. 10, 2023) (unpublished) ("Thus, any failure to consider the *Johnson* factors is not an abuse of discretion without more.").

that is customarily paid in the community for services like those involved in the case at hand." (citation modified)).

### 2. Analysis

As indicated above, the Court first considers whether the hours expended by Ms. Joppy's counsel were *reasonably* expended. *See Flitton*, 614 F.3d at 1176, Some were, some weren't. Next, the Court considers whether the hourly rates she seeks for her *six* attorneys and two paralegals are reasonable. Most are, one isn't.

### a. Hours Expended

As a preliminary matter, the Court agrees with Ms. Joppy that she has met her burden of providing evidence, in the form of time records, of the hours counsel worked on her case. *See, e.g.,* ECF No. 411 at 5; ECF No. 411-2; *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan*., 157 F.3d 1243, 1250 (10th Cir. 1998). And so, the Court may proceed, as the parties' briefs demonstrate, to analyze whether, in Ms. Joppy's words, the attorneys' hours were "necessary," ECF No. 411 at 5, or, to paraphrase the Medical Center, these records provide sufficient evidence for all the hours of billed time that Ms. Joppy seeks, *see* ECF No. 412 at 2, and whether certain tasks for which Ms. Joppy seeks fees are the result of proper "billing judgment," *id.* at 8. Overall, the Court agrees partially with both parties. Some of the hours billed were "necessary under the circumstances" of this case, *Valdez*, 66 F.4th at 836 (citation modified), whereas others do not reflect adequate billing judgment that warrant ultimate inclusion in the Court's final calculation and award of attorney fees. *See, e.g., Valdez*, 66 F.4th at 836 ("Counsel for the prevailing party must exercise 'billing judgment.'" (citation modified)); *$114,700.00*, 2023 WL

105

142257, at *2 ("A district court may reduce the hours if they are sloppy and imprecise or if they are unnecessary, irrelevant and duplicative." (citation modified)).

*First*, regarding the sufficiency of Ms. Joppy's time records, the Court agrees with the Medical Center that Ms. Joppy has not met her burden of showing that each time entry meticulously documents the specific tasks that Ms. Joppy's attorneys completed. *See* ECF No. 412 at 2; *Case*, 157 F.3d at 1250; *$114,700.00*, 2023 WL 142257, at *2. Ms. Joppy submitted a chart that is 141 pages long in support of her fee motion. *See generally* ECF No. 411-2. As the Medical Center observes, it is deficient in numerous ways. For instance, in entries dated June 4, 2025, Ms. Lisa R. Sahli, one of Ms. Joppy's attorneys, billed 1.90 hours for "Team meeting," whereas Ms. Jennifer C. Robinson, Ms. Joppy's lead counsel, reports attending the same meeting for 1.00 hour. *See* ECF No. 411-2 at 98 ("Team meeting and strategy revisions."). It would be one thing if these entries represented that one or both attorneys "attended" such a meeting so that the Court could discern if Ms. Robinson's attendance was partial—there is, after all, nothing improper about multiple attorneys attending the same meeting—or these entries described the *content* of these meetings so the Court could likewise discern if they were different meetings altogether. Or even what this "meeting" or possible meetings were about.[91] But "Team meeting" alone for two entries, with divergent hours expended, raises significant

---

[91] Not all entries about attorney meetings suffer this deficiency, underscoring the problem. *Cf.* ECF No. 411-2 at 83 ("Meeting with L. Sahli and J. Robinson *regarding the net worth issue* (.35)." (emphasis added)). In other words, that certain entries provide adequate explanation of how attorneys spent their time confirms these attorneys have the capacity to provide such explanations, and simply failed or refused to do so in other entries. *Cf. Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (affirming district court's reduction of hours where plaintiffs' "rather sloppy and imprecise time records failed to document adequately how plaintiffs' attorneys utilized large blocks of time").

evidentiary concerns. *See, e.g., AW Indus., Inc. v. Sleep Well Mattress, Inc.*, No. 07–CV–3969 (SLT) (JMA), 2009 WL 485186, at *5 (E.D.N.Y. Feb. 26, 2009) ("A party seeking a fee award must support the request with contemporaneous time records detailing, for each attorney, the date, the hours expended, and *the nature of the work done*." (citation modified)).[92]

The same concerns are raised by numerous other entries throughout Ms. Joppy's submission. Take an entry from October 30, 2021: "Factual Review." ECF No. 411-2 at 1. Or this entry from Ms. Sahli from January 27, 2023: "Legal research. *Id.* at 16.[93] And another for 9.30 hours: "Deposition review & hits." ECF No. 411-2 at 122. From August 8, 2025: "Trial prep." *Id.* at 126. Thus, while it is obvious many time entries are clear and support Ms. Joppy's fee request—for instance, in addition to certain entries mentioned

---

[92] The same entry is provided on August 8, 2025. *See* ECF No. 411-2 at 126 ("Team meeting."). Other entries from this date underscore the Court's evidentiary apprehensions. For instance, on this same date, Mr. Sanford billed 16.60 hours for itemized tasks, including telephonic conferences with witnesses, preparing witness outlines, researching hearsay issues, and practicing witness exams. *See id.* at 125. The Court can clearly tell the work that Mr. Sanford performed with sufficient specificity. Ms. Robinson's entries for this date are likewise sufficiency specific. *See id.* at 126. Notably, Mr. Sanford's entries do not indicate any "meeting" with the trial team as to any of these topics. On the same day, Mr. Liechty billed 9.60 hours for "Prepar[ing] for trial with cocounsel (9.35) [and] revis[ing] subpoenas (.25)." *Id.* Yet the length of this "preparation" with co-counsel is incongruous with the time that Ms. Sahli billed for a "team meeting"—again, without any further specification or elaboration as to the contents or topics discussed at this meeting for which Ms. Sahli billed 10.10 hours. In sum, taking the time billed by Ms. Joppy's attorneys on this one day alone, a reader can discern entries that show, as they must, how attorney time was "allowed to *specific* tasks," *Case*, 157 F.3d at 1250 (emphasis added), in contrast to others that are "sloppy and imprecise," *id.* (citation modified). For these reasons, the Court rejects Ms. Joppy's argument that the Medical Center's argument are about mere "technical quibbles" with her time entries. ECF No. 413 at 3.

[93] This entry stands in stark contrast to other *research* entries that otherwise provide the Court with sufficient information, *see, e.g., Case,* 157 F.3d at 1250, to understand the "nature of the work done," *Sleep Well Mattress,* 2009 WL 485186, at *5. *See, e.g.,* ECF No. 411-2 at 20 ("Review and analysis of Schoolcraft deposition; begin research re: Motion to Amend (Doc. 83)"). *See also id.* at 40 (specifying that "[l]egal research" was "regarding Rule 34 control of documents"); *id.* at 88 ("Legal research regarding judicial notice (.7) review motion in limine (.25) further research regarding judicial notice (1.7)"); *id.* at 93 ("Research/draft jury instructions.").

above from August 8, 2025, Ms. Robinson's entry from June 26, 2025, for "Trial Prep –
Revisions to witness examinations and opening," ECF No. 411-2 at 104—the Court
cannot conclude that Ms. Joppy has provided sufficient evidence showing that "*all* of the
recorded hours were hours reasonably expended for purposes of awarding fees in this
case." *Johnson v. City of Tulsa*, No. 94–CV–39–H(M), 2003 WL 24015152, at *3 (N.D.
Okla. Aug. 29, 2003) (emphasis added). The Court agrees fundamentally with the Medical
Center that Ms. Joppy's time entries suffer "basic failures of proof," ECF No. 412 at 4,
that do not "sufficiently allow the Court to determine the time allotted by her attorneys to
specific tasks and the reasonableness of that time," *id.* at 6 (citation modified).[94]

To the extent that the Medical Center challenges the entirety of Ms. Joppy's
request for fees that attend Ms. Sherrod, her disclosed expert, *see* ECF No. 412 at 9, the
Court agrees that exclusion of time entries that attend preparation and analysis of Ms.
Sherrod's report and proffer is proper. The Court excluded Ms. Sherrod's report and
testimony before trial. *See, e.g.,* ECF No. 290. To be sure, some authority supports the
Medical Center's position that time spent preparing Ms. Sherrod's report, which was
ultimately excluded, may be deducted from the reasonable hours expended in litigating
Ms. Joppy's case *solely* on the basis that it was excluded. *See, e.g., J.S. Nicol, Inc. v.
Peking Handicraft, Inc.*, No. 03 Civ. 1548(GHDAJP), 2008 WL 4613752, at *13 (S.D.N.Y.

---

[94] To the extent that the Medical Center challenges entries that engage in "block-billing," *see, e.g., id.*, the Court declines to apply a *per se* rule that this practice is improper, instead faulting certain "block-billed" entries for their overall failure to adequately specify the tasks performed by Ms. Joppy's attorneys. *See, e.g.,* Hendricks v. Alum Fin., LLC, No. 21–cv–00798 MV/JFR, 2026 WL 1180049, at *22 (D.N.M. Apr. 30, 2026), *report and recommendation adopted*, No. 21–cv–00798 MV/JFR, 2026 WL 1495347 (D.N.M. May 28, 2026) ("However, there is no per se prohibition on block billing; it is not a definite basis to deny an attorney's fee award request. Rather, the question is whether the entries are sufficiently detailed to allow the Court to determine if the hours claimed are reasonable." (citation modified)); ECF No. 413 at 4.

Oct. 17, 2008) (citation modified); *Anderson v. City of New York*, 132 F. Supp. 2d 239, 244 (S.D.N.Y. 2001). But those same authorities acknowledge that "courts have wide latitude in determining what constitutes reasonable attorney's fees." *J.S. Nicol*, 2008 WL 4613752, at *13 n.39 (citation modified). And exercising the Court's discretion, the Court concludes that it is proper to deduct hours expended regarding Ms. Sherrod not simply because the Court *excluded* her testimony, but because Ms. Joppy's efforts to bring in Ms. Sherrod's opinions as an expert were fundamentally frivolous. As the Court explained when ruling on the exclusion motion regarding Dr. Sherrod at the June 7, 2024, hearing: "There's no discernible methodology. What she's doing is rubber stamping a complaint, and that simply is not the purpose of expert testimony, so that can't come in." ECF No. 276 at 55. And in the Court's order regarding Ms. Joppy's proffer following its exclusion ruling, the Court excluded Ms. Sherrod's amended report *in full* because "Ms. Sherrod still fail[ed] to apply *any* methodology or base her opinions (if any) on *any* facts, instead asking the Court to take her word for it." ECF No. 290 at 5 (emphases added). Thus, while Ms. Joppy ultimately succeeded on her claims at trial, *see, e.g., Latta v. Otter*, No. 1:13–cv–00482–CWD, 2014 WL 7245631, at *7 (D. Idaho Dec. 19, 2014), this does not mean she may claim time for frivolous work. *See, e.g., Bishop v. Smith*, 112 F. Supp. 3d 1231, 1243 (N.D. Okla. 2015) ("Within the Tenth Circuit, district courts have discretion to strike hours spent on unsuccessful motions from the lodestar calculations but generally do so only if the motion was frivolous or caused by counsel's own conduct." (citation modified)). However, the same reasoning does *not* apply to Dr. Chambers, whose absence from trial is not attributable to a court order excluding her or her testimony, or the frivolity of any

litigation position taken by Ms. Joppy. *Cf. Est. of Bryant v. Cummens*, No. 11 C 1345, 2018 WL 5109688, at *4 (N.D. Ill. Oct. 16, 2018) ("It is not uncommon that a party plans and prepares to call witnesses that it does not end up calling to testify at trial. The Court does not believe [the] attorneys' fees should be reduced for the attorneys' prudent decision not to call certain witnesses at trial." (citation modified)).

The Medical Center relatedly seeks to exclude all time that Ms. Joppy spent preparing her own Rule 702 motions that were ultimately unsuccessful. *Cf.* ECF No. 413 at 7. But the Court's analysis of Ms. Joppy's own motions is the substantially similar, insofar as the Court asks whether her exclusion motions, although unsuccessful in striking the Medical Center's experts, were "frivolous or caused by counsel's own conduct." *Bishop*, 112 F. Supp. 3d at 1243. *See also id.* ("Within the Tenth Circuit, district courts have discretion to strike hours spent on unsuccessful motions from the lodestar calculations but generally do so only if the motion was frivolous or caused by counsel's own conduct." (citation modified)). And there is nothing to indicate that Ms. Joppy's own exclusion motions were frivolous. Accordingly, the Court declines to categorically strike all time that Ms. Joppy's attorneys spent on her Rule 702 motions solely because they were denied. *Cf.* ECF No. 270. That certain time entries attendant to those motions and the Court's hearing on them are insufficiently specific as a matter of billing judgment is another matter entirely. *See* ECF No. 411-2 at 60 (billing "7.00" hours for "Rule 702 hearing prep").

In sum, many entries in Ms. Joppy's 141-page submission are reasonable insofar as they "reveal [how] hours were allotted to specific tasks" related to the litigation of Ms.

Joppy's claims. *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (citation modified). In other words, many entries document "adequately how [attorneys] utilized large blocks of time." *Case*, 157 F.3d at 1250 (citation modified). In addition to those discussed above, the Court also draws attention to many that concern, for example, Ms. Robinson's time, which explicitly set forth the time spent preparing for depositions, *see, e.g.,* ECF No. 411-2 at 10, performing specific legal research and writing tasks, such as drafting the response to the Medical Center's summary judgment motion, *see id.* at 64, and from one entry: "Review depositions; continue witness examination outlines and related jury instructions," *id.* at 106. These are adequate time entries.[95]

But not all entries are similarly—or sufficiently—specific. And Ms. Joppy's representation that her attorneys "reviewed their time entries and exercised billing judgment," ECF No. 411 at 5, and even eliminated some time entries before filing their motion, *id.* at 6, does not mean that the entries they *did* submit and for which they seek compensation are immune from judicial scrutiny.[96] This case may have been, in Ms. Joppy's words, "hard-fought," ECF No. 411 at 8, but the nature of litigation does not change the nature of time entries that attorneys must submit, *see, e.g., Case*, 157 F.3d at 1250 ("Counsel for the party claiming the fees has the burden of proving hours to the

---

[95] The Court notes, however, that not all of Ms. Robinson's entries provide the requisite specificity for the Court in its *reasonable hour* analysis: "Case analysis for trial and review deadlines/*things to do* and opening statement." ECF No. 411-2 at 66. The Court is left without any indication of what "things" were done based on this entry.

[96] For example, the Court acknowledges that Ms. Robinson deducted hours regarding her unsuccessful malicious prosecution claim before submitting her fee motion. *See, e.g.,* ECF No. 411 at 6; ECF No. 411-1 at 8; *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1207 (10th Cir. 2015); *Hensley*, 461 U.S. at 435; ECF No. 411-2 at 64 (striking through entry for "revise mal pro response brief (2.4)").

111

district court by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks." (citation modified)).

Accordingly, upon review of Ms. Joppy's evidentiary submissions, the Court exercises its discretion to reduce Ms. Joppy's fee award due to the "defect in hours claimed." *Valdez*, 66 F.4th at 842 (citation modified). As explained further below, due to these deficiencies the Court exercises its discretion to reduce her fee award by 25% across the board. *Id.* ("[A] district court may reduce a requested lodestar as one means to compensate for partial success and *defects in hours claimed*." (citation modified)). At bottom, Ms. Joppy's time entries do not permit the Court to conclude that every hour expended was reasonable.[97]

### b. Hourly Rates

As a preliminary matter, the Medical Center does not contest the hourly rates of Ms. Shali, Mr. Liechty, or Ms. Sanford. *See* ECF No. 412 at 15 n.9. Accordingly, the Court devotes its *hourly rate* analysis to Ms. Robinson, Mr. Sanford, and "all paralegals," *id.* at 412, each of whom the Medical Center contend request hourly rates that exceed the hourly rate for what the "Denver market supports in other civil rights cases," *id.* Ms. Joppy contends that the hourly rates for these attorneys are reasonable, and consistent with rates in the relevant market. *See, e.g.,* ECF No. 411 at 10. The Court considers the fee request of these attorneys and paralegals in turn.

---

[97] The Court's conclusion is bolstered by the fact that *five* attorneys worked on this case. As explained further below, this was a relatively straightforward employment discrimination case. The Court agrees with the Medical Center that five attorney timekeepers for a case of this nature further supports a fee reduction of this size. *See* ECF No. 412 at 12.

Recall that in assessing the reasonableness of an attorney's hourly rate, courts consider the "prevailing market rate in the relevant community." *Lippoldt*, 468 F.3d at 1224 (citation modified). A court "should base its hourly rate award on what the evidence shows the market commands for civil rights or analogous litigation." *Case*, 157 F.3d at 1255 (citation modified). And in this case, the relevant market for calculating attorneys' hourly rates is Denver, Colorado. *See, e.g., Aptive Env't, LLC v. Town of Castle Rock, Colorado*, No. 17–cv–01545–MSK–MJW, 2018 WL 10231677, at *1 (D. Colo. Oct. 22, 2018).

### i.    Ms. Robinson

The Medical Center's argument, developed over a page in its response brief, is that Ms. Robinson's requested hourly rate of $720.00, *see* ECF No. 411 at 9, is inconsistent with hourly rates of other civil rights attorneys in the Denver market with comparable experience, *see* ECF No. 412 at 15. But market evidence supports Ms. Robinson's $720.00 hourly rate. Attorney Darold Killmer, a civil rights attorney in the Denver market who has practiced law for over thirty years, charges an hourly rate of $750.00. *See* ECF No. 411-10 at 5. As of January 1, 2026, Attorney John Culver, who has practiced civil rights litigation in the Denver area for a comparable length of time, charges at least $650.00 per hour. *See* ECF No. 411-11 at 6. Attorney Stephanie K. Wood, who currently practices at a Denver-based law firm with a specialty in employment and civil rights litigation, has practiced with a billing rate that "has exceeded $700 per hour." ECF No. 411-13 at 3. Attorney Ben Lebsack declares that Ms. Robinson's requested rate, based on his own experience in the Denver market, is reasonable relative

to attorneys with comparable experience in employment cases. *See* ECF No. 411-12 at 5.

Declarations from these attorneys constitute market evidence from which the Court may determine the reasonableness of Ms. Robinson's hourly rate. *See, e.g., Case*, 157 F.3d at 1256 ("Such evidence includes affidavits submitted by the parties and other reliable evidence of local market rates for civil rights litigation at the time fees are awarded."). Notably, the Medical Center does not put forward any market evidence that challenges the declarations of these attorneys, arguing instead that Ms. Robinson's rate is inconsistent with them. *Cf* ECF No. 412 at 15; *$114,700.00*, 2023 WL 142257, at *4. However, Ms. Robinson's rate is consistent with the rates set forth by the attorneys in these declarations submitted in support of the fee motion, and it does not exceed them in a manner that renders her rate unreasonable.

Accordingly, market evidence supports the reasonableness of Ms. Robinson's $720.00 hourly rate, which is consistent with hourly rates charged by civil rights attorneys of comparable skill and experience in the Denver market. *See also Ellis*, 163 F.3d at 1203; *Valdez*, 66 F.4th at 841 (observing determination that attorney rates were reasonable "had adequate factual support in the record" (citation modified)).

### ii.    Mr. Sanford

Mr. Sanford, who seeks an hourly rate of $1,000.00, is another matter entirely. Recall the market evidence, recited above, from experienced Denver civil rights and employment attorneys that establishes their hourly rates range from approximately $650–$750 per hour. Notwithstanding the excessiveness of his request relative to this market

evidence, Mr. Sanford premises his request largely on a fee award he received in California Superior Court. *See* ECF No. 411-6 at 7 ("On April 9, 2025, the Superior Court of California, County of Los Angeles, awarded fees for me at an hourly rate of $900 . . . after submitting a rate of $1,000."). The Court discerns no reason to apply an hourly rate award in Los Angeles, California to an entirely different market—Denver, Colorado—particularly where that materially different market did not award Mr. Sanford the $1,000 rate he sought then and seeks now. While Mr. Sanford may have decades of experience litigating civil rights cases "primarily in Dallas, [but also] throughout Texas, and in Oklahoma, Georgia, Louisiana, Arkansas, Tennessee, Indiana, Nevada, California, and New York, *id.* at 4, the Court must ask whether his request is reasonable relative to attorneys of comparable skill and experience in *this market*, *see, e.g., Lippoldt*, 468 F.3d at 1224. And the Court agrees with the Medical Center that Ms. Joppy's own market evidence belies Mr. Sanford's request for a $1,000.00 hourly rate. *See* ECF No. 412 at 15.[98]

For these reasons, the Court agrees with the Medical Center that Mr. Sanford's hourly rate must be reduced. Reduction of his rate to the outermost limit of the market evidence for hourly rates of attorneys of comparable skill and experience in *this market*, $750.00, is appropriate. *See, e.g., Thornton v. Kaplan*, 958 F. Supp. 507, 510 (D. Colo.

---

[98] For this reason, Ms. Joppy's argument that "none of [her] out-of-town counsel seek anything but Denver rates" borders on fabrication. ECF No. 411 at 9 (citation modified). And her effort to analogize Mr. Sanford's hourly rate to "defense counsel," ECF No. 411-10 at 7, falls flat, given that the Court's analysis looks to "prevailing market rate for *similar services* by lawyers of reasonably comparable skill, *experience*, and reputation in the relevant community including "experience in civil rights or *analogous litigation*." *Valdez*, 66 F.4th at 836 (citation modified); *Smith v. Bd. of Cnty. Commissioners for Cnty. of Chaves, New Mexico*, No. 1:09–cv–26 LH/DJS, 2011 WL 13282116, at *2 (D.N.M. Nov. 29, 2011) ("The Court is familiar with the rates attorneys customarily charge in this District for *comparable services*." (emphasis added)).

1996) (finding that hourly rate was "excessive" where it "[did] not reflect prevailing market rates in the relevant community").

### iii.    Paralegals

The paralegals whose hourly rates the Medical Center challenges are Mses. Gwen Burton and Leah Robinson. *See, e.g.,* ECF No. 411 at 10. They recite their hourly rates at $220.00 and $180.00, respectively. *See id.* The Medical Center challenges these rates as inconsistent with the market rate, and seeks their reduction to "no more than $200." ECF No. 412 at 14.[99]

The Court disagrees that these rates are improper. As with their challenge to the hourly rates for Ms. Joppy's attorneys, the Medical Center puts forward no evidence that challenges the hourly rates for Mses. Burton and Robinson. *See* ECF No. 412 at 15. Compounding this is the fact that the Medical Center's challenge almost entirely concerns the hourly rates of Ms. Robinson and Mr. Sanford. *See id.* In any event, Mr. Lebsack declared that, based on his experience, the rates for Ms. Burton and Ms. Robinson were reasonable, *see* ECF No. 411-12 at 6, and these rates fall under paralegal rates that courts in this judicial district have approved as reasonable in fee analyses, *see, e.g., Interstate Restoration, LLC v. Marriott Int'l, Inc.*, No. 21–cv–01380–NYW–JPO, 2024 WL 4661345, at *7 (D. Colo. Oct. 31, 2024), *appeal dismissed*, No. 24–1127, 2025 WL 1727520 (10th Cir. June 20, 2025) ("Indeed, in this District, courts have approved

---

[99] On its face, the Medical Center's challenge would only address Ms. Burton's rate, given that Ms. Robinson's rate of $180.00 falls *below* the $200.00 whose application the Medical Center urges, tantamount to conceding its reasonableness. Regardless, as explained below the hourly rate for both paralegals is permissible and supported by market evidence.

paralegal rates of $225 per hour." (citation modified)). Therefore, the Court rejects the Medical Center's challenge to the hourly rates of Ms. Burton and Ms. Robinson.

* * *

Consistent with the above analysis, the Court concludes that the hourly rates sought by Ms. Joppy for her attorneys and paralegals—except for Mr. Sanford—are consistent with market evidence. Mr. Sanford's requested hourly rate of $1,000.00 is excessive and is reduced to $750.00.

Having determined the hourly rate of these attorneys and paralegals, the Court must now calculate the lodestar amount for Ms. Joppy, bearing in mind the numerous deficiencies in the evidence showing the "hours expended" in this case. *$114,700.00*, 2023 WL 142257, at *2 (citation modified). Before making any reductions based on the deficiencies that attend the *hours expended*, the Court notes that Ms. Joppy's lodestar amount is $2,646,055.00, which is her requested lodestar amount with the reduction taken from Mr. Sanford's reduced *hourly rate*.

From here, and in light of the deficiencies in Ms. Joppy's time entries tracking her hours expended, the Court may in its discretion apply an across-the-board percentage-based reduction to this lodestar amount. It exercises its discretion to do so. *See id.* at *5 ("Rather than scour the time sheets for all the instances of non-legal work, the court validly applied a 7% reduction. The 25% fee reduction for partial success and non-legal work was appropriate." (citation modified)); *Valdez*, 66 F.4th at 842 ("[A] district court may reduce a requested lodestar as one means to compensate for partial success and *defects in hours claimed*." (citation modified)); *Latin v. Bellio Trucking, Inc.*, 720 F. App'x 908, 911

117

(10th Cir. 2017). A 25% fee reduction is proper. While the Court agrees with Ms. Joppy that she prevailed at trial on her claims, *see* ECF No. 411 at 13, her time entries that attend this success and the course of litigation do not permit the Court to conclude that every hour expended was reasonable due to her attorneys' failures to adequately set forth the work performed.[100]

In light of this reduction, Ms. Joppy's ultimate lodestar calculation is $1,984,541.25 as to work in this case performed prior to the filing of her reply in support of her fee motion. The Court agrees with Ms. Joppy that she may seek fees in connection with preparing her reply brief. *See, e.g., King v. Torres*, No. 07–cv–01021–WYD, 2008 WL 1883555, at *4 (D. Colo. Apr. 25, 2008). The work performed by counsel on the reply brief was sufficiently documented in the declarations submitted with the reply brief. *See* ECF No. 413-1; ECF No. 413-2. Each time entry sets forth the specific tasks that Ms. Robinson and Mr. McKnight performed in preparing the reply brief, and "adequately [document] how [they] utilized large blocks of time," *Jane L.*, 61 F.3d at 1510. And the Court has already concluded that the hourly rates for Ms. Robinson and Mr. McKnight are reasonable. Accordingly, the Court awards $18,456 to Ms. Joppy in attorney fees for work conducted in preparing the reply brief in support of her fee motion.

### c. Costs

Finally, Ms. Joppy seeks $33,283.58 in nontaxable "litigation expenses," ECF No. 413-1 at 3, for copies, court transcripts, expert related expenses, expenses related to

---

[100] The Court's decision to apply a percentage-based reduction is further supported by the Court's conclusion that, as a matter of *costs*, expenses that attend Ms. Joppy's focus groups are unrecoverable. This conclusion is further explained below. But it certainly follows that where such costs are unrecoverable, hours spent at such focus groups are themselves unreasonable.

"focus groups and mock trials, PACER fees, delivery fees, and expenses that attend travel. *See generally* ECF No. 411-8. The Medical Center argues that her "requested non-taxable costs must be denied." ECF No. 412 at 15. The Court concludes that Ms. Joppy may recover some, but not all, of the expenses that she seeks. *See generally* ECF No. 411-8.

Courts may award nontaxable, "additional costs" and expenses to a prevailing party beyond taxable costs awarded under 28 U.S.C. § 1920. *See Valdez*, 66 F.4th at 838. "To recover other out-of-pocket expenses" beyond those taxable under § 1920, "the prevailing party in a civil rights case must separately file a motion to collect attorney's fees and related nontaxable expenses, which are awarded under 42 U.S.C. § 1988." *Id.* at 837. "[O]ther out-of-pocket expenses incurred during litigation may be awarded as attorneys fees under § 1988 if (1) the expenses are not absorbed as part of law firm overhead but are normally billed to a private client, and (2) the expenses are reasonable." *Jane L.*, 61 F.3d at 1517 (citation modified).

*First*, regarding Ms. Joppy's *copies* request for $51.51, these are not previously taxed costs. *Compare* ECF No. 395, *with* ECF No. 411-8 at 1. Evidence in the record demonstrates that these costs were necessary for this case's prosecution, *see* ECF No. 411-1 at 9, and moreover the Medical Center does not meaningfully contest that an award of *copy* costs is improper, *cf.* ECF No. 412 at 15. Accordingly, awarding Ms. Joppy her requested $51.51 in copy costs is proper, particularly where the relatively minor sum of these costs is certainly reasonable in the context of this litigation. *See, e.g., Jane L.*, 61

F.3d at 1517; *Copar Pumice Co. v. Morris*, No. CIV 07–0079 JB/ACT, 2012 WL 2383667,

at *28 n.12 (D.N.M. June 13, 2012).

*Second*, regarding Ms. Joppy's *court transcripts* request for $1,491.60, the Medical

Center does not argue that these costs are part of the previously taxed court reporter

fees, *see* ECF No. 395. Moreover, as with Ms. Joppy's *copies* request, the Medical Center

does not meaningfully contest that an award of these costs is improper. *See* ECF No. 412

at 16. Accordingly, and given the nature of this expense, awarding Ms. Joppy her request

$1,491.60 in *court transcripts* costs is proper, particularly where this amount is reasonable

and such an expense was reasonably necessary. *See, e.g., O Centro Espirita*

*Beneficente Uniao Do Vegetal in U.S. v. Duke*, 343 F. Supp. 3d 1050, 1100 (D.N.M.

2018); *Martinez v. Thompson*, Civ. No. 9:04–cv–0440–DEP, 2008 WL 5157395, at *17

(N.D.N.Y. Dec. 8, 2008) (finding "the expense associated with obtaining a copy of the trial

transcript is compensable under section 1988" (citation modified)); *Marroquin v.*

*Unidentified LAPD Officer*, No. 2:21–cv–07607–RGK–JEM, 2023 WL 8143670, at *2

(C.D. Cal. Oct. 3, 2023).

*Third*, regarding Ms. Joppy's *expert* costs for Mses. Chambers and Sherrod that

total $9,475.00, ECF No. 411-8 at 1, the Medical Center argues these must be denied,

*see* ECF No. 412 at 15, because Ms. Sherrod was excluded as a witness and Ms.

Chambers did not testify at trial, *see id.* at 9. The Court agrees with the Medical Center

as to the $2,825.00 expenses related to Dr. Sherrod. Her testimony would not have been

reasonably necessary at trial, as explained above and in the Court's prior exclusion and

proffer orders. *See Alpine Bank v. Hubbell*, No. 05–cv–00026–EWN–PAC, 2006 WL

8438572, at *4 (D. Colo. Nov. 3, 2006) ("However, reasonable expert witness fees are recoverable under section 1988, if a court concludes that the expert testimony was *reasonably necessary*." (citation modified)). Yet Dr. Chambers does not suffer the same deficiencies, and thus the $6,650.00 in costs that attend Dr. Chambers are recoverable.[101]

Regarding the "Miscellaneous," ECF No. 411-8 at 3, $14,800.00 expense for Hollynd Hoskins, *id.* at 4, the Court notes that Ms. Joppy makes the following admission in her reply brief: "Ms. Hoskins was disclosed as a *fact witness* and provided invaluable information on the medical aspects of the case." ECF No. 413 at 10–11 (emphasis added); *id.* at 7 ("[S]he was never disclosed as an expert . . . and she appeared on the Final Pretrial Order as a potential non-expert witness."). *See also* ECF No. 412 at 11 (observing Ms. Hoskins was not disclosed as an expert witness); ECF No. 320 at 13. Section 1988 does not appear to contemplate costs regarding *fact* witness expenses. *Cf. Casias v. Dep't of Corr.*, No. 1:16–cv–00056–JMC–SCY, 2019 WL 2881007, at *6 (D.N.M. July 3, 2019) ("[C]ourts [may] award *expert witness fees* to prevailing parties in civil rights actions under 42 U.S.C. § 1981." (citation modified)). Regardless, although Ms. Joppy provides an itemized receipt of Ms. Hoskins's bill, *see* ECF No. 411-9 at 42, there is insufficient evidence in the record from which the Court can conclude that Ms. Hoskins would provide any testimony that was or would have been *reasonably necessary*, *see,*

---

[101] The Medical Center's arguments at the Court's June 7, 2024, hearing bolster this point, where counsel for the Medical Center stated, "I won't put words in the plaintiff's mouth, but their nursing expert Dr. Chambers certainly speaks to that point. Dr. Chambers takes issue with several statements that relate to the patient's treatment, standard of care, including whether or not there was pain or possibility of pain." ECF No. 276 at 15.

*e.g., Alpine Bank*, 2006 WL 8438572, at \*4. Accordingly, Ms. Joppy is not entitled to the $14,880.00 in expenses related to Ms. Hoskins.

*Fourth*, the Medical Center challenges the $620.28 in "local" travel costs for "Taxis, Mileage, and Parking" that Ms. Joppy seeks, ECF No. 411-8 at 3, as well as the costs for counsel's out-of-state travel, *id.* at 3, that total $8,823.06. In reply, Ms. Joppy withdraws her request for these $8,823.06 out-of-state travel costs, *see* ECF No. 413 at 11, and clarifies that she seeks only "in-town" travel costs, *id.* The Court concludes that the "in-town" travel for a local attorney, Ms. Sahli, set forth in Ms. Joppy's evidentiary submissions are recoverable, particularly where the record indicates that these expenses were reasonably incurred over the course of this case, and evidence shows that such expenses are typically billed to a fee-paying client. *See, e.g.,* ECF No. 411-4 at 3; *Summers v. Adams*, No. CA3:08–2265–CMC, 2010 WL 2179571, at \*5 (D.S.C. May 26, 2010) ("Travel to . . . appear before the court fall[s] well within the definition of 'necessary travel.'" (citation modified)); *Hodges v. Sch. Bd. of Orange Cnty., Fla*., No. 6:11–cv–135–ORL–36, 2014 WL 6455436, at \*15 (M.D. Fla. Nov. 13, 2014); *Utah Physicians for a Healthy Env't, Inc. v. Diesel Power Gear, LLC*, No. 2:17–cv–00032–RJS, 2021 WL 254268, at \*21 (D. Utah Jan. 26, 2021) ("These expenses are reasonable and normally charged to a client." (citation modified)).[102]

---

[102] The Court likewise awards costs for the expenses incurred by Ms. Joppy's out-of-town attorneys to travel *within* Colorado upon their arrival. *See, e.g.,* ECF No. 411-8 at 2–3; *Utah Physicians*, 2021 WL 254268, at \*21 ("[The Court] credits [the plaintiff] expenses for travel *within Utah*." (citation modified)); *Ramos v. Lamm*, 713 F.2d 546, 559 (10th Cir. 1983) ("[W]e do not think travel expenses for such counsel between their offices *and the city* in which the litigation is conducted should be reimburse." (citation modified)).

*Finally*, the Court addresses the propriety of the remaining costs that Ms. Joppy seeks, notwithstanding the Medical Center's apparent non-opposition to them. *Cf.* ECF no. 412 at 15–16; *Simmons v. City of Philadelphia*, No. CIV. A. 99–4204, 2001 WL 15958, at *1 n.1 (E.D. Pa. Jan. 4, 2001) (observing that "[w]hile defendant has lodged no objection to the reasonableness of plaintiff's fees, the [c]ourt has an independent duty under § 1988 to assess the reasonableness of the fees sought by plaintiff" and also analyzing request for costs).

Respectfully, regarding Ms. Joppy's $6,600.00 total expenses for "focus groups and mock trials," ECF No. 411-8 at 1, these are not reasonable "for § 1988 purposes." *Rivera v. Smith's Food & Drug Centers*, No. CIV 05–1049 RB/ACT, 2007 WL 9733646, at *7 (D.N.M. Aug. 14, 2007). This was a relatively straightforward employment discrimination case involving two claims brought by one plaintiff against one defendant, where certain legal and factual issues—such as the matter of any hostile work and environment and any economic damages Ms. Joppy may have incurred—were not at issue during this trial.[103] Simply stated, this case did not rise to the level of complexity otherwise justifying the focus group and mock trial expenditures that Ms. Joppy now seeks under § 1988. *See id.* (contrasting cases with numerous plaintiffs and defendants with "various statutory and constitutional claims" from the plaintiff's "relatively straightforward" Title VII claims in denying focus group expenses and concluding that "a focus group was [not] at all necessary to this lawsuit" (citation modified)); *Vitullo v.*

---

[103] Ms. Joppy argues otherwise in resisting the Medical Center's challenge to certain time entries. *See* ECF No. 413 at 9. She fails to persuade. That this case involved a "substantial factual record" and numerous exhibits does not change its fundamental nature, which fails to justify her focus group and mock trial expenditures.

123

*Borough of Yeadon*, No. CIV 04–3929, 2006 WL 1789031, at *4 (E.D. Pa. June 21, 2006)

("Plaintiff presented a straight-forward reverse discrimination claim. The evidence

consisted of both direct and circumstantial evidence of discrimination. However, nothing

about the case was novel or complicated. Under the circumstances, we do not believe

the use of a focus group was reasonable or warranted."); *United Steelworkers of Am.,*

*Loc. 4776 v. Phelps Dodge Corp.*, 944 F.2d 910 (9th Cir. 1991) (Table) (affirming district

court's conclusion that "expenses for a mock trial were not warranted" because

"disallowance of such expenses was not an abuse of discretion").

Regarding Ms. Joppy's $109.00 PACER expenses, *see* ECF No. 411-8 at 2, these

are recoverable under § 1988 in this case, where these expenses are "de minimis" and

Ms. Joppy's attorneys have stated that they "normally charges clients for these items."

*Thomas v. Reeves*, No. 3:18–cv–441–CWR–FKB, 2021 WL 517038, at *13 (S.D. Miss.

Feb. 11, 2021). *See also* ECF No. 411-4 at 3. While the Court notes its obligation to

examine all expense requests submitted by Ms. Joppy, *see Simmons*, 2001 WL 15958,

at *1 n.1, its conclusion here is bolstered by the Medical Center's failure to put forth any

evidence or argument that firms in the area do not normally charge for such expenses at

a de minimis amount. Ms. Joppy's request for $56.19 in FedEx expenses, which are

essentially de minimis currier and postage expenses, are likewise recoverable. *See, e.g.,*

*Sussman v. Patterson*, 108 F.3d 1206, 1213 (10th Cir. 1997) ("[W]e are unpersuaded by

the challenge that defendants make to the imposition of cost items such as photocopying,

mileage, meals, and *postage*." (emphasis added)); *Am. Charities for Reasonable*

*Fundraising Regul., Inc. v. Pinellas Cnty.*, 278 F. Supp. 2d 1301, 1328 (M.D. Fla. 2003)

(concluding that where plaintiffs sought reimbursement for "postage, facsimiles, Federal Express, and courier services" that these "types of litigation expenses are recoverable as part of an attorneys' fee award under § 1988" (citation modified)).

* * *

Consistent with the above analysis, the Court grants in part and denies in part Ms. Joppy's request for "nontaxable litigation expenses," ECF No. 411 at 14, under § 1988. The Court awards the following expenses: $51.51 in copy expenses; $1,491.60 in court transcript expenses; $6,650.00 in expert-related expenses for Dr. Chambers; $109.00 in PACER expenses; $56.19 in FedEx delivery expenses; and $620.28 in "in-town" travel expenses. The total amount of these allowable expenses is $8,978.58.

### d. Post-Judgment Interest

Ms. Joppy also asks the Court to "award post-judgment interest on the award of fees and costs." ECF No. 411 at 15 (citation modified). However, the Court agrees with the Medical Center that this request is premature. *See* ECF No. 412 at 16. The judgment for Ms. Joppy's fee award has not yet been "included in the final merits judgment." *MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/Am. Exp., Inc.*, 962 F.2d 1470, 1476 (10th Cir. 1992) (citation modified); *Kelley v. City of Albuquerque*, No. CIV–03–507 JB/ACT, 2006 WL 1305038, at *3 (D.N.M. Apr. 12, 2006) ("In the case of attorney's fees and costs, post-judgment interest begins to accrue when the fees and costs are *quantified and reduced to a judgment*, not from the date in which the district court enters a merits judgment." (citation modified)). Thus, her request for an award of post-judgment interest on her fee and cost award is denied.

125

### III.    CONCLUSION

Consistent with the above analysis, the Medical Center's Opposed Renewed Motion for Judgment as a Matter of Law, Or in the Alternative, Motion for a New Trial, Remittitur, and Review of the Damages Award, ECF No. 402, is GRANTED IN PART and DENIED IN PART. The Court affirms the jury's compensatory damages award of $5,000,000. The Court grants the Medical Center's remittitur request, and reduces the jury's punitive damages award to $2,500,000. Ms. Joppy may consent to the remittitur. Should she decline to accept the reduced punitive damages award, a new trial will be held. *See, e.g., Cont'l Trend Res., Inc. v. OXY USA Inc*., 101 F.3d 634, 643 (10th Cir. 1996); *Perkins v. Fed. Fruit & Produce Co*., No. 11–cv–00542–JAP–KLM, 2013 WL 2112425, at *9 (D. Colo. May 14, 2013).

Ms. Joppy's Motion for Reasonable Fees and Related Non-Taxable Expenses, ECF No. 411, is GRANTED IN PART and DENIED IN PART. Ms. Joppy is entitled to an award of attorney fees in the amount of $2,002,997.25. She is entitled to an award of nontaxable costs in the amount of $8,978.58.

DATED this 14th day of August 2026.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

126